# EXHIBIT C

Dan Stormer, Esq. [S.B. #101967]
Cindy Pánuco, Esq. [S.B. #266921]
HADSELL STORMER & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 585-9600/Fax:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
            cpanuco@hadsellstormer.com

Joshua Piovia-Scott, Esq. [S.B. #222364]
Lori Rifkin, Esq. [S.B. # 244081]
HADSELL STORMER & RENICK LLP
4300 Horton Street, #15
Emeryville, CA 94608
Tel: (626) 585-9600/Fax:  (626) 577-7079
Emails: jps@hadsellstormer.com
            lrifkin@hadsellstormer.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF MARK VASQUEZ PAJAS, SR., deceased, by and through ROSEMARY LOPEZ, as Administrator; ROSEMARY LOPEZ; YVETTE PAJAS; MARK PAJAS, JR.; JANEL PAJAS; XAVIER PAJAS,<br><br>                    Plaintiffs,<br><br>vs.<br><br>COUNTY OF MONTEREY; SHERIFF STEVE BERNAL, in his individual and official capacity; CALIFORNIA FORENSIC MEDICAL GROUP; CHRISTINA KAUPP; and DOES 1-20,<br><br>                    Defendants. | Case No.: 16-CV-00945-BLF<br><br>[Assigned to the Honorable Beth Labson Freeman – Courtroom 3]<br><br>**PLAINTIFFS' INITIAL DISCLOSURE OF EXPERT TESTIMONY FRCP 26 (a)(2)(A)-(D)**<br><br>Complaint filed:          February 25, 2016<br>Discovery Cut-Off:      July 28, 2017<br>Motion Cut-Off:         June 28, 2018<br>Trial Date:                 January 28, 2019 |

1    **TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

2        **PLEASE TAKE NOTICE** that pursuant to Federal Rule of Civil Procedure 26 (a)(2)(A)-(D),

3    and the scheduling order issued by the Court in this case, Plaintiffs hereby serve their expert witness

4    disclosures as follows:

5                                    **RETAINED EXPERTS**

6        1.    Larissa J. Mooney, M.D., UCLA Integrated Substance Abuse Programs, David Geffen

7    School of Medicine, Semel Institute for Neuroscience and Human Behavior, 11075 Santa Monica Blvd.,

8    Ste. 200, Los Angeles, CA 90025.

9        Attached hereto as Exhibit 1 is the initial report of Larissa J. Mooney, M.D., as well as her current

10   curriculum vitae, testimonial record and fee schedule, including fees for deposition and trial testimony.

11       2.    Marc F. Stern, M.D., 1100 Surrey Trace Drive, SE, Tumwater, WA 98501.

12       Attached hereto as Exhibit 2 is the initial report of Marc F. Stern, M.D., as well as his current

13   curriculum vitae, testimonial record and fee schedule, including fees for deposition and trial testimony.

14

15   Dated: September 26, 2017            Respectfully Submitted,

16                                        HADSELL STORMER & RENICK LLP

17

18                                        By: _____

19                                            Dan Stormer
20                                            Joshua Piovia-Scott
                                             Lori Rifkin
21                                           Cindy Pánuco
22                                        Attorneys for Plaintiffs

23

24

25

26

27

28

PLAINTIFFS' DESIGNATION OF                      -1-                                          2
EXPERT WITNESSES

Exh. 1
3

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                    UCLA

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO          SANTA BARBARA · SANTA CRUZ

UCLA Integrated Substance Abuse Programs (ISAP)
Department of Psychiatry and Biobehavioral Sciences
David Geffen School of Medicine at UCLA
11075 Sepulveda Blvd., Suite 200
Los Angeles, CA 90025-7535
(310) 267-5419, Fax (310) 473-7885

September 26, 2017

Cindy Pánuco, J.D. and Lori Rifkin, J.D.
Hadsell Stormer & Renick LLP
128 N Fair Oaks Ave #204
Pasadena, CA 91103
Ph 415-685-3591

Dear Ms. Pánuco and Rifkin,

    I am writing to provide expert review and opinions on the case of *Pajas v. County of Monterey,* focusing on the issues of social, psychological, and physical effects of addiction and the ability of substance users to maintain quality interpersonal relationships. I have reviewed the following materials to date regarding this case: 1) records from the Monterey County Jail and Sheriff's office, 2) autopsy report, 3) CFMG medical records, 4) Natividad Medical Records, 5) King City Arrest Report, 6) First Amended and Operative Complaint, 7) County Jail policy documents, and 8) Order Granting Preliminary Injunction in the matter of *Hernandez v. County of Monterey, et al*. For this case, I am billing at a rate of $500/hour for review and preparation of materials, and for any future depositions or court testimony.

    I understand that Mr. Mark Pajas, Sr. had a longstanding history of heroin addiction and was arrested on January 19, 2015. He was sent to jail in Monterey County and died in his cell less than 24 hours after entering the jail on January 20, 2015 after having reported to jail staff that he was experiencing heroin withdrawal. The coroner's report noted significant atherosclerotic disease as a likely cause of death, with opioid withdrawal and methamphetamine use possibility contributing to his state of cardiac stress. Mr. Pajas was survived by his wife, Rosemary Lopez, and four adult children, Yvette, Mark Jr., Janel, and Xavier, and grandchildren.

    I am a board certified addiction psychiatrist at UCLA and have treated numerous individuals with substance use disorders, including opioid addiction, in outpatient and inpatient settings. Heroin addiction has long been a disease marked by compulsive substance use despite medical, psychological, and social consequences. Neurobiological changes in the brain resulting both from underlying addiction risk factors (e.g. genetic, social, psychological) and the effects of repeated drug use on brain chemistry cause dysregulation brain in reward and learning systems, in turn affecting decision-making and loss of control over drug-seeking behaviors. Like other chronic medical illnesses, relapse is a common feature of addiction, particularly in the absence of ongoing medical treatment. Even after completion of a treatment episode, 40% to 60% of individuals will relapse within the first year (McLellan et al., 2000).

4

September 26, 2017
Page 2

Heroin is a central nervous system depressant; common effects of use include feelings of pleasure, relaxation and sedation while under the influence, and anxiety, craving and irritability during withdrawal states. Heroin withdrawal is marked by extreme physical discomfort, with symptoms ranging from muscle and joint pain to nausea, vomiting, diarrhea, sweating, and rapid heart rate. It is common for individuals with heroin addiction to use several times per day to avoid withdrawal symptoms and relieve cravings due to the drug's relatively short duration of effect (several hours). Though recreational heroin use is marked by intense euphoria during intoxication states, longstanding users who become addicted to heroin describe using more to relieve dysphoria and withdrawal symptoms than to feel "high"; they are compelled to use throughout the day just to function and feel "normal".

In my clinical experience working with addicted individuals over the years, substance use may cause difficulties in interpersonal relationships and interruptions in schooling and employment, but the majority of substance users are able to maintain close relationships with family members, particularly if their use does not interfere with basic trust and ability to communicate. Shame is a common experience of individuals who are struggling with addiction, resulting in attempts to hide their use from others. Use and intoxication states may not always be readily apparent to family members, friends, or coworkers as users may carefully titrate or time their use to relieve withdrawal and optimize functioning throughout the day.

Depending on family members' communication styles, confrontation about drug use or pleas to enter treatment may be common in some cases but completely absent in others; the impact of having a family member with a substance use disorder will depend on the role that he or she has within the family, their attitudes and beliefs about substance use, and external factors such as financial concerns (Lander et al., 2013). Similarly, the consequences of drug use within family systems are widely varied; some users are prone to conflict, irritability and verbal or physical outbursts when under the influence of drugs, while others tend to retreat and isolate when using. Though a significant proportion of substance users are able to continue to work and financially support themselves, others may have repeated legal consequences and less ability to function at work or at school. In summary, the impact and effects of longstanding heroin addiction vary widely among individuals and across families, but compulsive use to relieve cravings and withdrawal is a core feature of the disease.

Sincerely,

Larissa Mooney, M.D.
Associate Clinical Professor
Department of Psychiatry and Biobehavioral Sciences
UCLA Integrated Substance Abuse Programs
Director, UCLA Addiction Medicine Clinic
David Geffen School of Medicine at UCLA

# Curriculum Vitae

# Larissa J. Mooney, M.D.

---

| | |
|---|---|
| ***Business Address:*** | UCLA Integrated Substance Abuse Programs |
| | David Geffen School of Medicine |
| | Semel Institute for Neuroscience and Human Behavior |
| | 11075 Santa Monica Blvd., Suite 200 |
| | Los Angeles, CA 90025 |
| | (310) 267-5419 - tel |
| | (310) 312-0538 - fax |
| | lmooney@mednet.ucla.edu |

## Education

| | |
|---|---|
| 1993-1997 | **Cornell University**, Ithaca, NY |
| | B.S. in Biology *with Honors and Distinction* |
| 1997-2001 | **SUNY Health Science Center at Brooklyn**, Brooklyn, NY |
| | M.D., *Summa Cum Laude* |
| 2001-2005 | **Residency in Psychiatry, New York University**, New York, NY |
| | *Chief Resident* |
| 2005-2006 | **Addiction Psychiatry Fellowship, Cedars-Sinai Medical Center** |
| | Los Angeles, CA |

## License

| | |
|---|---|
| 2001-2005 | New York |
| 2005-present | California |
| | License: A92391, DEA: BM8125836, XM8125836 |

## Board Certifications

| | |
|---|---|
| 2007 | Diplomate, American Board of Psychiatry and Neurology |
| 2008 | Addiction Psychiatry subspecialty, American Board of Psychiatry and Neurology |

## Positions and Employment

| | |
|---|---|
| 2006- 2007 | **Asian Pacific Counseling and Treatment Centers** |
| | Los Angeles, CA |
| | *Staff Psychiatrist* |
| 2006-2007 | **Private Practice** |
| | West Hollywood, CA |
| 2006-2007 | **UCLA Addiction Medicine Clinic** |
| | Los Angeles, CA |

|  | *Clinical Instructor* |
| 2007-2008 | **UCLA Integrated Substance Abuse Programs** |
|  | Los Angeles, CA |
|  | *Associate Physician* |
| 2008-present | **UCLA Integrated Substance Abuse Programs** |
|  | **Department of Psychiatry and Biobehavioral Sciences** |
|  | **David Geffen School of Medicine at UCLA** |
|  | *Associate Clinical Professor* |
| 2015-present | **Veterans Affairs Greater Los Angeles Healthcare System** |
|  | *Acting Section Chief, Substance Use Disorders Services* |

*Professional Activities*

| 2008-2011 | UCLA K30 Graduate Training Program Fellow in Translational and Clinical Investigation |
| 2008-2011 | Associate Editor, American Academy of Addiction Psychiatry Newsletter |
| 2008-2014 | Associate Faculty Reviewer, Faculty of 1000 |
| 2009-2010 | State of California Prescription Drug Abuse Task Force Member |
| 2011-2013 | American Psychiatric Association Council on Addiction Psychiatry, Appointed Member |
| 2011-2013 | Editor, American Academy of Addiction Psychiatry Newsletter |
| 2012-present | Director, UCLA Addiction Medicine Clinic |
| 2013-2015 | Executive Board Secretary, American Academy of Addiction Psychiatry |
| 2014-present | Friends Research Institute, Inc. Institutional Review Board Member |
| 2015-present | Executive Board Treasurer, American Academy of Addiction Psychiatry |
| 2016-present | Medical Director, International Fellowship UCLA Integrated Substance Abuse Programs |

*Committee Memberships*

| 2008-2013 | Board of Directors, American Academy of Addiction Psychiatry |
| 2008-present | UCLA Medical Staff Health Committee Member |
| 2010-2012 | American Academy of Addiction Psychiatry Maintenance of Certification Committee Member |
| 2010-present | UCLA Residency Oversight Committee, Member At-Large |
| 2011-2014 | UCLA Electroconvulsive Therapy Committee Member |
| 2012-2015 | Member, UCLA Outpatient Practice Council |
| September, 2015 | Substance Abuse and Mental Health Services Administration (SAMHSA) Veterans Administration Substance Use Disorder Virtual Implementation Academy member |
| 2015-2016 | Greater Los Angeles Veterans Administration Healthcare System Substance Use Disorders Center of Excellence Workgroup |

| 2016 | Chair, Ad Hoc Committee for Academic Achievement, UCLA Department of Psychiatry Faculty Member |
| 2016 | Member, UCLA Neuropharmacology Faculty Search Committee |
| 2016 | Member, UCLA Senior Addictions Research Faculty Member Search Committee |
| 2016-present | Pharmacy & Therapeutics Advisory Committee, Greater Los Angeles Veterans Affairs |
| 2016-present | Mentor for UCLA Medical School Primary Care College |
| 2016-present | Mentor for American Academy of Addiction Psychiatry program |

### *Peer Review*
Journal of Psychoactive Drugs (April, 2010)
General Hospital Psychiatry (December, 2011)
Addiction (June, 2013)
Harvard Review of Psychiatry (April, 2014)
The American Journal of Drug and Alcohol Abuse (Sept, 2010; April, 2014; May, 2015)
Journal of Substance Abuse Treatment (December, 2011; July, 2014; March, 2016)
Drug and Alcohol Review (April, 2015)
Psychology of Addictive Behaviors (March, 2015)
Journal of Addiction Medicine (Mar, 2013; Jan, Mar, 2014; Sept, 2015; July, 2016)
American Journal on Addictions (December, 2016)
Journal of Studies on Alcohol and Drugs (June, 2017)
Drug and Alcohol Dependence (July, 2017)

### *Professional Memberships*

| 2002-present | American Psychiatric Association, Member |
| 2005-present | Southern California Psychiatric Society, Member |
| 2005-present | California Psychiatric Association, Member |
| 2005-present | American Academy of Addiction Psychiatry, Member |
| 2005-present | California Society of Addiction Medicine, Member |
| 2005-present | American Society of Addiction Medicine, Member |
| 2009-present | College on Problems of Drug Dependence, Associate Member |

### *Honors and Awards*
Hughes Scholarship for summer research, Cornell University (1995 and 1996)
B.S. with Honors and Distinction (1997)
Summer Research Grant, SUNY Health Science Center at Brooklyn Alumni Association (1998)
Alpha Omega Alpha Medical Honors Society (2000)
Brooklyn Psychiatric Society Award for Excellence in Psychiatry (2001)
Abraham Max Rabiner Award for Excellence in Neurology (2001)
Merck Manual Award to Outstanding Students in Medical Studies (2001)
APA/Lilly Chief Resident Executive Leadership Program Fellowship, Atlanta, GA (2004)
Chief Resident, New York University Residency Training Program in Psychiatry (2004-2005)

Travel Award for the American Academy of Addiction Psychiatry 16th Annual Meeting,
    Scottsdale, AZ (2005)
Medical Education and Research Foundation Scholarship for the California Society of
    Addiction Medicine Annual Conference, Long Beach, CA (2005)
American Academy of Addiction Psychiatry Research Award (2007)
NIH Extramural Clinical Loan Repayment Program Award (2008-2010)
NIH Extramural Clinical Loan Repayment Program Award Renewal (2010-2013)
Fellow, American Society of Addiction Medicine (2015)
Fellow, American Psychiatric Association (2016)

## *Publications*

### *Books*

Stead, L. G., Stead, S. M., Kaufman, M. S., Klamen, D., & Mooney, L. J., Eds. (2002).
    *First aid for the psychiatry clerkship: A student to student guide* (1st ed.). New
    York: McGraw-Hill.
Danovich, I., & Mooney, L. J., Eds. (in preparation). *The Assessment and Treatment of
    Addiction: Best Practices and New Frontiers*. PA: Elselvier, Inc.

### *Book Chapters*

Shrikhande, A., Gona, S., & Mooney, L. (2005). Intoxication; Substance withdrawal; and
    detoxification protocol for alcohol. In C. Bernstein, Z. Levin, M. Poag, & M.
    Rubinstein (Eds.), *On call psychiatry* (3rd ed.). PA: Elselvier, Inc.
Mooney, L., Shrikhande, A., & Gona, S. (2005). Clonidine detoxification: protocol for
    opioid dependence. In C. Bernstein, Z. Levin, M. Poag, & M. Rubinstein (Eds.),
    *On call psychiatry* (3rd ed.). Elsevier, Inc.: PA.
Mooney, L.J., Glasner-Edwards, S., Rawson, R.A., & Ling, W. (2009). Medical effects of
    methamphetamine use.  In J. M. Roll, R. Rawson, W. Ling, & S. Shoptaw (Eds.),
    *Methamphetamine addiction*: *From basic science to treatment*. New York, NY:
    Guilford Press.
Ling, W., Mooney, L., & Rawson, R. (2013).  Amphetamine-type stimulants.  In B. S.
    McCrady & E. E. Epstein (Eds.), *Addictions: A comprehensive guidebook* (2nd
    ed.), New York, NY: Oxford University Press.
Rawson, R., Ling, W., & Mooney, L. (2015).  Clinical management: methamphetamine.
    In M. Galanter, H. D. Kleber, & K. Brady (Eds.), *Textbook of substance abuse
    treatment (*5th ed.). Arlington, VA: The American Psychiatric Press.
Mooney, L.J., Cooper, C.B., London, E.D., Chudzynski, J., & Rawson, R.A. (2015).
    Exercise for substance use disorders.  In: N. El-Guebaly, G. Carra, M. Galanter
    (Eds.), *Textbook of addiction treatment: International perspectives* (pp. 973-986).
    NY: Springer.
Cohen, S., Haglund, M., Mooney, L. (2016). Treatment modalities for substance use
    disorders in later life. In M. Sullivan & F. Levin (Eds.), *Addiction in the older
    patient* (pp. 233-274). New York, NY: Oxford University Press.

Rawson, R., Mooney, L., & Ling, W. (2016). Stimulants.  In A. Mack, K. Brady, S. Miller, &, R. Frances  (Eds.), *Clinical textbook of addictive disorders* (4th ed.). New York, NY: Guilford Press.

Mooney, L. & McKance-Katz, E. (2016). Psychopharmacological treatments for substance use disorders.  In A. Mack, K. Brady, S. Miller, &, R. Frances (Eds.), *Clinical textbook of addictive disorders* (4th ed.). New York, NY: Guilford Press.

Mitton, A. & Mooney, L. (in press).  Integrated treatments for stimulant use disorders. In S. Modir & M. Torrington (Eds.), *Integrative addiction and recovery book for the Weil Medical Library*. New York, NY: Oxford University Press.

### Journal Articles

Kolchinsky, P., Mirzabekov, T., Farzan, M., Kiprilov, E., Cayabyab, M., Mooney, L., Choe, H., Sodroski, J. (1999). Adaptation of a CCR5-using, Primary Human Immunodeficiency virus type 1 for CD4-independent replication. *Journal of Virology*, *73*(10), 8120-26.

Rayor, L.S., Mooney, L.J., and Renwick, A. (2007). Predatory behavior of *Polistes dominulus* wasps in response to cardenolides and glucosinolates in pieris napi caterpillars. *Journal of Chemical Ecology*, *33*, 1177-85.

Gonzales, R., Marinelli-Casey, P., Hillhouse, M., Hunter, J., Mooney, L.J., Ang, A., & Rawson, R.A. (2008).  Hepatitis A and B infection among methamphetamine dependent users [Letter to the editor].  *Journal of Substance Abuse Treatment*. *35*, 351-52.

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P., Hillhouse, M., Ang, A., Rawson, R.A., and the Methamphetamine Treatment Project Corporate Authors. (2008) Risk factors for suicide attempts in methamphetamine-dependent patients. *The American Journal on Addictions*, *17*(1), 24-7.

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P., Hillhouse, M., Ang, A., Rawson, R.A. and the Methamphetamine Treatment Project Corporate Authors. (2008). Identifying methamphetamine users at risk for major depressive disorder: findings from the Methamphetamine Treatment Project at 3-year follow-up. *The American Journal on Addictions*, *17*(2), 99-102.

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P., Hillhouse, M., Ang, A., Rawson, R.A., and the Methamphetamine Treatment Project Corporate Authors. (2008). Clinical course and outcomes of methamphetamine-dependent adults with psychosis. *Journal of Substance Abuse Treatment*, *35*, 445-50.

Glasner-Edwards, S., Marinelli-Casey, P., Hillhouse, M., Ang, A., Mooney, L.J., Rawson, R.A., and the Methamphetamine Treatment Project Corporate Authors. (2009). Depression among methamphetamine users: association with outcomes from the Methamphetamine Treatment Project at 3-year follow-up.  *Journal of Nervous and Mental Disease*, *197*(4), 225-231.

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P., Hillhouse, M., Ang, A., Rawson, R.A. and the Methamphetamine Treatment Project Corporate Authors. (2009). Psychopathology in methamphetamine-dependent adults 3 years after treatment.  *Drug and Alcohol Review*, *29*, 12-20.

Mooney, L.J., Glasner-Edwards, S., Marinelli-Casey, P., Hillhouse, M., Ang, A., Hunter, Haning, W., Colescott, P, Ling, W., & Rawson, R.A. (2009). Health conditions in methamphetamine-dependent adults 3 years after treatment. *Journal of Addiction Medicine*, *3*(3), 155-163.

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P., Hillhouse, M., Ang, A., Rawson, R.A., and the Methamphetamine Treatment Project Corporate Authors. (2010). Anxiety disorders among methamphetamine dependent adults: association with post-treatment functioning. *The American Journal on Addictions*, *19*(5), 385-90.

Gonzales, R., Mooney, L., and Rawson, R. (2010). The methamphetamine problem in the United States. *Annual Review of Public Health*, *31*, :6.1-6.14.

Shetty, V., Mooney, L., Zigler, C.M., Belin, T.R., Murphy, D., and Rawson, R. (2010). The relationship between methamphetamine use and increased dental disease. *Journal of the American Dental Association*, *141*, 307-318.

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P., Ang, A., Rawson, R.A., and Methamphetamine Treatment Project Corporate Authors. (2011). Bulimia nervosa among methamphetamine dependent adults: association with outcomes 3 years after treatment. *Eating Disorders: The Journal of Treatment and Prevention*, *19*(3), 259-69.

Gonzales, R., Brecht, M.L., Mooney, L. & Rawson, R. (2011). Prescription and over-the-counter drug treatment admissions to the California public treatment system. *Journal of Substance Abuse Treatment*, *40*(3), 224-9.

Ling, W., Mooney, L.J., & Hillhouse, M. (2011). Prescription opioid abuse, pain, and addiction: clinical issues and implications. *Drug and Alcohol Review*, *30*, 300-5.

Ling, W., Mooney, L.J., Zhao, M., Neilsen, S., Torrington, M., & Miotto, K., (2011). Selective review and commentary on emerging pharmacotherapies for opioid addiction. *Journal of Substance Abuse and Rehabilitation*, *2*, 1-8.

Ling, W., Mooney, L., & Wu, L. (2012). Advances in opioid antagonist treatment for opioid addiction. *Psychiatric Clinics of North America*, *35*(2), 297-308.

Mooney, L.J., Nielsen, S., Saxon, A., Hillhouse, M., Thomas, C., Hasson, A., Stablein, D., McCormack, J., Lindbald, R., & Ling, W. (2012). Cocaine Use Reduction with Buprenorphine (CURB): Rationale, design, and methodology. *Journal of Contemporary Clinical Trials*, *34*(2), 196-204.

Nielsen, S., Hillhouse, M., Mooney, L., Fahey, J., & Ling, W. (2012). Comparing buprenorphine induction experience with heroin and prescription opioid users. *Journal of Substance Abuse Treatment*, *43*(3), :285-90.

Dolezal, B.A., Chudzynski J., Storer T.W., Abrazado, M., Penate, J., Mooney, L., Dickerson, D., Rawson, R.A., & Cooper, C.B. (2013). Eight weeks of exercise training improves fitness measures in methamphetamine-dependent individuals in residential treatment. *Journal of Addiction Medicine*, *7*(2), 122-8.

Glasner-Edwards, S., Mooney, L.J., Ang, A., Hillhouse, M., Rawson, R. on behalf of the Methamphetamine Treatment Project Corporate Authors. (2013). Does post-traumatic stress disorder affect post-treatment methamphetamine use? *Journal of Dual Diagnosis*, *9*(2), 123-128.

Ling, W., Mooney, L., Torrington, M. (2013). Buprenorphine for opioid addiction. *Neuropsychiatry*, *3*(5), 535-543.

Dolezal, B.A., Chudzynski, J., Dickerson, D., Mooney L., Rawson, R.A., Garfinkel, A., & Cooper, C.B. (2014).  Exercise training improves heart rate variability after methamphetamine dependency.  *Medicine and Science in Sports and Exercise*, *46*(6), 1057-66.

Glasner-Edwards, S. & Mooney, L.J. (2014). Methamphetamine psychosis: epidemiology and management. *CNS Drugs*, *28*(12), 1115-26.

Haglund M., Mooney L., Gitlin M., Miotto K., Fong T., Tsuang J. (2014). Vivitrol and depression: a case report and review of the literature.  *Addictive Disorders and Their Treatment*, *13*(3), 147-150.

Ling, W., Chang, L, Hillhouse, M., Ang, A., Striebel, J., Jenkins, J., Hernandez, J., Olaer, M., Mooney, L., Reed, S., Fukaya, E., Kogachi, S., Alicata, D., Holmes, N., Esagoff, A. (2014). Sustained-release methylphenidate in a randomized trial of treatment of methamphetamine use disorder. *Addiction*, *109*(9), 1489-1500.

Ling, W., Mooney, L. & Haglund, M. (2014). Treatment for methamphetamine use disorder:  Perspectives from experience in research and practice. *Current Psychiatry*, *13*(9), 36-42.

McClure, E., Sonne, S., Winhusen, T., Carroll, K., Ghitza, U., McRae-Clark, A., Matthews, A., Sharma, G., Veldhuisen, P., Vandrey, R., Levin, F., Weiss, R., Lindblad, R., Allen, C., Mooney, L., Haynes, L., Brigham, G., Sparenborg, S., Hasson, A., & Gray, K. (2014). Achieving Cannabis Cessation - Evaluating N-acetylcysteine Treatment (ACCENT): Design and implementation of a multi-site, randomized controlled study in the National Institute on Drug Abuse Clinical Trials Network. *Contemporary Clinical Trials*, *39*(2), 211-23.

Mooney, L.J., Cooper, C., London, E., Chudzynski, J., Dolezal, B., Dickerson, D., DOa, Brecht, M.L., Penante, J., & Rawson, R.A. (2014).  Exercise for methamphetamine dependence: Rrationale, design, and methodology. *Journal of Contemporary Clinical Trials*, *37*(1), 139-47.

Nielsen, S., Hillhouse, M., Weiss, R.D., Mooney, L., Sharpe Potter, J., Lee, J., Gourevitch, M.N., Ling, W. (2014). The relationship between primary prescription opioid and buprenorphine-naloxone induction outcomes in a prescription opioid dependent sample. *American Journal of Addiction*, *23*(4), 343-8.

Haglund, M., Ang, A., Mooney, L., Gonzalez, R., Chudzynski, J., Cooper, C.B., Dolezal, B.A., Gitlin, M., & Rawson, R.A. (2015). Predictors of depression outcomes among abstinent methamphetamine-dependent individuals exposed to an exercise intervention. *The American Journal of Addictions*, 24(3), 246-51.

Jacobs, P., Ang, A., Hillhouse, M.P., Saxon, A.J., Nielsen, S., Wakim, P.G., Mai, B.E., Mooney, L.J., Potter, J.S., Blaine, J.D. (2015).  Treatment outcomes in opioid dependent patients with different buprenorphine/naloxone induction dosing patterns and trajectories. *The American Journal on Addictions*, *24*, 667-75.

Nielsen, S., Hillhouse, M., Mooney, L., & Ang, A. (2015). Buprenorphine pharmacotherapy and behavioral treatment: Comparison of outcomes among prescription opioid users, heroin users, and combination users. *Journal of Substance Abuse Treatment*, *48*(1), 70-6.

Rawson R.A., Chudzynski, J., Mooney, L., Gonzales, R., Ang, A., Dickerson, D., Penate, J., Salem, B., Dolezal, B., Cooper, C. (2015). Impact of an exercise intervention

on methamphetamine use outcomes post-residential treatment care. *Drug and Alcohol Dependence*, *156*, 21-28.

Rawson R.A., Chudzynski, J., Gonzales, R., Mooney, L., Dickerson, D., Ang, A., Dolezal, B., & Cooper, C.B. (2015). The impact of exercise on depression and anxiety symptoms among abstinent methamphetamine-dependent individuals in a residential treatment setting. *Journal of Substance Abuse Treatment*, *57*, 36-40.

Glasner-Edwards, S, Mooney, L.J., Ang, A., Garneau, H.C., Hartwell, E., Brecht, M.L., & Rawson, R.A. (2016). Mindfulness based relapse prevention for stimulant dependent adults: A pilot randomized clinical trial. *Mindfulness*, 8(1): 126-135.

Glasner-Edwards, S., Hartwell, E.E., Mooney, L., Ang, A., Garneau, H.C., Brecht, M.L., & Rawson, R. (2016). Changes in stress reactivity among stimulant dependent adults after treatment with mindfulness based relapse prevention: Results from a pilot randomized clinical trial. *Journal of Addiction Research & Therapy*, *7*(5), 298. doi:10.4172/2155-6105.1000298

Ling, W., Hillhouse, M.P., Saxon, A.J., Mooney, L.J., Thomas, C.M., Ang, A., Matthews, A.G., Hasson, A., Annon, J., Sparenborg, S., Liu, D.S., McCormack, J., Church, S., Swafford, W., Drexler, K., Schuman, C., Ross, S., Wiest, K., Korthuis, P., Lawson, W., Brigham, G.S., Knox, P.C., Dawes, M., Rotrosen, J. (2016). Buprenorphine + naloxone plus naltrexone for the treatment of cocaine dependence: The Cocaine Use Reduction with Buprenorphine (CURB) study. *Addiction*, *111*(8), 1416-27.

Mooney, L.J., Hillhouse, M.P., Thomas, C., Ang, A., Sharma, G., Terry, G., Chang, L., Walker, R., Trivedi, M., Croteau, D., Sparenborg, S., & Ling, W. (2016). Utilizing a two-stage design to investigate the safety and potential efficacy of monthly naltrexone plus once-daily bupropion as a treatment for methamphetamine use disorder. *Journal of Addiction Medicine*, *10*(4), 236-43.

Robertson, C.L, Ishibashi, K., Chudzynski, J., Mooney, L.J., Rawson, R.A., Dolezal, B.A., Cooper, C.B., Brown, A.K., Mandelkern, M.A., & London, E.D. (2016). Effect of Exercise Training on Striatal Dopamine D2/D3 Receptors in Methamphetamine Users during Behavioral Treatment. *Neuropsychopharmacology*, *41*, 1629-36.

Hser, Y.H., Mooney, L.J., Saxon, A.J., Miotto, K., Bell, D.S., Zhu, Y., Liang, D., and Huang, D. (2017). High mortality among patients with opioid use disorder in a large healthcare system. *Journal of Addiction Medicine*. 11(4):315-319.

Gray, K. M., Sonne, S. C., McClure, E. A., Ghitza, U. E., Matthews, A. G., McRae-Clark, A. L., Carroll, K. M., Potter, J. S., Wiest, K., Mooney, L. J., Hasson, A., Walsh, S. L., Lofwall, M. R., Babalonis, S., Lindblad, R. W., Sparenborg, S., Wahle, A., King, J. S., Baker, N. L., Tomko, R. L., Haynes, L. F., Vandrey, R. G., & Levin, F. R. (2017). A randomized placebo-controlled trial of N-acetylcysteine for cannabis use disorder in adults. *Drug and Alcohol Dependence* 177:249-257.

Hser, Y.H., Mooney, L.J., Saxon, A.J., Miotto, K., Bell, D., Huang, D. (2017). Chronic pain among patients with opioid use disorder: Results from electronic health records data. *Journal of Substance Abuse Treatment* 77:26-30.

Hser, Y.H. Huang, Zhu, Mooney, L.J. Chou, Tomko, McClure, E. Gray, K. et al. (in press). Reductions in cannabis use are associated with improvements in anxiety,

depression, and sleep quality, but not quality of life. *Journal of Substance Abuse Treatment*.

Rawson, R.A., Mooney, L.J., Glasner, S., & Gonzalez, R. (*in press*). Innovations in behavioral treatments for substance use disorders. *International Addiction Review*.

Hillhouse, M., Perrochet, B., Thomas, C., Oyama, M., Sparenborg, S., Hasson, A., Mooney, L., Ling, W. (under review). Smartphone videos supporting medication adherence in the Accelerated Development of Additive Pharmacotherapy Treatment (ADAPT) study for methamphetamine use disorder. *Journal of Substance Abuse Treatment*.

### *Non-Peer Reviewed Publications*

Mooney, L.J. &Tsuang, J. (2006). Review of the book *Cognitive therapy of schizophrenia*. *In book series*: Guides to individualized evidence-based treatment. *Journal of Clinical Psychiatry*, *67*(6), 1001.

Mooney, L.J. (2009). Technical Input, *Meth Inside Out: Human Impact Handbook*.

Mooney, L.J. (March, 2009). Mindfulness Meditation: A Promising Treatment Approach for Substance Use Disorders. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (August, 2009). Prescription opioid misuse: who are the users? *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (March, 2010). Medical consequences of methamphetamine use. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (June, 2010). Exercise for Addiction. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (September, 2010). Brain derived neurotrophic factor (BDNF) and addictive disorders. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (January, 2011). Psychiatric symptoms associated with amphetamine use. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (June, 2011). Adolescents and prescription opioid misuse: A Growing Public Health Concern. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (March, 2011). Kappa antagonism as a potential therapeutic target for opioid dependence. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (June, 2012). Nicotine Dependence: Recent Trends and Treatment Modalities. *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (March, 2013). Smiles: What Else? *AAAP News: The Official Newsletter of the American Academy of Addiction Psychiatry*.

Mooney, L.J. (September, 2013). Mind if I Smoke This? (article on electronic cigarettes). *AAAP News: The Official Newsletter of the American Academy of Addiction*

*Psychiatry.*

### Online Articles

Mooney, L.J. (January, 2015). Ask an Expert: What Options Are There for Detox? The Fix. Retrieved from https://www.thefix.com/content/ask-expert-what-options-are-there-detox

Mooney, L.J. (January, 2015). Ask an Expert: What Can I Expect When Tapering off Methadone? *The Fix*. Retrieved from https://www.thefix.com/content/ask-expert-what-can-i-expect-when-tapering-methadone

Mooney, L.J. (January, 2015). Ask an Expert: How Can I Maintain My Sex Drive While On Antidepressants? *The Fix*. Retrieved from https://www.thefix.com/content/ask-expert-how-can-i-maintain-my-sex-drive-while-antidepressants

Mooney, L.J. (January, 2015).  Ask an Expert: What are the Best Addiction Blockers Available? The Fix. Retrieved from https://www.thefix.com/content/ask-expert-what-are-best-addiction-blockers-available

Mooney, L.J. (February, 2015).  Ask an Expert: How Long Should I Stay on Suboxone? *The Fix*. Retrieved from https://www.thefix.com/content/ask-expert-how-long-should-i-stay-suboxone

Mooney, L.J. (February, 2015). Ask an Expert: Which Street Drugs Don't Mix with Antidepressants? The Fix. Retrieved from https://www.thefix.com/content/ask-expert-which-street-drugs-dont-mix-antidepressants

Mooney, L.J. (February, 2015).  Ask an Expert: How do I make Amends with my Adult Children? *The Fix*. Retrieved from https://www.thefix.com/content/ask-expert-how-do-i-make-amends-my-adult-children

Mooney, L.J. (February, 2015).  Ask an Expert: Should I do Ecstasy Therapy? *The Fix*. Retrieved from https://www.thefix.com/content/ask-expert-should-i-do-ecstasy-therapy

Mooney, L.J. (February, 2015). Ask an Expert: What do I do if my State Won't Support my Treatment? *The Fix*. Retrieved from https://www.thefix.com/content/ask-expert-what-do-i-do-if-my-state-wont-support-my-treatment

Mooney, L.J. (March, 2015). Ask an Expert: Can you Feel Withdrawal Years Later? *The Fix*. Retrieved from https://www.thefix.com/content/ask-expert-can-you-feel-withdrawal-years-later

Mooney, L.J. (June, 2017). Drugs of Abuse: What Clinicians Need to Know.  Medscape. Retrieved from http://reference.medscape.com/slideshow/drugs-of-abuse-ref-6006623

### Abstract Presentations

Glasner, S.V., Mooney, L.J., & Wilkins, J. (June, 2006). Review of antidepressant treatment of methamphetamine dependence: hypothesized mechanisms and future directions. Paper presented at the 68th annual meeting of the College on Problems of Drug Dependence (Scottsdale, Arizona).

10

Mooney, L.J., Glasner-Edwards, S., Marinelli-Casey, P., Hillhouse, M., Ang, A., and Rawson, R. (December, 2007) Clinical course of depression in methamphetamine users: association with outcomes 3 years after treatment. Paper presented at the 18th Annual Meeting of the American Academy of Addiction Psychiatry, San Diego, CA.

Mooney, L.J., Glasner-Edwards, S., Marinelli-Casey, P., Hillhouse, M., Ang, A., and Rawson, R. (December, 2007) Predictors of depression and suicide attempts in methamphetamine dependent patients. Paper presented at the 18th Annual Meeting of the American Academy of Addiction Psychiatry, San Diego, CA.

Glasner-Edwards, S., Marinelli-Casey, P., Hillhouse, M., Gonzales, R., Ang, A., Marcu, F., Mooney, L. & Rawson, R. (June, 2007) Psychiatric illness as a predictor of post-treatment methamphetamine use. Paper presented at the 69th annual meeting of the College on Problems of Drug Dependence, Quebec City, Canada.

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P., Hillhouse, M., Ang, A., & Rawson, R.A. (June, 2008). Treatment outcomes of methamphetamine dependent adults with psychotic disorders. Paper presented at the 70th annual meeting of the College on Problems of Drug Dependence (San Juan, Puerto Rico).

Mooney, L.J., Reid, M.S., & Lee, J. (December, 2008). Treating our clients' health: medical monitoring and management of the addicted patient. Workshop presented at the 19th annual meeting of the American Academy of Addiction Psychiatry, Boca Raton, FL.

Ling, W., Hillhouse, M., Jenkins, J., Miotto, K., Mooney, L., Torrington, M., Reed, S., McGraw, L., & Chim, D (June, 2009). A clinical trial comparison of two formulations of depot buprenorphine for pain. 71st annual meeting of the College on Problems of Drug Dependence (Reno, NV).

Mooney, L.J., Rawson, R.A., Elkashef, A., Glasner-Edwards, S., Hamilton, A., and Ling, W. (December, 2009). Methamphetamine use disorders: associated symptoms and treatment outcomes. Workshop presented at the 20th annual meeting of the American Academy of Addiction Psychiatry, Los Angeles, CA.

Mooney, L.J., Glasner-Edwards, S., Marinelli-Casey, P., Hillhouse, M., Ang, A., Hunter, J, Haning, W., Colescott, P., Ling, W., and Rawson, R (June, 2009). Medical outcomes in methamphetamine dependent adults 3 years after treatment.. Paper presented at the 71st annual meeting of the College on Problems of Drug Dependence (Reno, NV).

Mooney, L.J., Glasner-Edwards, S., Marinelli-Casey, P., Hillhouse, M., Ang, A., Hunter, J, Haning, W., Colescott, P., Ling, W., and Rawson, R (February, 2010). Health conditions in methamphetamine-dependent adults 3 years after treatment. UCLA Consortium for Research and Education in Addictions.

Glasner-Edwards, S., Mooney, L., Marinelli-Casey, P., Hillhouse, M., Ang, A., and Rawson, R.A. (August, 2010). Treatment Outcomes of Methamphetamine Dependent Adults with Mood and Anxiety Disorders. American Psychological Association Annual Meeting (San Diego, CA).

Gonzales, R., Brecht, M.L., Mooney, L., and Rawson, R.A. (November, 2010). Prescription and Over the Counter Drug Misuse in the California Public Treatment System: How Youth Fare? 138th American Public Health Association Annual Meeting (Denver, CO).

Glasner-Edwards, S., Mooney, L.J., Marinelli-Casey, P, Hillhouse, M., Ang, A., Rawson, R.A. (June, 2011).  Association of bulimia nervosa with treatment outcomes of methamphetamine-dependent adults.  71st annual meeting of the College on Problems of Drug Dependence (Hollywood, FL).

Chudzynski, J., Rawson, R., Penate, J., Dolezal, B., Dickerson, D., Cooper, C., & Mooney, L. (June, 2011).  Exercise as a novel treatment approach to methamphetamine treatment.  71st annual meeting of the College on Problems of Drug Dependence (Hollywood, FL).

Mooney, L.J., Hillhouse, M., Thomas, C., Hasson, A., & Ling, W. (June, 2011).  Variations in outcomes and patient characteristics associated with methadone and buprenorphine dose.  73rd annual meeting of the College on Problems of Drug Dependence (Hollywood, FL).

Saxon, A.J, Mooney, L.J., & Ling, W. (July, 2011).  Cocaine Use Reduction with Buprenorphine (CURB) Study.  Therapeutic Potential of Kappa Opioids Conference (Seattle, WA).

Mooney, L.J. & Ross, S.  (December, 2011).  *Careers in Addiction Psychiatry*.  Workshop presented at the 22nd Annual Meeting of the American Academy of Addiction Psychiatry (Scottsdale, AZ).

Mooney, L.J. & Ross, S. (December, 2011).  Alternative Treatments in Addiction: Mindfulness Meditation, Exercise, and Psychedelics.  Workshop presented at the 22nd Annual Meeting of the American Academy of Addiction Psychiatry (Scottsdale, AZ).

Ling, W., Hillhouse, M.P., Fahey, J., Thornton, B., Schaper, E., Jenkins, J., MacNicoll, S., Reed, S., Mooney, L. Miotto, K., Torrington, M., Dickerson, D. (June, 2012).  Behavioral treatment added to pharmacotherapy with buprenorphine for opioid dependence.  74th Annual Meeting of the College on Problems of Drug Dependence (Palm Desert, CA).

Canamar, C., Penate, J., Chudzynski, J., Mooney, L., & Rawson, R. (June, 2012).  Moderate exercise improves methamphetamine users' performance on neurocognitive tests.  74th Annual Meeting of the College on Problems of Drug Dependence (Palm Desert, CA).

Nielsen, S., Hillhouse, M., Mooney, L., Potter, J.S., Weiss, R., Lee, J.,& Ling, W.  (June, 2012).  Buprenorphine induction for prescription opioid users: findings from the prescription opiate addiction treatment study (POATS).  74th Annual Meeting of the College on Problems of Drug Dependence (Palm Desert, CA).

Nielsen, S., Hillhouse, M., Mooney, L., & Ling, W.  (June, 2012).  Opioid use and retention outcomes following 18 weeks of buprenorphine for prescription opiod and heroin users. 74th Annual Meeting of the College on Problems of Drug Dependence (Palm Desert, CA).

Glasner-Edwards, S., Mooney, L.J., Ang, A., Marinelli-Casey, P., Hillhouse, M. & Rawson, R.A. (June, 2012).  Association of post-traumatic stress disorder with post-treatment outcomes of methamphetamine-dependent adults.  Symposium on Addiction and Stress presented at the 74th Annual Meeting of the College on Problems of Drug Dependence (Palm Desert, CA).

Glasner-Edwards, S., Mooney, L.J., & Rawson, R.A. (June, 2012).  Mindfulness Based Relapse Prevention Reduces Negative Affect and Stress Reactivity Among

Stimulant Dependent Adults. "Late Breaking News Session" presented at the 74th Annual Meeting of the College on Problems of Drug Dependence (Palm Desert, CA).

Robertson, C.L., Chudzynski, J., Rawson, R., Cooper, C., Mooney, L., Brown, A.K., Mandelkern, M.A., Ishibashi, K., London E.D. (June, 2012): Increased caudate dopamine D2/3 receptor binding after abstinence from chronic methamphetamine in a treatment program including exercise. 74th Annual Meeting of the College on Problems of Drug Dependence – Late Breaking session (Palm Desert, CA)

Hillhouse, M.P., Jenkins, J., MacNicoll, S., Reed, S., Mooney, L., Miotto, K., Torrington, M., Dickerson, D., Ling, W. (June, 2013). Long-term follow-up of medication treatment with and without a behavioral component for opioid-dependent participants. 75th Annual Meeting of the College on Problems of Drug Dependence (San Diego, CA).

Lindblad, R., McCormack, J., Saxon, A., Hillhouse, M.P., Thomas, C., Hasson, A., Mooney, L., VanVedlhuisen, P., Ling, W. (June, 2013). Induction onto extended-release naltrexone in 302 cocaine-dependent opioid users. 75th Annual Meeting of the College on Problems of Drug Dependence (San Diego, CA).

Jacobs, P., Ang, A., Hillhouse, M.P., Mooney, L., Saxon, A., Potter, J.S., Nielsen, S., Wakim, P., Blaine, J. (June, 2013). Treatment outcomes by patterns of methadone and buprenorphine induction strategies: Does higher dose and faster induction improve outcomes? 75th Annual Meeting of the College on Problems of Drug Dependence (San Diego, CA).

Mooney, L., Hillhouse, M.P., Ang, A., Miotto, M., Torrington, D., Dickerson, D., MacNicoll, S., Jenkins, J., Reed, S., Ling, W. (June, 2013). Psychiatric diagnoses and treatment outcomes in opioid-dependent individuals receiving buprenorphine and behavioral treatment. 75th Annual Meeting of the College on Problems of Drug Dependence (San Diego, CA).

Hasson, A., Hillhouse, M., Thomas, C., Mooney, L., Ling, W. (June, 2015). Alcohol and tobacco use in cocaine-dependent participants provided treatment with buprenorphine/naloxone and naltrexone. 77th Annual Meeting of the College on Problems of Drug Dependence (Phoenix, AZ).

Oyama, M., Hillhouse, M. P., Thomas, C., Annon, J., Hasson, A., Mooney, L., Walker, R., Chang, L., Sparenborg, S., Ling, W. (June, 2015). Using cellphone technology to monitor and increase dosing adherence. 77th Annual Meeting of the College on Problems of Drug Dependence (Phoenix, AZ).

Annon, J., Hillhouse, M., Thomas, C., Mooney, L., Hasson, A., Walker, R., Chang, L., Sparenborg, S., Lindbald, R., VanVeldhuisen, P., Ling, W. (June, 2015). A new study methodology: ADAPT, the short, staged trial. 77th Annual Meeting of the College on Problems of Drug Dependence (Phoenix, AZ).

Thomas, C., Hillhouse, M., Ang, A., Annon, J., Mooney, L., Hasson, A., Ling, W. (June, 2015). Treatment satisfaction in the CTN Cocaine Use Reduction with Buprenorphine Study. 77th Annual Meeting of the College on Problems of Drug Dependence (Phoenix, AZ).

Mooney, L., Hillhouse, M.P., Thomas, C., Ang, A., Hasson, A., Annon, J., Reed, S., Ling, W. (June, 2015). Psychiatric symptoms and treatment outcomes in cocaine-

13

dependent adults treated with buprenorphine and long acting naltrexone. 77th Annual Meeting of the College on Problems of Drug Dependence (Phoenix, AZ).

Glasner-Edwards, S., Mooney, L., Angl, A., Chokron-Garneau, H., Hartwell, E. E., Brecht, M., Rawson, R. (June, 2015). Mindfulness-based relapse prevention improves stimulant use among adults with major depression and generalized anxiety disorder. 77th Annual Meeting of the College on Problems of Drug Dependence (Phoenix, AZ).

Walter, L., Hillhouse, M., Saxon, A., Mooney, L., Thomas, C., Ang, A., Hasson, A., Annon, J., Study Group, C. (June, 2015). The cocaine use reduction with buprenorphine study: Cocaine use findings. 77th Annual Meeting of the College on Problems of Drug Dependence (Phoenix, AZ).

Hillhouse, M., Mooney, L., Ang, A., Glasner-Edwards, S., Ling, W. (August, 2015). Psychiatric Diagnoses and Treatment Outcomes Among Opioid and Methamphetamine Dependent Adults. 123rd Annual Meeting of the American Psychological Association, (Toronto, Canada).

Mooney, L, Fong, T., Vito, J. (December, 2015). Addiction Psychiatry 8: Inside Info For Trainees On The Why, How, And What's Next Of Choosing A Career In Substance Use Disorders. 26th Annual Meeting of the American Academy of Addiction Psychiatry (Huntington Beach, CA).

Lindblad, R., Saxon, A., VanVeldhuisen, P., Lul, L., Hul, L., Hasson, A., Tomas, C., Sparenborg, S., Mooney, L., Ling, W. (June, 2016). Safety of combination buprenorphine/naloxone and extended-release naltrexone. 78th Annual Meeting of the College on Problems of Drug Dependence (Palm Springs, CA).

Padwa, H., Hser, Y.H., Mooney, L. Valdez, J.E., Castro-Moino, K. (August, 2017). Functional changes associated with reductions in cannabis use: an exploratory qualitative study. Poster presented at the 2017 CALDAR Summer Institute and International Conference Promoting Global Health (Los Angeles, CA). *Journal of Neuroimmune Pharmacology* 12(2): S81-S113.

Mooney, L. Brecht, M.L., Wang, G.-J., Danovitch, I., Miotto, K., Grella, C. (August, 2017). Cannabis use and health effects. Symposium presented at the 2017 CALDAR Summer Institute and International Conference Promoting Global Health (Los Angeles, CA). *Journal of Neuroimmune Pharmacology* 12(2): S81-S113.

Mooney, L. Chen, J.H., Wu, F., Evans, E.A., Hser, Y.H. (August, 2017). Electronic records-based research and applications. Symposium presented at the 2017 CALDAR Summer Institute and International Conference Promoting Global Health (Los Angeles, CA). *Journal of Neuroimmune Pharmacology* 12(2): S81-S113.


*Invited Presentations*

Mooney, L. (October, 2005). *The Meth Epidemic*. Invited presentation, City of West Hollywood Recovery Month Lecture Series.

Glasner-Edwards, S., Mooney, L.J. and Huang, W. (June, 2006). *Motivational Interviewing for Adults with Substance Use Disorders.* Symposium on Crystal Methamphetamine, Cedars-Sinai Medical Center.

Mooney, L.J. (April, 2007). *Sisters Helping Sisters: Confronting the Problems of Substance Abuse Among Women in our Professions.* Panel presentation, The Association of Black Women Physicians and the Black Women Lawyers Association of Los Angeles Joint Symposium.

Mooney, L.J. and Glasner-Edwards, S. (August, 2007). *Treatment of Methamphetamine Users: A Role for Alternative Medicine.* Invited presentation, UCLA Center for East-West Medicine.

Mooney, L.J. (September, 2007). *Diagnosis and Treatment Options for Substance Abuse Disorders in the Private Practice Setting.* Panelist, Sierra Tucson and Matrix Professional Development Series.

Mooney, L.J. (January, 2008). *Introduction to the Psychiatry Clerkship.* Invited presentation, MS-III Psychiatry Clerkship Orientation, UCLA School of Medicine.

Mooney, L.J. (February, 2008). *Addressing Secondary Addiction.* Invited presentation, UCLA Integrated Substance Abuse Program quarterly journal club.

Mooney, L.J. and Dickerson, D. (April, 2008) *Co-occurring psychiatric and substance use disorders in children and adolescents.* Invited presentation, Los Angeles County Department of Mental Health.

Mooney, L.J. (September, 2008). *New Developments in Medication Treatment for Addiction.* Invited Presentation, Women's Association for Addiction Treatment, San Fernando Valley, CA.

Mooney, L.J. (September, 2008). *Pharmacological Treatment of Addictive Disorders in Adolescents.* Invited Presentation, Los Angeles County Department of Mental Health.

Mooney, L.J. (October, 2008). *Pharmacotherapy of Addictive and Co-Occurring Disorders.* Invited Presentation, Matrix Institute, Los Angeles, CA.

Mooney, L.J. and Rawson, R.A. (October, 2008). *Prescription Drug Abuse: What are People Using and How Do You Treat Them?* Invited Presentation, County of Los Angeles Department of Public Health Alcohol and Drug Program Administration, Los Angeles, CA.

Mooney, L.J. and Hillhouse, M. (November, 2008). *A Randomized, Double-Blind, Cross-Over Trial Comparing the Analgesic Potency and Side Effects of Buprenorphine plus Ultra-Low-Dose Naloxone to Buprenorphine Alone.* UCLA Women's Health Education & Resource Center physician seminar.

Mooney, L.J. (April, 2009). *Pharmacological Management of Substance Use Disorders in Adults.* Invited Presentation, Los Angeles County Department of Mental Health.

Mooney, L.J. and Rawson, R.A. (May, 2009). *Integrated Treatment of Co-Occurring Mental Health and Substance Use Disorders.* Invited Presentation, Los Angeles County DMH Clinical Leadership Forum at UCLA, Los Angeles, CA.

Mooney, L.J. (May, 2009). *Evidence-Based Medication Treatment Approaches for Addictive Disorders.* Institutional Grant Seminar for Research Fellows, UCLA Integrated Substance Abuse Programs, Los Angeles, CA.

Mooney, L.J. (May, 2009).  *Medical Consequences of Methamphetamine Use.*  UCLA
Seminars in Addiction Psychiatry, Los Angeles, CA.

Mooney, L.J. and Freese, T. (May, 2009).  *Prescription Drug Misuse: What's the
Problem?*  Keynote Address, LA County Annual Drug Court Conference, Los
Angeles, CA.

Mooney, L.J. (June, 2009).  *Screening, Brief Intervention, and Referral to Treatment
(SBIRT): A Training for Personnel from Trauma Centers, Emergency
Departments, and Primary Care Facilities.*  CME course presented at UCLA
Medical Center, Los Angeles, CA.

Mooney, L.J. (March, 2010).  *Stimulants.*  MS-III Didactic Series, UCLA David Geffen
School of Medicine.

Mooney, L.J. (May, 2010).  *Prescription Drug Abuse.*  UCLA Addiction Medicine Clinic
Didactic Series.

Mooney, L.J. (June, 2010*).  Basics of Psychopharmacology and Methods for Effectively
Treating Clients on Psychotropic Medications.*  Los Angeles County Annual Drug
Court Conference, Los Angeles, CA.

Mooney, L.J. (July, 2010).  *Substance Use Disorders.*  Glendale Adventist Medical
Center weekly CME didactic series, Los Angeles, CA.

Mooney, L.J. (January, 2011). *Prescription Drug Abuse: Who Are the Users?*  Loyola
Marymount University, Los Angeles County Sober Living Coalition, Los
Angeles, CA.

Mooney, L.J. (February, 2011).  *The Role of Physical Activity in Addiction Treatment.*
UCLA ISAP quarterly journal club, Los Angeles, CA.

Mooney, L.J. (March, 2011). *Medication Treatment Approaches for Addictive Disorders.*
Matrix Institute on Addictions Quarterly Staff In-service, Los Angeles, CA.

Mooney, L.J. (March, 2011).  *Exercise as a Potential Treatment for Methamphetamine
Dependence.* UCLA Addiction Medicine Clinic Didactic Series.

Mooney, L.J. & Miotto, K. (May, 2011). *Marijuana: Psychiatric Aspects.*  Addiction
Journal Club, Sherman Oaks, CA.

Mooney, L.J. (September, 2011).  *Stimulant Use Disorders.*  UCLA PGY-II Didactic
Series, Los Angeles, CA.

Mooney, L.J. (December, 2011).  *American Academy of Addiction Psychiatry (AAAP)
2011 Annual Meeting Case Presentation*.  Discussant, 22nd Annual Meeting of the
AAAP, Scottsdale, AZ.

Mooney, L.J & Freese, T. (January, 2012).  *Introduction to the Medical System:
Physicians' Role in Facilitating Effective Coordination of Care for Patients with
Substance Use Disorders.*  Kern County Mental Health, Bakersfield, CA.

Mooney, L.J. (January, 2012). *Alcohol Dependence: Clinical Manifestations and
Treatment Approaches.*  Kern County Mental Health, Bakersfield, CA.

Mooney, L.J. (March, 2012).  *What You Need to Know About Stimulants in Your
Practice.*  UCLA PGY-IV Didactic Series, Los Angeles, CA.

Mooney, L.J. (March, 2012).  *Alternative Treatments in Addiction: Mindfulness
Meditation and Exercise.*  UCLA Addiction Medicine Clinic Didactic Series.

Mooney, L.J. (April, 2012).  *Medication Assisted Treatment for Alcohol and Opioid
Addiction.*  California SUD/Health Care Integration Learning Initiative
Teleconference, Los Angeles, CA.

Mooney, L.J. (July, 2012, September, 2011). *Stimulant Use Disorders.* UCLA PGY-II Didactic Series, Los Angeles, CA.

Mooney, L.J. (July, 2012). *Screening and Assessment for Addiction in Chronic Pain Patients.* Kern County Mental Health, Bakersfield, CA.

Mooney, L.J. (February, 2013). *Opiate Detoxification-Clinical Issues to Consider.* NIDA CTN Pacific Region Node Regional Dissemination Conference, Los Angeles, CA.

Mooney, L.J. and Westreich, L, Co-Chairs (May, 2013). Recognizing and Addressing Distinctive Needs Among Diverse Patients with Addictions. American Academy of Addiction Psychiatry APA Presidential Symposium, 166th Annual Meeting of the American Psychiatric Association, San Francisco, CA.

Mooney, L.J. (October, 2013). *The Natural History of Opioid Addiction and Findings from the POATS study.* California Society of Addiction Medicine State of the Art Annual Meeting, San Diego, CA.

Mooney, L.J. (December, 2013). *What you Need to Know in Starting Your Private Practice.* American Academy of Addiction Psychiatry Trainee Workshop Panelist, Scottsdale, AZ.

Mooney, L.J. (March, 2014). *Medical Advances in the Treatment of Addiction.* Funding Addiction Research Event, Santa Monica, CA.

Mooney, L.J. (June, 2014). *Medication Assisted Treatment for Addiction.* Los Angeles County Drug Court Annual Conference, Los Angeles, CA.

Mooney, L.J. (October, 2014). AAAP Symposium Chair, *Advances in Addiction Pharmacotherapy.* American Psychiatric Association 66th Institute on Psychiatric Services, San Francisco, CA.

Mooney, L.J. (October, 2014). *Introduction to Medication Assisted Treatment for Substance Use Disorders.* Eleventh Statewide Conference: Integrating Substance Use, Mental Health, and Primary Care Services in Our Communities, Los Angeles, CA.

Mooney, L.J. (March, 2015). *Pharmacotherapy for substance use disorders and findings from the NIDA Clinical Trials Network.* CALDAR T32 fellowship didactic series, UCLA Integrated Substance Abuse Programs, Los Angeles, CA.

Mooney, L.J. (June, 2015) *Exercise as a treatment intervention for methamphetamine dependence.* UCLA Addiction Medicine Clinic Didactic Series, Los Angeles, CA.

Mooney, L.J. and Freese, T. (June, 2015). *Pharmacology of Addiction and Related Issues.* OC Crime Lab, Santa Ana, CA.

Mooney, L.J. and Freese, T. (July, 2015). *Understanding the ASAM Criteria in the Context of the California Treatment System.* Substance Abuse Prevention and Control Lecture Series, County of Los Angeles Department of Public Health, Los Angeles, CA.

Mooney, L.J. (August 2015, 2014, 2013, 2012, 2011, 2009, 2008). *Methamphetamine Use Disorder.* UCLA Addiction Medicine Clinic Didactic Series.

Mooney, L.J. (September, 2015). *Extended-Release Naltrexone for Opioid Use Disorder.* Narcotic Treatment Programs Advisory Committee, Sacramento, CA.

Mooney, L.J. (September, 2015). *Pharmacology of Behavioral Medications.* Rancho San Antonio Boys Home staff training event, Chatsworth, CA.

Mooney, L.J. (October, 2015, 2014).  *Treatment of Addiction in Pregnancy*. UCLA Women's Life Clinic Didactic Series; UCLA Addiction Medicine Clinic Didactic Series.

Mooney, L.J. (October, 2015). Panelist on *Careers in Academic Psychiatry and Addiction Psychiatry*, Southern California Psychiatric Association Career Day. Culver City, CA.

Mooney, L.J. (October, 2015). *Medication Assisted Treatment for Substance Use Disorders*.  Department of Health Care Services Statewide Conference, Orange County, CA.

Mooney, L.J. (November, 2015). *Advances in Addiction Treatment*. UCLA 20th Annual Review of Psychiatry and Psychopharmacology Update. Los Angeles, CA.

Mooney, L.J. (November, 2015).  *Achieving Cannabis Cessation Treatment using N-Acetylcysteine: a NIDA Clinical Trials Network Study Overview*.  UCLA Integrative Center on Addictions Data Blitz weekly seminar presentation.

Mooney, L.J. and Peck, J. (November, 2015; December, 2015).  *Identifying and Addressing Substance Use Needs in Your Patient Population: Providing Integrated Services through the New Drug Medi-Cal Benefit*.  (Los Angeles, CA, Oakland, CA).

Mooney, L.J. (December 2015, March 2014, 2012).  *What You Need to Know About Stimulants in Your Practice*.  UCLA PGY-III Didactic Series, Los Angeles, CA.

Mooney, L.J. (January, 2016).  *Emerging Treatments for Substance Use Disorders*. Greater Los Angeles Veterans Affairs SUD staff quarterly training event.  Los Angeles, CA.

Mooney, L.J. (March, 2016).  *Medication Assisted Treatments for Substance Use Disorders*. LA Care Behavioral Health Treatments in the Primary Care Setting Conference, Alhambra, CA.

Mooney, L.J. and Teran, S. (March, 2016). *Evidence-Based Treatments for Substance Use Disorders*.  West Los Angeles VA Social Work Intern Didactic Series, Los Angeles, CA.

Mooney, L.J. (April, 2016).  *Opioid Addiction: Diagnosis and Treatment*. LA Care Pain Management in the Primary Care Setting Conference, Alhambra, CA.

Mooney, L.J. (April, 2016).  *Treatment of Substance Use Disorders in Patients with Hepatitis C*.  VISN 22 Quarterly HCV staff training event.  Long Beach (via webinar), CA.

Mooney, L.J. (May, 2016; 2014; 2015; 2013; 2012; 2011; 2009).  *Street Drugs and Mental Disorders: Dual Diagnosis Outpatient Assessment*.  CME Course presented at the American Psychiatric Association Annual Meeting.

Mooney, L.J. (July, 2016, 2015, 2014, 2013). *Neurobiology of Addictive Disorders*. UCLA Addiction Medicine Clinic Didactic Series.

Mooney, L.J. (July, 2016, 2015, 2014, 2013).  *Introduction to Addictive Disorders*. UCLA Addiction Medicine Clinic Didactic Series.

Mooney, L.J. (August, 2016). *Medication Assisted Therapy for Substance Use Disorders*. LA Care Pain Management for Chronic Non-Cancer Pain Conference, Alhambra, CA.

Mooney, L.J. (August, 2016).  *Stimulants: Cocaine and Amphetamines*.  California Society of Addiction Annual Meeting <u>Plenary Talk</u>, Anaheim, CA.

Mooney, L.J. & Teran, S. (October, 2016). *Addiction Treatment: Veteran Centered Care at the VA Greater L.A. Healthcare System*. 13th Annual Statewide Integrated Care Conference, Los Angeles, CA.

Mooney, L.J. (October, 2016). *Raising the Curtain on "Barbecue": A Conversation at the Geffen Playhouse*. Subject Matter Expert Panelist for public discussion moderated by John Horn & KPCC Radio, Geffen Playhouse, Los Angeles, CA.

Mooney, L.J. (November, 2016). *Substance Use Disorders in Veterans*. UCLA Addiction Medicine Clinic Didactic Series.

Mooney, L.J. (December, 2016). *Career Issues in Psychiatry*. PsychSign event at the 27th Annual Meeting of the American Academy of Addiction Psychiatry, Bonita Springs, FL.

Mooney, L.J. (January, 2017). *Medication Assisted Treatment for Substance Use Disorders*. T32 ISAP Postdoctoral Fellowship Program Didactics, Los Angeles, CA.

Mooney, L.J. (February, 2017). *Chronic Pain and Opioid Addiction*. 10th Kasr Al-Ainy Annual International Psychiatry Congress, Cairo University, Cairo, Egypt.

Mooney, L.J. (April, 2017). *The Opioid Epidemic: Role of the Clinician*. Panelist for UCLA Fielding School of Public Health Event, "The Opioid Addiction Epidemic: A Public Health Crisis," Los Angeles, CA. Available at https://www.youtube.com/watch?v=nCQvw7SZhtA.

Mooney, L.J. (May, 2017). *Introduction to Addictive Disorders: Assessment, Neurobiology, and Behavioral Treatment Approaches*. Presentation for CME Master Course, "Street Drugs and Mental Disorders: Overview and Treatment of Dual Diagnosis Patients" for the American Psychiatric Association Annual Meeting, San Diego, CA.

Mooney, L.J. (July, 2017). *Opioid Addiction Treatment: Best Practices in an Outpatient Setting*. Association for Ambulatory Behavioral Healthcare 49th Annual Meeting, Long Beach, CA.

Mooney, L.J. (August, 2017). *Cannabis Use Disorder*. VA Substance Use Disorders Clinic Didactic Series.

Mooney, L.J. (August, 2017). *DSM-5 Substance Use Disorder Diagnoses*. VA Substance Use Disorders Clinic Didactic Series.

### *Interviews & Media*

"Addiction: A Disorder of Choice?" KPCC AirTalk radio show; July 22, 2009.

"Face2Face Computer Program Shows Kids Consequences of Meth Use" ABCNews.com, January 5, 2010.

"Risk Factors for Opioid Misuse Among Pain Patients Differ by Sex", Medscape News, May 4, 2010.

"Shocking Mug Shots Reveal Toll of Drug Abuse", MSNBC.com, February 25, 2011.

"Your Body on Drugs," Curiosity Series, Discovery Health Channel, November, 2011.

"Drugs Made Me Do It" expert commentary, Bio Channel, June, 2013.

"Autopsy Conducted on Hoffman, Answers Sought on Actor's Drug Use", Reuters, February 4, 2014

"Mixing Energy Drinks and Alcohol Can 'Prime' You for a Binge", Today.com, July 17, 2014.

"State PDMP Regulation Important for Opioid Control", RiskandInsurance.com, July 18, 2014.

"Ask an Expert", contributor to thefix.com; June 2014-2015.

"Are Modafinil's Brain-Boosting Benefits Hype Or Science?" npr.org, November 17, 2014.

"Shortcuts to Recovery", thefix.com, December 1, 2014.

"Recovering Addicts Often Use Food to Satisfy Cravings", Good Morning America interview, December 29, 2014.

"Record Border Meth Seizures", KFI AM640 live interview with Bill Carroll, January 6, 2015.

"Benzodiazepines: Helpful or Harmful?", quoted in US News and World Report article by Kirsten Fawcett, February 19, 2015.

"The Risks of Alcohol, Marijuana, and Other Drugs, Explained", Vox.com, February 25, 2015.

"High Hitler and his Nazi Supersoldiers" Expert commentary, American Heroes Channel, Blink Films, August, 2015.

"FDA Approval of OxyContin for Children Raises Concerns." Quoted in article by Mark Wolfenbarger, Tampa Bay Times, TBO.Com, August 23, 2015. "Ask Well: Depression and Alcoholism", quoted in New York Times column by Karen Weintraub, September 25, 2015.

"Marijuana Abuse Doubles Among US Adults." Quoted in article by Mary Brophy Marcus, CBSNews.com, October 21, 2015.

"N-acetylcysteine (NAC) as a Treatment for Marijuana Dependence". Expert commentary in Vimeo video series, "Addiction. The Next Step." January, 2016. https://vimeo.com/149817887.

"A Drug Called Spice". Press Play live interview with Madeline Brand, NPR (KCRW), October 16, 2015. https://www.kcrw.com/people/larissa-mooney

"Man Made Drugs like 'Spice' are Far More Dangerous than Users Realize", Today.com, March 22, 2016.

"Fearful of Opioid Addiction, Some Under-Medicate." Quoted in article by Rebecca Plevin, KPCC News Blog, August 17, 2016.

"Medications to Treat Alcohol Abuse are Often Overlooked." Quoted in article by Mary Brophy Marcus, CBS News.com, October 4, 2016.

"Can Anything Stop America's Opioid Addiction?" Panelist, UCLA-Zocalo and C-SPAN Event Moderated by Lisa Girion, Americas Top News Editor, Reuters. Los Angeles, CA, November, 2016. Available at http://www.zocalopublicsquare.org/category/events/video-archive/?postId=81774

"Babies Born with Drug Withdrawal Symptoms Skyrocketing in Rural Areas". Quoted in article by David Mills, Healthline.com, December 12, 2016.

"Broader Availability of Opioid Overdose Drug is Saving Lives." Interview for UCLA Newsroom. http://newsroom.ucla.edu/stories/broader-availability-of-opioid-overdose-drug-is-saving-lives. February 9, 2016.

"US Drug Overdose Deaths Continue to Rise." Quoted in article by Rachael Rettner, LiveScience.com, February 24, 2017.

"25% of all Overdoses are from Heroin." Quoted in article by Nadia Kounang,
CNNHealth.com, February 24, 2017.

"Sobering Truth About Addiction Treatment in America." Quoted in article by author
David Sheff, PsychologyToday.com, May 8, 2017.

"As Complaints About Licensed Rehab Centers Rise, What Should You Look Out For?"
AirTalk KPCC live interview with Larry Mantle, May 21, 2017.  Available at
http://www.scpr.org/programs/airtalk/2017/05/31/57094/as-complaints-about-
licensed-rehab-centers-rise-wh/

"Addiction Treatment: The New Gold Rush. 'It's Almost Chic'." Quoted in article by
Teri Sforza, Orange County Register, OCRegister.com, June 16, 2017.

"Marijuana Moms Say Smoking Pot Makes Them Better Parents"
Today Show Interview, August 1, 2017
https://www.today.com/parents/marijuana-moms-say-smoking-pot-makes-them-
better-parents-t114510?cid=sm_npd_td_tw_ma


### Ongoing Research Support

1R21DA045844-01          Mooney and Hser (PIs)          09/01/2017-8/31/2018
NIDA
Patient Decision Aid for Medication-Assisted Treatment for Opioid Use Disorder
Project Role: Principal Investigator
The aim of this project is to develop and pilot test a patient decision aid within the
California Hub and Spoke System to promote expansion of medication assisted treatment
for opioid use disorder and facilitate patient involvement in care.

1R21DA042280-01          Hser and Mooney (PIs)          08/01/2016 – 06/30/2018
NIDA
Assessing Functional Outcomes Associated with Reductions in Cannabis Use
Project Role: Principal Investigator
The aim of this project is to determine if reductions in cannabis use are associated with
positive changes in health, psychosocial, and other functional outcomes in individuals
with cannabis use disorder (CUD).

1U79TI026556-01 [26556-01-04]     Kates-Wessel (PI)     08/01/2016 - 07/31/2019
SAMHSA
FY 2016 Cooperative Agreement for the Provider's Clinical Support System –
Medication Assisted Treatment
Project Role: UCLA PI
The aim of this project is to provide clinical support and education for physicians
implementing medication assisted treatment for opioid use disorder.

1U79TI026654-01          Larkins (PI)          04/15/2016 - 04/14/2019
SAMHSA
Cooperative Agreement to Support the Establishment of a Southeast Asia Regional HIV
Addiction Technology Transfer Center (ATTC)

Project Role:  Medical Advisor
The aim of this project is to assess and address the HIV and addiction treatment workforce needs in Southeast Asia, with special focus on Laos, Cambodia, Thailand, Burma, Papua New Guinea, Indonesia and China.

Subcontract CTN-0066-O          Hser (PI)               09/2015 – 08/2017

NIDA/EMMES
Opioid Use Disorders in Primary Care: Linking EHRs with PDMP and National Death Index Data Systems
Project Role: Co-Investigator
This project will analyze electronic health records of individuals treated for opioid addiction in a primary care network and will link EHR data with two other existing data systems in order to generate actionable knowledge and identify ways to improve care.

1 R01 DA032733-01A1   Karno, Rawson, Glasner-Edwards (PIs)  09/15/12 - 08/31/17
NIH/NIDA
SBIRT for Substance Abuse in Mental Health Treatment Settings
Project Role:  Co-Investigator
The major goal of this project is to use a randomized controlled trial to examine the extent to which the World Health Organization's Screening, Brief Intervention, and Referral to Treatment (SBIRT) model, the ASSIST (Alcohol, Smoking, and Substance Involvement Screening Test) and its associated brief behavioral intervention, leads to reductions in substance use and to examine the effect of SBIRT on improvement in psychiatric symptoms and initiation and engagement into substance use disorder  treatment services.

20161321                Messina (PI)              09/01/2015 – 08/31/2018
The California Endowment
Criminal Justice Involved Populations and the ACA: Enrollment, Engagement, and Effectiveness
Project Role:  Medical Advisor
The aim of this project is to increase understanding of how to effectively enroll criminal justice involved men and women into Medi-Cal or other equivalent health care coverage plans in CA that result in long-term coverage, as indicated by summative survey data on enrollment practices by the Los Angeles Sheriff Department and current probation department staff.

1 UR1 TI024242-01        Freese (PI)               09/30/12-09/29/17
SAMHSA/CSAT
The Pacific Southwest Addiction Technology Transfer Center
Project Role:  Co-Investigator
The major goal of this project is to help service providers in the community to efficiently produce optimum outcomes by disseminating knowledge about state-of-the-art treatment practices and their delivery, seeking to effect changes in practice among community-based treatment providers.

*Completed Research Support*

1 R34 AA022055-01  Glasner-Edwards (PI)                         09/1/13-08/31/16
NIH/NIAAA
Cell Phone Technology Targeting ART and Naltrexone Adherence and Alcohol Use
Project Role: Co-Investigator
The major goal of this project is to improve treatment for alcohol dependent adults by
augmenting naltrexone pharmacotherapy with an innovative text-messaging strategy to
promote relapse prevention skills, reduce HIV-risk behaviors, and improve naltrexone
and HIV treatment regimen adherence.

1 R56 DA036718-01A1        (PI Glasner-Edwards)                 07/1/14 - 06/30/15
NIH/NIDA
Cost-Effectiveness & Efficacy of Computerized Therapy for Depression & Drug Use
Project Role: Co-Investigator
The major goal of this project is to improve treatment for cannabis dependent adults with
comorbid major depression by augmenting depression pharmacotherapy with an
innovative, integrated computer-assisted strategy combining cognitive behavioral therapy
and motivational enhancement therapy to promote relapse prevention skills, reduce
cannabis use and depressive symptoms, and improve treatment adherence.

5 U10 DA13045-11  Ling (PI)                                     09/01/10 - 08/31/15
NIH/NIDA
The National Drug Abuse Clinical Trials Network
Project Roles:
Site PI, Co-Investigator; Cocaine Use Reduction with Buprenorphine (CURB)
Site PI, Co-Investigator, Accelerated Development of Additive Pharmacotherapy for
Treatment of Methamphetamine Use Disorder (ADAPT)
Site PI, Co-Investigator, Achieving Cannabis Cessation: Evaluating N-Acetylcysteine
Treatmtent (ACCENT)
The major goal of this project is to conduct and participate in behavioral,
pharmacological, and combined behavioral and pharmacological treatment trials for
substance use disorders and to conduct research on treatment practices within and across
the NIDA Clinical Trials Network Nodes.

TV-1380-COA-201    Ling (PI)                                    06/01/13 - 05/31/15
NIH/NIDA
TV-1380: A 12-week, Multicenter, Randomized, Double-Blind, Placebo-Controlled,
Parallel-Group, Study to Evaluate Effect & Safety of Once-Weekly Intra-Muscular
Injection of TV1380 (150mg/week or 300mg/week) as Treatment for Facilitation of
Abstinence in Cocaine-Dependent Subjects
Project Role: Co-Investigator
The major goal of this project is to conduct a clinical study to assess the efficacy and
safety of TV-1380 in facilitating abstinence in cocaine-dependent subjects and in
reducing measures of cocaine use compared to placebo treatment.

5 R34 DA0133196-02          Glasner-Edwards (PI)               07/1/12-06/30/15
NIH/NIDA
Cell Phone Technology Targeting ART & Suboxone Adherence and Injection Drug Use
Project Role: Co-Investigator
The major goal of this project is to develop a cognitive behavioral therapy-based text-messaging intervention (TXT-CBT) to augment buprenorphine pharmacotherapy in HIV-inflected, injection drug users (IDUs) with opioid dependence, to assess the feasibility of recruiting and retaining individuals for a large scale study and to determine the effect size of TXT-CBT over and above medication management with buprenorphine on opioid use, HIV medication adherence, buprenorphine adherence, and healthcare outcomes, and to examine potential mechanisms of action of TXT-CBT.


1 R01 DA027633-01   Rawson (PI)                09/30/09 - 08/31/14
NIH/NIDA
Aerobic Exercise to Improve Outcomes for Treatment of Methamphetamine Dependence
Project Role:  Co-Investigator
The major goal of this project is to determine whether inclusion of an aerobic exercise within a residential program improves treatment outcomes in terms of reduced methamphetamine use during a 12 weeks post discharge and 26 week follow up, as well as to characterize effects of exercise on health, psychiatric symptoms and cognition compared to the control group pre/post intervention.


MH010054          Whybrow (PI)                07/01/11-06/30/14
LA County/Dept of Mental Health
Co-Occurring Disorder Training Program
Project Role: Co-Investigator
The major goal of this project is to provide professional development and consultation on improving treatment for co-ocurring mental illness and substance abuse for over 3,000 DMH directly operated and contracted staff who serve consumers across all age groups.


2 UD1 TI13594-08   Rawson (PI)                03/31/03-09/30/12
SAMHSA/CSAT
The Pacific Southwest Addiction Technology Transfer Center
Project Role:  Expert Advisor
The major goal of this project is to help service providers in the community to efficiently produce optimum outcomes by disseminating knowledge about state-of-the-art treatment practices and their delivery, seeking to effect changes in practice among community-based treatment providers.


09-00115          Rawson (PI)                07/01/09-06/30/12
State of California/DADP
Evaluation Services to Enhance the Data Management System in California
Project Role: Expert Advisor
The major goal of this project is to evaluate California Outcomes Measurement System

24

29

data to enhance treatment services, to work with agency and counties to develop a conceptual framework for a performance and outcome management system within the continuum of care, and to increase stakeholder capacity to understand and apply performance and outcome data in order to help ADP achieve the objectives of the Continuum of Services System Re-Engineering (COSSR) strategic plan.

1 R01 DA025084-01 Ling (PI)                    02/1/09-12/31/12
NIH/NIDA
Sustained-Release Methylphenidate for Management of Methamphetamine Dependence
Project Role:  Co-Investigator/Study Physician
This project aims to evaluate the ability of sustained-release methylphenidate to reduce stimulant abuse and increase retention in the protocol among a sample of adults seeking treatment for methamphetamine use disorders, to examine its clinical utility, and to assess functioning of participants in terms of psychiatric, cognitive, social, and physical domains.

5 R01 DA 020210-03  Ling (PI)                   09/01/06-05/31/11
NIH/NIDA
Optimizing Outcomes Using Suboxone for Opiate Dependence
Project Role:  Study Physician
The major goal of this project is examine an integrative approach to the treatment of opioid dependence using pharmacotherapy in conjunction with empirically based behavioral treatment strategies.

FIJ-US-X046         Glasner-Edwards (PI)          10/01/07-09/30/10
Eli Lilly Corporation
Duloxetine for Depressed Substance Abusers
Project Role: Co-Investigator, Study Physician
This clinical trial is to evaluate the efficacy of duloxetine in reducing depression symptoms, as measured by the Hamilton Depression Rating Scale in a population with major depressive disorder and comorbid stimulant dependence.

N01DA-3-8824        Rawson (PI)                   09/30/07-09/29/09
NIH/NIDA
Phase II Clinical Trial with Bupropion for Methamphetamine Dependence.
Project Role: Co-Investigator/Study Physician
This study will assess the efficacy of bupropion in reducing methamphetamine (MA) use in subjects with MA dependence who report using MA 18 or less days per month.

08-00133            Freese (PI)                   09/29/08-09/29/09
State of California/DADP
Screening and Brief Interventions for Trauma Centers and Other Emergency Departments in California
Project Role:  Expert Advisor
The major goal of this project is to provide training on Screening Brief Interventions (SBI) techniques to trauma centers and emergency department personnel across California and

25

to provide followup consultation to address difficulties that centers may encounter in implementing the services in real world settings.


MH010054E            Freese (PI)                          07/01/07- 06/30/09
Los Angeles DMH
Integrated Services for Co-Occurring Mental Health and Substance Abuse Disorders for Children Ages 0-15.
Project Role:  Curriculum Development, Physician Trainer
The major goal of this contract is to provide to DMH staff that are treating children ages 0-15 with training and consultation for treating clients with co-occurring mental relevant and addiction-related disorders.


1 R21 DA029255-01  Glasner-Edwards (PI)                 04/1/10-03/31/12
NIH/NIDA
Mindfulness Based Relapse Prevention for Stimulant Users
Project Role:  Co-Investigator
The major goal of this project is to improve treatment for stimulant use disorders by augmenting traditional relapse prevention therapy with innovative meditation-based strategies to promote affect regulation skills.


1R43DA030879-01   Mooney (UCLA PI) /Meyers (sponsor PI)      07/01/11-06/30/12
NIH/NIDA
**A Web-Based Multimedia Resource for Prescription Opioid Treatment**
**Sponsor:  Eyes of the World Media Group, Inc.**
Project Role:   Site PI; Co-Investigator
This Phase I SBIR aims to develop a web-based intervention tool to augment treatment for prescription opioid dependence.  Feasibility, perceived value, and changes in knowledge acquisition will be assessed.

**Expert Testimony – Larissa Mooney, M.D.**

Haddad & Sherwin
Jaime Reyes, Jr. v. City of Fresno
(Plaintiffs)

Haddad & Sherwin
Petrov v. Alameda county
(Plaintiff)

 2015 Chris Vader
BRS vs. City of Palm Springs
Records review, report
(Plaintiff)

2015 Jonathan Cavins
Paramore v. Caner, et al.
records review, consultation; possible deposition/trial pending
(Defendant)

Serrato v. Monterey County – N.D. Ca. Case Number CV11-03642 RMW
6-6-13, Deposition
(Plaintiffs)

Harrison v. Alameda County – N.D. Ca. Case Number C11-2868 JST
1-20-14, Deposition
(Plaintiffs)

2014 Freeman, Freeman, and Smiley, LLP
Kern County Superior Court Case S-1501-PB-61517
Estate of Tamara Carruthers
-court testimony

2013 Law Offices of the Public Defender, Riverside County
People v. Robert Castro, Riverside Courthouse
-court testimony
(Defendant)

2013 Robins, Kaplan, Miller & Ciresi
Reuter v. Allina Medical Clinic
-written deposition for Minnesota
(Plaintiff)

32

Exh. 2

33

**Marc F. Stern, MD, MPH**
**Consultant in Correctional Health Care**
**1100 Surrey Trace Drive SE**
**Tumwater, Washington 98501**
**(360) 701-6520**
**marcstern@live.com**

August 31, 2017

This report contains my medical opinions regarding the care provided to Mr. Mark Vasquez Pajas at the Monterey County Jail (MCJ) from January 19, 2015 to January 20, 2015. It is produced at the request of Lori Rifkin, Esq., Hadsell Stormer & Renick LLP.

## I. Qualifications

I am a board certified internist specializing in correctional health care. I have managed correctional health care operations as an agent of public entities and a correctional health care vendor, and have practiced correctional health care in the following settings: jail; prison; private industry; I recently served as the Assistant Secretary for Health Care, Washington State Department of Corrections.

Over the course of my career I have worked with, and directly or indirectly supervised, hired and fired, and taught registered nurses (RN), mid-level practitioners (nurse practitioners and physician assistants), primary care physicians, and administrative support staff, both in correctional settings and in the community.

I have indirectly supervised correctional officers, have participated in designing and reviewing operational policies as they apply to the health-related activities of correctional officers, have trained custody staff and jail managers in their responsibilities relative to health care (including writing a curriculum to train prison and jail directors and health services administrators in the principles and practice of operating safe and effective correctional health care operations, for the National Institute of Corrections, U.S. Department of Justice), and have frequently been called upon to evaluate the health care-related behavior of custody officers and supervisors.

On a regular basis I investigate, monitor, or evaluate the safety and appropriateness of health care delivery in correctional institutions for a variety of parties, including federal courts, the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security, the Special Litigation Section of the Civil Rights Division of the U.S. Department of Justice, state departments of corrections, county jails, and current or former inmates. I teach correctional health care principles, including practice standards related to the practice of nurses and physicians, to national audiences of physicians, nurses, and other health care professions.

In my practice as a physician, I have diagnosed and cared for patients with endocarditis and strokes, and have occasion to consider these diagnoses in the patients I treat.

34

I thus have the training and expertise to evaluate the conduct of the nurses, support staff, officers, and jail authorities in this case. Additional detail of my education, teaching and work experience, and publications are contained in my Curriculum Vitae, which is attached.

## II. Documents
I relied upon the following documents for my report:

1. Jail Medical Records – Current and Prior Admissions
2. Coroner's Report
3. Photographs of Jail and Descriptions
4. Jail Custody Records – index admission
5. Sheriff's Death Investigation Report
6. Jail Medical Policy and Procedure Manual
7. Video recordings in Booking area, 1/19/15 – 1/20/15
8. California Forensic Medical Group (CFMG) Quality Assurance Committee Meeting Minutes of 11/15/07, 8/12/11, and 3/19/15
9. Standardized Nursing Procedure Manual
10. Mee Memorial Hospital Clinic Medical Records
11. Natividad Medical Center Medical Records
12. AED Tracings
13. Deposition of Dr. Daniel Wasserman, ER Physician
14. Deposition of Dr. Eluido Garcia, Facility Medical Director, as 30(b)(6) witness
15. Deposition of RN Kristina Russum
16. Deposition of RN Christina Kaupp, as 30 (b) (6) witness
17. Deposition of RN Christina Kaupp, as individual
18. Video and sound clip from above deposition showing demonstration of Mr. Pajas' position at the 13:00 check
19. Deposition of Deputy Officer (DO) Rosio Silva
20. Deposition of DO Alejandro Miranda
21. Deposition of DO Jeffrey Colon
22. Deposition of DO Catherine McGrew
23. Deposition of DO Luis Serrano
24. Expert Report of Dr. Michael Puisis
25. Death Investigation Report (45 pages)
26. Death Investigation Report (Palazzolo Interviews and Report; 191 pages)
27. Representation of facts from plaintiff's counsel
28. Declaration of Ben Rice
29. First Amended Complaint
30. Medical Records of Jose Contreras
31. Medical Records of Daniel Lariviere

## III. Summary of Facts with *Annotations*
Mr. Mark Pajas was a 56 year old gentleman with a past medical history of hepatitis C, heroin, tobacco, and alcohol abuse, emphysema, and bacterial endocarditis. He was seen in a community clinic on 12/2/14 for continuing treatment of right hip pain. At that time his blood pressure was

---

142/84 and 140/90 (normal or close to normal), and similar to previous readings in the clinic over the previous few years.

On 1/19 (all dates are in 2015 unless otherwise specified), following his arrest[1], King City Police took Mr. Pajas to the Natividad Medical Center Emergency Department (ED), where he was found to have cellulitis and discharged with prescriptions for two antibiotics; his blood pressure at the time was 142/98 (above normal).

> *There is little to no clinical evidence, pre-mortem or post-mortem, supporting the diagnosis of cellulitis (an infection of the skin). Having two simultaneous symmetrical infections of the legs would be highly unlikely. Having a single infection in the body extending to both legs would require the infection to be continuous from one leg, through the pelvis, to the other leg. Such an infection would be quite major; the patient would be markedly ill, much more obviously ill than Mr. Pajas was at that moment. Mr. Pajas was also lacking other concomitants of infection such as symptoms of infection in the prior days (fever, chills, sweats), elevated body temperature, redness or increased warmth of the skin of his legs, an obvious source of the infection (other than a scab on his left leg[2]), or significant changes in the white blood cells that fight infection.*

At 18:30 (all times are the time on the corresponding paper document unless a video time stamp was available) he was taken from the ED to MCJ where he was admitted. He had been admitted to this jail numerous times in the past  (I saw records going back to the late 1990s). At least once during those admissions he was treated for acute alcohol withdrawal. Upon admission on 1/19 a Deputy Officer (DO) conducted a screening that revealed that Mr. Pajas last used heroin that day. The DO also noted that Mr. Pajas has swollen legs, trouble hearing, and was taking morphine (this probably reflected a dose of morphine Mr. Pajas had received in the ED).

At 20:08 on the video (documented as 21:00) RN Russum conducted an Intake Triage Assessment evaluation of Mr. Pajas. The evaluation appeared to have been triggered by Mr. Pajas' positive responses to the DO who conducted the Intake Health Screening earlier, notably his use of heroin. The nurse conducted the evaluation while the two were standing in the hallway in front of the doorway to Booking Cell 3, in the presence of DO. The evaluation lasted 132 seconds. The nurse did not elicit any additional past medical history, but did learn from him that he was "coming down" and needed medications to help him. The nurse also determined that Mr. Pajas had just been in an ED at 18:30 that evening for cellulitis where he had been prescribed two antibiotics. The nurse measured his vital signs with the following results: blood pressure 178/92 (very high); heart rate 74 (normal); temperature 97.8 (normal); respiratory rate 16 (normal); weight and blood oxygen level were not measured. The nurse also noted that he had "popping" marks on both thighs. Based on this evaluation, the nurse began an opiate detoxification regimen (Valium 10 mg orally daily for three days, vitamins, Vistaril 50 mg orally

---

[1] The arrest was made while Mr. Pajas was riding a bicycle. His bicycle was stopped by using a police vehicle. After careful review, I did not find any evidence that this event was in any way medically traumatic or had any bearing on Mr. Pajas' health or his cause of death.

[2] A jail nurse noted "'popping' marks to both thighs." However, a) these were not noted by the ED doctor, the ED nurse, or the Medical Examiner, and b) even if they existed, they were in a different location than the purported infection, so in either case, this nurse observation has no bearing on my analysis.

Report of Marc F. Stern, MD                                                                                      Page 3

daily for five days, clonidine 0.1 mg. orally twice daily for five days, to be held for blood pressure less than 80/60, vital sign checks daily for three days, ibuprofen 600 mg orally thrice daily for 3 days, and Imodium 2 mg orally thrice daily for 3 days, "push fluids" [encourage and support the patient to drink fluids]), ordered the two antibiotics recommended by the ED physician to be given twice daily (i.e. 06:00 and 18:00), and scheduled the patient for a clinic visit in 72 hours.

> *There is no indication that the nurse involved a practitioner (physician, nurse practitioner, physician assistant). With the exception of the antibiotics, the nurse ordered these things in accordance with a generic nursing procedure in effect at the time for patients withdrawing from heroin (Standardized Procedures for RN's – Drug Withdrawal). As described in more detail later, this procedure was not only inappropriate and dangerous, but the defendants knew so before Mr. Pajas even arrived in the jail.*

> *The nurse failed to request Mr. Pajas' medical records from his ED visit (the documents he brought with him were only the patient discharge instructions and prescription, not the actual medical records).*

> *The nurse failed to follow the treatment plan ordered by the ED. The discharge instructions called for Mr. Pajas' legs to be kept elevated. The nurse ignored this. The prescriptions called for Mr. Pajas to receive two antibiotics twice a day. He had not yet received his first dose of either medication, so it was incumbent on the nurse to arrange for Mr. Pajas to receive them that day. Instead she did not order them to begin until the following day. When asked during her deposition whether she knew if Mr. Pajas had gotten his first dose of antibiotics at the ED, Nurse Russum said that she didn't know, and when asked if, therefore, she sought to find out, she said she didn't ask. Had Mr. Pajas actually been suffering from cellulitis, this delay would have been negatively impacted his ability to fight the infection.*

> *The evaluation lasted just over two minutes. It is impossible to fathom how a medical professional could possibly conduct a minimally complete evaluation, the structured part of which itself contained 42 questions (i.e. not counting open ended questions, follow-up questions, responses to questions from the patient, and instructions the nurse needed to give the patient about the treatment plan, including the need to drink plenty of fluids), in that amount of time.*

> *The nurse unnecessarily conducted the evaluation non-confidentially. In addition to the DO who was standing in front of Mr. Pajas, the conversation would have been audible to anyone passing in the hallway or in a nearby cell (snippets of the conversation are audible on the video recording made with a microphone some 20 to 25 feet away). This violated a patient's right to privacy as well as MCJ's own policy (Health Care Philosophy; "Medical procedures and interviews shall be performed in a private clinical setting in accordance with facility security procedures."). Moreover, it made the medical care more dangerous. Indeed, patients in a custodial environment are less likely to provide full and accurate health information when they cannot rely on the conversation*

*to be confidential, and in the absence of full and accurate information, the health care that follows may be misguided and unsafe. While it is sometimes necessary for custody staff to be present during medical encounters, the record is clear in this case that at this point in time Mr. Pajas presented no danger to the safety of the nurse.*

*Lastly, and perhaps most importantly, the nurse took no further action to address Mr. Pajas' markedly elevated blood pressure (178/92, normal less than 120/80)[3]. Not only was it elevated, but it was rising as compared to the previous blood pressure obtained a few hours earlier in the ED (142/98), something she was not aware of because she had failed to request the ED records. Given the Medical Examiner's finding of heart disease as a likely cause of death, and the role of high blood pressure in triggering an acute heart attack, this is **a critical failure point** in the management of this case. In her deposition, Nurse Russum explained she thought Mr. Pajas' elevated blood pressure was just the result of agitation from being in jail, and thus did not feel the need to contact a practitioner. Even a lay person knows that people die from elevated blood pressure and a subsequent heart attack; this is certainly something a licensed nurse should have known. While agitation may raise someone's blood pressure, having a possible reason for the elevation doesn't make the elevation any less significant and dangerous. That agitation may have been the cause of Mr. Pajas' elevated blood pressure may reasonably have affected the <u>manner</u> in which she treated it, but this suspicion did not obviate the <u>need</u> to treat it. Thus it would have been very reasonable for Ms. Russum to spend a few minutes as a caring clinical nurse trying to reduce Mr. Pajas' agitation and then plan to return several minutes later to recheck it. Instead, she ignored it. She did not write about it in her note. She did not call a practitioner. She did not try to reduce Mr. Pajas' agitation. She did not plan to remeasure his blood pressure. She did not ask another nurse to recheck his blood pressure. Mr. Pajas' blood pressure was not checked again from this moment until his heart stopped, some 18 hours later.*

At 21:49, when brought from Booking Cell 3 to the Booking desk to sign some papers, Mr. Pajas asked to use the rest room. A DO Miranda sent him into Sobering Cell 1. At 21:54, when he hadn't emerged from the cell, DO Quintera checked on him. She found him lying on the floor, wishing to stay there because he was feeling sick. He apparently asked for a blanket, to which DO Miranda replied, "If you want a blanket, I need you to come out and go to the other cell. Alright. You get nothing then." At this point, the DOs made the decision that Mr. Pajas was not well and needed to be formally assigned to the Sobering Cell.

*The decision to officially house Mr. Pajas in a Sobering Cell because he wasn't well invoked a formal process, described in MCJ policies and procedures, which, among other things, required the DOs to a) immediately contact medical staff, and b) begin monitoring him every 15 minutes, to be recorded on a log.*

*Instead, the DOs did not contact medical staff immediately. Video shows a nurse coming to the cell at 00:29 (on 1/20), some two and a half hours later, to see him. The trigger or purpose for the nurse's visit is not clear as the nurse (and the DO) failed to document the*

---

[3] At this and multiple other failure points in this report, my analysis assumes that the further steps that should have been required and taken would be performed by competent health care professionals.

*event, as required by minimally acceptable nursing practice. Whatever the purpose of the visit, presumably the nurse had one. Yet, she walks away a few seconds later, without ever entering the cell. The next time a nurse interacts with Mr. Pajas is at 04:45, which appears to be the formal medical evaluation for placement in the Sobering cell (an evaluation that should have occurred some seven hours earlier). A proper evaluation the previous evening, when Mr. Pajas was first thought to be unwell, may very well led to discovering clinical information, treatment of which may have prevented his death. Thus this is the **second critical failure point** in Mr. Pajas' care.*

*DOs also did not begin monitoring Mr. Pajas every 15 minutes and recording this in the log; the log was not even begun and posted until 04:05.*

On 1/20 at 03:46, a licensed vocational nurse (LVN) came to Mr. Pajas' cell. The DO accompanying him called to Mr. Pajas several times. Mr. Pajas appears to come to the door and get medications. According to the record, the medications given were Valium, multivitamins, Vistaril, clonidine, ibuprofen, Imodium, Bactrim, and Keflex. A moment later I surmise that Mr. Pajas threw up his medications.[4]

After observing the vomiting, there is conversation among the three staff members about Mr. Pajas having the flu or bird flu. The LVN continues to observe Mr. Pajas through the closed cell door, yelling "Are you alright? Are you okay?" He does not re-enter the cell and after a few moments, all the staff walk away.

*Mr. Pajas' medications were ordered to be given at 06:00. Instead, the LVN administered the medication at 03:46. The current standard of care dictates that most of these medications should be delivered within a one hour window of the scheduled time (i.e. between 05:00 and 07:00); the one exception was the multivitamin which is allowed a two hour window. Thus all medications were delivered outside the acceptable limit, with the most important medications begin delivered well outside the window. The LVN did not document any reason for ignoring the orders.*

*Based on statements provided by staff, it appears that nurses' practice of deviating from the ordered time delivery of medications at MCJ is not only well known, it is planned and happens at other times (e.g., see below where nurses attempted to administer Mr. Pajas' noon medications at 10:00). The deviation is especially troubling for 06:00. Not only does it border on inhumane to roust a sick patient out of bed at 03:46 to receive medications, but doing so increases the chances the patient will refuse the medication, which is unsafe.*

*The order for clonidine, a powerful blood pressure lowering medication, called for the administering nurse to "hold clonidine if BP [blood pressure] is < [less than] 80/60."*

---

[4] This conclusion is based on review of the video and is consistent with subsequent facts. Mr. Pajas cannot be seen on the video, however, based on the reaction of the DOs and LVN and their conversation, Mr. Pajas vomited his pills. Further, this was the last time there was documented administration of medications while Mr. Pajas was alive, and several pills were found in his sink during the death investigation, the analysis of which correspond to the medications documented as having been given at this time.

*Thus it is impossible to safely carry out this order without first checking the patient's blood pressure. The nurse did not. There is no report by the nurse that Mr. Pajas refused anything during this encounter, and, in fact, Mr. Pajas complied with requests to come to the door and take his medication. Presumably he would also have been fully cooperative with the blood pressure check but the nurse did not even attempt to take one. Had the nurse checked Mr. Pajas' blood pressure, it may have revealed that it was abnormal, leading to further evaluation and/or treatment, which in turn may have avoided his death. Thus this is the **third critical failure point** in Mr. Pajas' care.*

At 04:05, a log shows that Mr. Pajas was officially assigned to Sobering Cell 1, the cell in which he had been for the previous seven hours because he was not well. The DO began the Sobering Cell Assessment Report log, and the "Sobering/Safety Cell/Restraints Log" in which, under "initial arrestee examination/observations" he described Mr. Pajas' condition in the following way: "staggering, swaying, poor coordination, unsteady…eyes watery…face pale…speech slow."

*The DO's examination revealed an individual who had undergone a significant deterioration since his arrival in the jail nine hours earlier, and his examination by a nurse eight hours earlier. Mr. Pajas' change in condition (and his assignment to Sobering Cell status) required a notification to a nurse, followed by a timely evaluation by the nurse. Instead, no nurse arrived until almost an hour later (05:02). I was unable to determine whether the delay in response resulted from a failure on the part of the DO, the nurse, or both, due to the absence of documentation by either. Timely evaluation of Mr. Pajas at this point may have revealed whatever physiologic perturbations he was experiencing, leading to treatment and avoidance of his death. This juncture was thus the **fourth critical failure point** in Mr. Pajas' care.*

At 05:02 on video (documented as 04:45 on the log), RN Ruybel came to do the first "Sobering/Safety Cell/Restraint" check on Mr. Pajas. According to the nurse's note, she was informed by the DO that Mr. Pajas had had nausea and vomiting once. On the video recording, the nurse is seen standing outside Mr. Pajas' cell the entire time. The conversation is mostly inaudible except for a short clip which ends with "otherwise I can't give you anything." She did not obtain any vital signs (other than respiratory rate, 16) or conduct any other evaluation as part of the check because the "[patient] refused." The orders show that she ordered a medication for nausea and vomiting (Phenergan 50 mg orally, one now and then one twice daily). The patient refused the "now" dose.

*This evaluation was meant to constitute the initial health evaluation of someone placed in Sobering Cell status due to being unwell, and evaluation which would also serve as a baseline for each subsequent four-hourly evaluation. According to the form the nurse was using, such an evaluation required (and minimally adequate care would require) that the nurse measure the patient's vital signs (blood pressure, pulse, temperature, breathing rate), and assess the patient's level of consciousness, gait, fluid intake, voiding, behavior, breathing, skin color, skin moisture, skin temperature to the touch, capillary refill time, and pupil reactivity to light. CMJ Standardized Procedures for RNs (Drug Withdrawal) required the nurse to collect at least eight other pieces of symptom information from the*

*patient, and examine another five physical signs. The active orders also required the nurse to be encouraging and supporting the patient in drinking plenty of fluid. Chart and video evidence indicate that the nurse conducted but a fraction of this entire critical evaluation. There is no evidence on the video recording or the progress note of the nurse "pushing fluids" as per the existing detoxification regimen and orders.*

*The explanation the nurse wrote for failure to conduct the evaluation was that Mr. Pajas refused. This is an unacceptable conclusion for two reasons. First, given the reason Mr. Pajas was being evaluated in the first place (drug use/withdrawal), his capacity to make medical decisions in his own best interest is in question and cannot therefore be assumed. Other than knowing that Mr. Pajas was "awake," the nurse failed to conduct any further evaluation of his mental status to prove that he had capacity to refuse. Second, there is no evidence that Nurse Ruybel made even a modicum of effort to explain the importance of the evaluation she needed to do or explain the risks of refusal. Third, and most troubling, there's no evidence reflecting any caring, compassion, or humanity on her part during her 37 second encounter to try to gain Mr. Pajas' participation in an evaluation – even an abbreviated one.*

*Regardless of whether Mr. Pajas' voiced refusal of medications constituted an informed refusal, Nurse Ruybel had an obligation to take further action to protect Mr. Pajas by mitigating the effects of that refusal (effects such as continuing vomiting, cardiac stress, and loss of fluids and electrolytes). If she was unsuccessful – as she was – she then had an obligation to seek assistance from a higher professional. This obligation is based both in minimally acceptable medical practice, as well as MCJ's own policy (Health Care Philosophy; "Refusal of essential mediations and treatment [i.e. the absence of which would jeopardize the health and safety of the inmate] shall be reported to the responsible medical provider as soon as possible."). That higher professional was her physician supervisor, Dr. Garcia, MCJ Medical Director. However, Nurse Ruybel made no attempt to contact the physician.*

*One of the two only pieces of clinical information the nurse did collect from Mr. Pajas was his breathing rate, which she documented as 16. Based on my review of the video, even that piece of information cannot be relied upon as being true. It might barely be possible to measure a patient's breathing rate in 37 seconds, however, a) in this case Mr. Pajas was speaking for part of the time (making measurement impossible), and b) the nurse never looked at her watch. Thus I cannot determine how the nurse divined this physiologic measurement nor can it reasonably be relied upon to be true.*

*In sum, a caring and minimally competent evaluation of Mr. Pajas at this point by the nurse or after referral to the physician, may have uncovered abnormalities and reasonably led to treatment that could have prevented his death. Thus this juncture was the **fifth critical failure point** in Mr. Pajas' care.*

*Finally, further indicative of substandard procedures, training, or practices by CFMG/MCJ, the nurse's order for Phenergan constituted the practice of medicine without a license. There was an existing nursing protocol for administration of*

*Phenergan for nausea and vomiting, however, that protocol excluded patients undergoing detoxification. There was also an existing protocol for administration of Phenergan during alcohol withdrawal, however, a) Mr. Pajas was not suffering from alcohol withdrawal, and b) even if he were, the dose called for in the protocol was not the dose the nurse ordered.*

At 08:28 on the video, (documented as 08:30) RN Kaupp came to Mr. Pajas' cell to conduct the next four-hour check. According to her written progress note, she found Mr. Pajas lying on the floor, but according to her deposition testimony, she found him sitting upright in the middle of the cell, not against a wall. The nurse did not obtain his vital signs, but did check boxes indicating that he was: awake; had a steady gait; was taking fluids; was voiding; breathing regular. color normal. skin moist. skin temperature warm; capillary refill normal; pupils reactive right and left; awake and alert. Nurse Kaupp gave no explanation in the progress note for not measuring Mr. Pajas' vital signs, but in depositions stated that he was refusing vital signs, saying "No, I'll be fine." The nurse offered, and the patient refused Phenergan by mouth; he refused because he said he would throw it up. So the nurse offered him Phenergan by injection, but she said he didn't want that. In her contemporaneously written progress note, Nurse Kaupp wrote that Mr. Pajas asked for Gatorade[5], but in her deposition she stated that she encouraged him to drink Gatorade. The nurse said she would bring some. During the entire visit, according to Nurse Kaupp's testimony, confirmed by the video, she never set foot in Mr. Pajas' cell.

*Based on my review of the video, the custody log, and the investigator who interviewed staff immediately after Mr. Pajas' death, the nurse never brought the Gatorade nor is there any other evidence of the nurse "pushing fluids" as per the detoxification regimen. In deposition, Nurse Kaupp explained that in fact she was not the one who would bring patients their Gatorade, but rather this is something provided by the LVNs who kept it on their medication carts. So, when she returned from Mr. Pajas' cell to the infirmary, she instructed an LVN to give Mr. Pajas Gatorade during the 10:30 medication pass. Whether Nurse Kaupp failed to actually give this instruction, or the LVN failed to follow it, the result was the same: there is no evidence the LVN provided – or even offered – Mr. Pajas any Gatorade during the 10:30 (10:21 actual time) medication pass. Moreover, Nurse Kaupp's plan for the Gatorade was illogical and therefore dangerous. If she believed that Mr. Pajas was nauseous and or vomiting (which I assume she did because she offered him Phenergan), then expecting him to be able to drink Gatorade borders on magical thinking. If, on the other hand, she believed that Mr. Pajas was able to drink the Gatorade, then her plan to have the LVN provide Gatorade at the 10:30 medication pass was woefully insufficient. First, that meant Mr. Pajas wouldn't get any Gatorade for another two hours. Second, according to Nurse Kaupp's deposition testimony, LVNs only deliver Gatorade powder in the patient's cup. Thus the maximum Gatorade Mr. Pajas would receive in a day would be one cup at each of the three or four medication passes; this hardly satisfied the orders for Mr. Pajas which were to "push fluids." Thus, regardless of Nurse Kaupp's thinking and plan at that moment, her actions made it likely that Mr. Pajas would not receive sufficient fluids and electrolytes.*

---

[5] Gatorade is commonly used in the treatment of opiate withdrawal accompanied by fluid loss from diarrhea or vomiting, as an effective way to keep patients hydrated with a fluid that replaces not only water, but also electrolytes and carbohydrates.

Report of Marc F. Stern, MD                                           Page 9

*Nurse Kaupp's assertion that Mr. Pajas was refusing vital signs and medication is not consistent with an interview with the investigator who interviewed staff immediately after Mr. Pajas' death, "Pajas never said he did not want treatment only that he could not get up."*

*Nurse Kaupp's assertion that Mr. Pajas voiced refusal of vital signs and medications, even if true, suffers from the same problems as the "refusal" reported by the previous nurse at 05:02, i.e. there is insufficient evidence that Mr. Pajas had the capacity to refuse, there is insufficient evidence that Nurse Kaupp made an adequate effort to explain the importance of the evaluation she needed to do or explain the risks of refusal, and there is insufficient evidence of Nurse Kaupp making a good faith effort to try to gain Mr. Pajas' participation in an evaluation – even an abbreviated one – or offer another alternative to delivery of Phenergan: rectal suppository (a common way to administer Phenergan).*

*Even the scant assessment that Nurse Kaupp did record is not entirely credible.*

- *By her own documentation, Mr. Pajas was "lying on the floor"; how could she possibly observe, then, that his gait was "steady"?[6]*
- *Nurse Kaupp documented that Mr. Pajas' skin was moist (but not diaphoretic, where there is frank sweating). Moist skin – certainly at early stages – is not something that can be seen. Thus it is highly questionable that she knew his skin to be moist. However, if she did, then she had further obligations. Moist skin is an abnormal finding, requiring further investigation and possible treatment for the underlying cause (e.g. infection, heart attack). Yet the nurse did nothing more about the moist skin. She simply ignored it.*
- *Nurse Kaupp documented that Mr. Pajas' skin was "warm," yet she never touched him.[7]*
- *Nurse Kaupp documented that Mr. Pajas' pupils were each "reactive," meaning that when shining a light in the right pupil, it constricted, and when shining a light in the left pupil, it also constricted. Barring a long explanation to the patient, his cooperation, close proximity, and excellent lighting conditions, it is simply impossible to determine that a patient's pupils are reactive to light from a distance.[8]*
- *Lastly, Nurse Kaupp documented that Mr. Pajas had "normal" capillary refill time. The capillary refill test, which measures, in part, how well the heart is pumping, requires the examiner to blanch the patient's skin by pressing on it*

---

[6] In her deposition, Nurse Kaupp explained this documentation by saying that she mis-documented another patient's information on Mr. Pajas' record. This is not a plausible explanation. The nurse did begin entering another patient's information on Mr. Pajas' record, but when she realized her mistake, she crossed out the information, some of which was above the "steady" gait entry, and some of which was below it. So it is highly unlikely that she corrected erroneous entries before and after the gait, but not the gait.

[7] In her deposition, Nurse Kaupp claims that she can determine skin temperature based on skin moisture. Even if the nurse believes this explanation, it is a scientific impossibility.

[8] Nurse Kaupp also claimed in her deposition to be able to measure Mr. Pajas' pupillary reactivity from a distance: "I was looking at him and talking to him, so you can examine pupils." For the reasons explained above, her claim is ludicrous.

---

Report of Marc F. Stern, MD                                                      Page 10

> *and measure the number of seconds for normal color to return. Nurse Kaupp simply documented something she did not do.*
>
> *Nurse Kaupp's above-cited failures during this encounter, especially her failure to conduct an assessment of Mr. Pajas which may have uncovered abnormalities and reasonably led to treatment that could have prevented his death, and her failure to make an adequate effort to get him to take medications to reduce nausea and vomiting, which may have the stress on his heart, constitute the **sixth critical failure point** in Mr. Pajas' care.*

Between her visit at 08:28 and her subsequent visit at 13:02, Nurse Kaupp claims to have conducted observations of Mr. Pajas "a few times," "at least two." None of these alleged observations are documented, and it has been represented to me that review of video footage of the booking area from 08:28 to 13:02 reveals no observations were conducted by Nurse Kaupp in this interval.

At approximately 09:00, Dr. Garcia, MCJ Medical Director, was on site at the jail. According to information provided at her deposition (not documented in Mr. Pajas' medical record), Nurse Kaupp informed Dr. Garcia that Mr. Pajas refused Phenergan. She did not inform him that she had not obtained any vital signs. Dr. Garcia apparently asked no further questions. His only statement was for the nurse to be sure Mr. Pajas was still in a detoxification cell and that staff were following the protocol for monitoring.

> *In a properly functioning medical department where patients were properly diagnosed with substance withdrawal, and properly managed by protocols consistent with current medical science knowledge, permissible scope of practice, and implemented by attentive nurses functioning at a minimally competent level who were regularly supervised, Dr. Garcia might not ordinarily be required to check into each withdrawing patient each day. However, the system for providing medical care at Monterey County Jail was not a properly functioning system and did not have the necessary protocols and supervision in place to allow for this. In the specific case of Mr. Pajas, Dr. Garcia was allegedly directly notified by the nurse that one of his patients was having a problem, and therefore he certainly had an obligation to look further and make inquiry as to, for example: Why was Mr. Pajas not accepting his needed medications? What effect would lack of these medications have on his health? What was the current status of his health, such as his level of mentation and his vital signs? Did any further testing need to be done? Did he require different treatment, such as intravenous fluids, stronger medications, evacuation to a hospital, etc.? Had Dr. Garcia asked any of these question, it would inevitably have led to discovering how little clinical information nurses had collected about Mr. Pajas, that the detoxification protocol that was in place was not being followed, and likely how poorly he was doing, leading to further evaluation and treatment that may have avoided his death. However, Dr. Garcia chose not to see Mr. Pajas or ask the nurse for any additional information. In other words, rather than look further, Dr. Garcia looked away at this, the **seventh critical failure point** in Mr. Pajas' care.*

At 10:21 on the video (documented as 10:00 on the Medication Administration Record (MAR) and 10:17 on the custody log) an LVN ("Amy") came to Mr. Pajas' cell to administer his 12:00 medications. The DO accompanying her can be heard on the video recording asking Mr. Pajas if he wants his medications (Valium, Vistaril, ibuprofen, and Imodium). Based on the DO's part of the conversation, I surmised that Mr. Pajas had been throwing up. The nurse does not appear to say much to Mr. Pajas. After 31 seconds she departs without giving the medications. She documented in the MAR that he refused.

> *This medication "refusal" suffers from the same problems as the medication "refusals" reported previously by Nurse Ruybel at 05:02 and Nurse Kaupp at 08:30, i.e. there is insufficient evidence that Mr. Pajas had the capacity to refuse and there is insufficient evidence that the LVN made an adequate effort to explain the importance of the evaluation she needed to do or explain the risks of refusal. Indeed, it is difficult to have much of a meaningful interaction in 31 seconds.*

> *This medication "refusal" also suffers from the same additional deficiency manifest by Nurse Ruybel at 05:02 by failing to notify Dr. Garcia as required by minimally acceptable medical practice, as well as MCJ's own policy. For the same reasons as described for the two previous medication "refusals," the LVNs behavior at 10:21 constitutes the **eighth critical failure point** in Mr. Pajas' care.*

> *Further evidencing a medical system functioning below the standard of care, the attempted administration of these medications one hour and 40 minutes prior to the time they were scheduled to be administers exceeds the acceptable window (explained in greater detail where I described the 03:46 medication administration).*

At 13:02 Nurse Kaupp came to the cell for the third RN check on Mr. Pajas. Mr. Pajas was either lying (Kaupp statements during Death Investigation) or sitting (Kaupp statements during deposition) on the floor. The nurse asked him to step out and sit on the bench, to which he replied that he was not able to. The nurse then asked him to at least sit up against the wall so she could check his vital signs to which he again replied that he could not. The nurse documented the same description of his physical condition as during the 08:30 encounter. According to testimony of DO Colon, the DO accompanying Nurse Kaupp, Mr. Pajas also complained of back pain during this encounter. Mr. Pajas again asked for Gatorade (using expletives). The nurse documented that he "refuses medical" and "states he can't move yet witnessed walking around cell moments prior by deputies." In her deposition, the nurse stated she concluded he was being uncooperative. She stated that because he could not sit up straight, she could not measure his blood pressure. The nurse left without measuring *any* vital signs (except respiratory rate of 16). There is no evidence of the nurse "pushing fluids" as per the detoxification regimen, nor, based on review of the video, does it appear that the nurse brought Mr. Pajas the Gatorade at any time after this encounter or before his collapse was discovered at 14:12.

> *Nurse Kaupp's assertion that Mr. Pajas was "refusing" medical care suffers from the same problems I described in the previous "refusals" to nurses.*

*Nurse Kaupp's documentation (check-off boxes) of Mr. Pajas' physical condition – identical to what she documented during her 08:30 visit – suffers from the same problems I explained under the description of that visit and therefore is equally incredible. In her deposition, she explains her documentation of Mr. Pajas' gait as "steady" as being based on observations by custody staff just prior to her arrival. I could not rely on her assertion for a few reasons. First, "gait" is a component of the physical examination section of her report, meaning that a nurse is supposed to document what they saw themselves, not historical information provided by the patient or other informants. Second, even if custody staff told her that Mr. Pajas was "walking around cell," that still does not necessarily mean he was steady on his feet (as opposed to "unsteady," which was the other choice available on the form). Third, patients' conditions change over time; they can get worse, as happened with Mr. Pajas. So even if Mr. Pajas had been walking around prior to this visit, and even if he was walking steadily, the evaluation called for the nurse to assess and report on his <u>current</u> condition; given the fact that Mr. Pajas told the nurse that he could not get up, there was more than enough reason for Nurse Kaupp to suspect that something had changed (worsened).*

*Nurse Kaupp's failure to measure Mr. Pajas' vital signs (with the exception of his breathing rate) is again, unforgivable. In her deposition, she tried to provide a reason for not measuring Mr. Pajas' blood pressure: "I needed him to sit more erect to get a blood pressure. If you are pushing on your femoral artery, and you have weight on your femoral artery -- which is in your thigh -- you're not going to get a really good blood pressure. So just like when you to the doctor's, and they said, sit up, put your feet on the ground, you need somebody to sit up straight to get an accurate blood pressure." If Nurse Kaupp believed this explanation, it is evidence of very poor understanding of basic nursing science, so poor as to render her not competent to perform the duties of an RN. If she did not believe it, then her explanation was a post-hoc excuse for not conducting a simple rudimentary nursing intervention. While a patient's position can have some small effect on a blood pressure reading, such minor effects are irrelevant in this situation (and the patient's "femoral artery" had as little to do with his blood pressure at this point as did the color of his eyes). Nurses take blood pressures of patients in lying or semi-seated position in hospital beds all the time; if they required all hospital patients to "sit up, with [their] feet on the ground" most hospital charts would be devoid of any blood pressure measurements. Notwithstanding any discussion about why Mr. Pajas' position prevented Nurse Kaupp from measuring Mr. Pajas' blood pressure, she provided absolutely no explanation or excuse for not checking his pulse and temperature. It is very likely that at least one, if not more, of Mr. Pajas' vital signs would have been abnormal at this point in time, and discovering this would have inevitably led to more evaluation and treatment which may have prevented his death. Nurse Kaupp's failure to conduct a proper evaluation at this point, including physical assessment and measurement of vital signs, thus constitutes the **ninth critical failure point** in Mr. Pajas' care.*

*The most troubling aspect of the care provided by Nurse Kaupp at 13:02 of the day he died – and arguably the most troubling finding in this entire case – is revealed by a statement DO Colon provided to Sheriff's investigators preparing the Death Investigation. DO Colon attested, "The medical staff (Nurse Kaupp) explained to Pajas*

46

*that he would need to get up and cooperate in order to receive any medications. The nurse asked to take Pajas' vitals and he refused." This statement from the nurse could not be further from the truth and more devoid of scientific rationale. While there was certainly a need to check Mr. Pajas' vital signs, and standing up might have made it easier for the nurse to take his blood pressure or assess his gait, there was no clinical requirement to "get up and cooperate" with vital signs in order to administer his nausea medication at that point. Given the utter lack of a scientific medically-based reason for Nurse Kaupp's conduct, I can only conclude that it was driven by cynical annoyance with him, and thus constituted a callous disregard for Mr. Pajas' welfare.*

At 13:45 a DO made the last scheduled check (see below) on Mr. Pajas. The DO logged "on R side, breathing."

During the interval from 1/19 at approximately 21:49 until 1/20 at 14:12 Mr. Pajas was in Sobering Cell 1. As noted earlier, he was in the cell for most of that period "for cause," i.e. custody staff had concern about his condition and placed him there under closer observation for his safety.

*MCJ policy Sobering Cells – Custody Role says the following:*

*4. Individuals in sobering cells should be re-evaluated every 15 minutes or more frequently if necessary, for signs of deterioration of their medical condition. The evaluation, includes, but is not limited to, the following:*
*A. Determine if the person is less easily aroused;*
*B. Determine if the person shows a decreasing ability to follow simple commands;*
*C. Determine if the person has difficulty breathing; and,*
*D. Determine if the person is acutely ill.*

*5. Monitoring of individuals in the sobering cells shall be documented on a sobering cell log with all documentation being placed in the individual's jail file as a permanent record.*

*Yet, during this entire interval, DOs failed to monitor Mr. Pajas' health condition as required by policy.*

*Instead, during the interval from approximately 21:49 until 04:06 the next morning, there is no record on the Sobering Cell Assessment Report that he was monitored at all, even the periodic observations required for monitoring individuals in general population throughout the jail. From 04:06 until 14:12, an interval of 10 hours and six minutes, the above policy predicts that he should have been monitored a minimum of 41 times. Instead, he was only monitored 31 times. Whereas all the monitoring intervals should have been 15 minutes or less, many were more, with the longest lasting 40 minutes (The following is a list of the 31 monitoring intervals: 9, 15, 20, 20, 20, 20, 15, 19, 22, 14, 13, 31, 4, 35, 11, 29, 11, 15, 15, 17, 20, 13, 11, 14, 20, 20, 35, 40, 26, 19, 27.)*

*Not only did DOs fail to monitor Mr. Pajas as often as they were supposed to, they also failed to monitor him with the thoroughness they were supposed to. Policy required them to determine his level of arousability, his ability to follow simple commands, whether he had difficulty breathing, and whether he appeared acutely ill. 11 of the 31 monitorings contained one of these determinations, the rest contained none. In other words, of a minimum of 164 determinations (41 expected observations x 4 determinations at each observation) that custody staff should have made of Mr. Pajas health status, they only succeeding in making 11, or 7% (this calculation ignores the interval from 21:49 to 04:06 when no Sobering Cell Assessment Report checks were documented, and thus is very conservative).[9]*

*As explained elsewhere, Mr. Pajas was sick during this interval and likely getting sicker. Appropriate monitoring would have led to recognition of this and notification of health care staff, which in turn would have led to further evaluation and treatment which, more likely than not, would have prevented his death. The terminal custody monitoring interval – 27 minutes from 13:45 to 14:12 – is the most significant. When Mr. Pajas was observed at 14:12[10] he was not breathing. Unless he had collapsed just as DOs happened upon him, he had collapsed some time in the 27 minutes since the previous check. The human brain begins to undergo irreversible damage within four to six minutes without oxygen, thus it is statistically more likely than not that the delay in checking in on Mr. Pajas this last time significantly reduced his chances of survival. I will consider the entirety of incomplete or non-existent Sobering Cell checks by DOs as the **tenth critical failure point** in Mr. Pajas' care, though it would be more accurate to consider each individual incomplete or missed check as its own failure point.*

At 14:12, DOs opened the door to Mr. Pajas' cell when attempting to place another inmate in the same cell as Mr. Pajas. At that point they noticed that Mr. Pajas was lying face down in vomit. The DOs left Mr. Pajas' cell to place the second inmate in another cell and then returned to Mr. Pajas and called out his name. At one minute and 16 seconds after first opening his door, a DO stated that Mr. Pajas was not breathing. The DOs began CPR. The first nurse to respond arrived about 1 minute later. A medical staff person brought a bag-mask-valve ventilator followed by another medical staff member who brought oxygen; this equipment arrived two minutes and 58 seconds after the arrival of the first nurse, or about 4 minutes after Mr. Pajas was found to be breathless. An ambulance crew arrived at around 14:20 and departed around 14:38. Mr. Pajas was declared dead at the hospital at 14:53.

*The documentation related to if, how, and when Mr. Pajas' lungs were oxygenated (ventilation) is unclear, but suggests that it did not start until after the bag-mask-valve*

---

[9] One might argue that the policy itself was ill-conceived in that arousing an individual and asking them to follow simple commands every 15 minutes throughout the day and night would deprive the individual of needed sleep. However, there would still be no justification for the DOs to have failed to conduct the full required evaluations during daytime hours.

[10] It should be noted that even this check at 27 minutes after the previous one, did not appear to be driven by a plan to check in on Mr. Pajas. Rather it appears on the video that the only reason DOs happened across Mr. Pajas at this time was that they were attempting to put another individual in his cell and noticed that he was lying on his face in a pool of vomit. Had it not been for the transfer of the other individual, it is entirely possible that it would have taken even longer for DOs to discover that Mr. Pajas had collapsed.

Report of Marc F. Stern, MD                                                      Page 15

*ventilator and oxygen arrived.[11] If this is the case, Mr. Pajas was resuscitated without oxygenation for more than three minutes and 46 seconds after the beginning of resuscitative efforts began, and more than three minutes after the first nurse arrived. Irreversible brain damage is thought to occur within four to six minutes of cardiac arrest, which is why it is generally recommended that medical staff be able to respond to any part of a jail in under four minutes. However, the "four to six minute" time frame is an approximation that may be overstated for patients who are older or have underlying medical problems. I am unfamiliar with the layout of the MCJ and whether a shorter response time for initiation of ventilation was possible. Further, the "four to six minutes" begins when the patient's heart stops, not when the stoppage is discovered. Thus, whether or not medical staff began ventilations within four minutes of the start of the emergency, a) given Mr. Pajas' general health, brain damage may have already begun, and b) if medical staff could have brought the ventilation equipment initially when they first heard that Mr. Pajas' heart stopped, then at least some brain damage was avoidable.*

*As stated previously, DOs were supposed to check Mr. Pajas every 15 minutes and document these checks on the Sobering Cell Assessment Report. The previous check was at 13:45, so the next check was supposed to be at 14:00. Instead it was at 14:12, 27 minutes after the last check, and 12 minutes late. Mr. Pajas' heart and breathing stopped some time in this 27 minute interval. As explained in the previous annotation, time is of the essence in beginning resuscitative efforts. Thus this 12 minute delay in checking on Mr. Pajas statistically cut the chance of successfully resuscitating him, roughly, in half.*

The coroner found, among other things: coronary artery disease (proximal 50% occlusions of the right and left coronary arteries; proximal 75% occlusion of the left anterior descending coronary artery); heart weight 425 grams (above normal); d-Methamphetamine = 0.04 mg/l (effective level .02-.05); left ventricular wall thickening (1.5 cm); morphine = 0.03 mg/l (effective level 0.01-0.12); codeine = 0.02 mg/l (0.01-0.25); 6MAM (a metabolite of heroin) absent; emphysema; and bilateral lower lobe lung congestion (without no infection); gastric mucosa stress ulcers, vitreous electrolyte panel without diagnostic pathological changes. She opined that the cause of death was likely coronary heart disease, and that "Opiate withdrawal and methamphetamine may have contributed to his cardiac stress, and it is possible he was also undergoing alcohol withdrawal symptoms."

*There is no evidence that the coroner considered Mr. Pajas' elevated blood pressure upon admission to MCJ or that it was not checked again prior to his death.*

*As discussed in more detail below, despite a history of alcohol abuse in the distant past, there is no evidence suggesting that Mr. Pajas was intoxicated with alcohol upon arrival at MCJ or underwent any alcohol withdrawal, and thus the coroner's basis for including alcohol withdrawal as a possible contributor to Mr. Pajas' death is not clear.*

---

[11] DO Castillo informed the post-event investigator that he saw a nurse "blowing into the mouth of Pajas." I was unable to determine if this meant a nurse was blowing directly into his mouth with hers (in which case ventilations may have begun within a minute of the start of resuscitation), or meant she was blowing using a bag device, in which case it started later.

49

## IV. Analysis and Opinions

### 1. Cause of Death

Mr. Pajas had underlying coronary heart disease as evidenced by significant blockages of his coronary arteries. He also had thickening of his left ventricle. In the hours before his death, he had high blood pressure. In the short term, high blood pressure causes the heart to have to work harder, which, especially in a patient who already has blocked arteries and a thickened heart, can cause the heart to operate with less oxygen that it needs ("ischemia"), which in turn can cause heart failure, abnormal heart beats, or a heart attack, each of which can cause the heart to stop.

As explained above, it is unlikely that Mr. Pajas was suffering from bilateral cellulitis when he was evaluated at Natividad Medical Center on the afternoon of 1/19. More likely, the bilateral leg swelling may have been from severe heart failure in the days leading up to his ED evaluation, or else the swelling was due to weak veins in his legs and was merely an exacerbation of a condition he had had for years (for example, on 3/4/06, during an examination at the jail, he was found to have bilateral swelling of the feet, and reported this was a chronic problem).

The coroner opines that Mr. Pajas' opiate withdrawal may have contributed to his death. There is a well-validated and widely-accepted scale (Clinical Opiate Withdrawal Scale; COWS) which is used in most jails and community settings to assess, follow, and guide treatment of, opiate withdrawal. Such treatment is meant to reduce the symptoms of withdrawal and prevent serious outcomes, such as dehydration and death. Medical staff at MCJ did not use the COWS scale (or conduct almost any kind of assessment) on Mr. Pajas, so they had no way of monitoring his condition and making appropriate treatment decisions. Based on the information available, it is highly likely Mr. Pajas was undergoing acute withdrawal from opiates. This is something that likely would have been substantiated by assessments by MCJ medical staff, however, MCJ staff did not properly assess him. Assuming he was in acute opiate withdrawal, it went largely untreated. Untreated opiate withdrawal by itself is potentially lethal. Further, some of the physiologic effects of withdrawal speed up the body's metabolism, e.g. increased heart rate, increased blood pressure, tremors. These effects increase the workload on the heart. In a patient such as Mr. Pajas, whose heart is not normal and sensitive to workload demands, the increase in heart workload can lead to heart failure, abnormal heart beats, or a heart attack.

The coroner posits that alcohol withdrawal symptoms may have contributed to Mr. Pajas' death, but as noted above, the basis for this hypothesis is not clear. I think it is unlikely Mr. Pajas was in alcohol withdrawal  because a) he did not report alcohol use upon admission (though he freely admitted to using heroin), and b) he did not have a history of alcohol use across recent previous admissions (he last appeared to report alcohol abuse in a 1995 admission). However, to the extent that alcohol withdrawal symptoms did contribute to his death, then these symptoms were controllable by proper evaluation and treatment. The signs and symptoms of alcohol withdrawal should be well known to correctional health care providers. As with opiate withdrawal, there is a well-validated and widely-accepted scale (Clinical Institute Withdrawal Assessment; CIWA) which is used in most jails and community settings to assess, follow, and guide treatment of, alcohol withdrawal. Such treatment is meant to reduce the symptoms of withdrawal and prevent serious outcomes, such as mental status changes and death. Medical staff at MCJ did not use the CIWA scale (or conduct almost any kind of assessment) on Mr. Pajas, so they had no way of monitoring his condition and making appropriate treatment decisions. Thus, if he had alcohol

withdrawal, it went largely untreated.[12] Like untreated opiate withdrawal, untreated alcohol withdrawal by itself is potentially lethal. Further, similar to opiate withdrawal, some of the physiologic effects of alcohol withdrawal speed up the body's metabolism, e.g. increased heart rate, increased blood pressure, fever. These effects increase the workload on the heart. In a patient such as Mr. Pajas, whose heart is not normal and sensitive to workload demands, the increase in heart workload can lead to heart failure, abnormal heart beats, or a heart attack.

As noted by the coroner, Mr. Pajas had amphetamines in his system. Amphetamines also speed up the body's metabolism in ways somewhat similar to alcohol withdrawal, e.g. speeding up the heart rate, increasing the blood pressure. And, as with alcohol withdrawal, most of these metabolic effects can be treated. Untreated, the effects of amphetamine infer a similar risk to the heart as does the other cardiac stressors described above (untreated high blood pressure and untreated alcohol withdrawal).

The extreme lack of collection of key clinical information by MCJ medical staff make it difficult to know the exact physiologic mechanism by which Mr. Pajas' underlying conditions, coupled with the extreme lack of care he received at MCJ on 1/19 and 1/20, led to his death. However, the failure of MCJ medical staff to do their jobs does not impair the ability to draw reasonable medical conclusions. We know Mr. Pajas had a diseased heart for which additional stress (cardiac workload) had a reasonable chance of causing damage, including causing his heart to stop. We also know that there were at least two conditions (acute opiate withdrawal, effects of amphetamines) present and documented in Mr. Pajas' medical records causing stress to his heart. Despite the lack of collection of data by MCJ staff, we know that at least two specific cardiac stressors were present: 1. His blood pressure was elevated in the ED at 18:01 (142/98), and was higher upon admission to MCJ at 20:09 (178/92). Given this trajectory, and the course of his deterioration, it is reasonable to conclude that his blood pressure remained abnormally elevated through at least several of his hours alive in the jail. 2. Mr. Pajas was throwing up. The process of throwing up is highly stressful on the heart. In addition to these two stressors, the coroner noted that Mr. Pajas had stress-related damage to the lining of his stomach ("gastric mucosa stress ulcers") which reflects physiologic or mental (or both) stress, which we would also expect to contribute to a rise in heart rate and blood pressure.

Overlaying Mr. Pajas' physical condition I just described, we know that MCJ medical staff: 1. knew that Mr. Pajas' was at risk for opiate withdrawal (and therefore the cardiac effects therefrom); 2. knew that he was not doing well health-wise; 3. knew that there were assessments that needed to be done and medication that needed to be administered to keep Mr. Pajas safe, neither of which they were accomplishing; and 4. did nothing to remedy the situation. Had medical staff evaluated and treated Mr. Pajas, more likely than not, they would have discovered additional physiologic derangements they were not aware of, and successfully treated those and the ones they were aware of (such as his vomiting), all of which would have led to decreased stress on his heart, which in turn more likely than not, would have saved his life.

---

[12] The treatment regimen ordered for Mr. Pajas did have some components which form part of an alcohol withdrawal regimen. However, for an alcohol withdrawal regimen to be correct and successful, there must also be monitoring and tailoring of the treatment based on the monitoring results. This did not happen. Further, Mr. Pajas did not, in effect, receive any medications because the one time they were administered to him, he threw them up, as witnessed by medical staff.

Thus I believe that, more likely than not, a high level of cardiac workload demand (stress) on Mr. Pajas' heart caused his heart to stop and that but for the acts and omissions of MCJ staff, these stressors would have been prevented or controlled, averting Mr. Pajas' death. Before arriving at this conclusion I also considered whether Mr. Pajas' death could have been a random event that would have happened even if he were not in the MCJ on 1/20. Mr. Pajas had two independent risk factors for a stoppage (coronary artery disease and thickened heart wall). With those risk factors, stoppage *could* happen at any time. Thus, one could theorize that his heart stoppage in the afternoon of 1/20 *could* have been a random event that would have happened regardless of whether he was in jail and how he was treated (or not treated) by jail and medical staff. However, we also know that Mr. Pajas was very ill on 1/19 and 1/20. The laws of statistics, prediction, and medical science tell us that these two facts are most likely related, i.e. that Mr. Pajas' heart stoppage on 1/20 was *not* a random event, but rather related to his severe illness in the hours before.

Regardless of the mechanism of Mr. Pajas's death, given that the autopsy did not reveal any catastrophic abnormality which would been silent until it was too late (e.g. ruptured brain aneurysm, massive hemorrhage, massive blood clot to the lung, choking), it is highly likely Mr. Pajas was experiencing severe metabolic derangements in the hours prior to his death, and it is equally likely that those derangements would have resulted in measurable abnormality of at least one, if not multiple, vital signs. Thus even if there is an alternative cause of death from what I have described, the failure of MCJ medical staff to measure (and then address any abnormal) vital signs remains directly causally linked to Mr. Pajas' death.

Thus medical staff caring for Mr. Pajas on 1/19 and 1/20 had an obligation to care for Mr. Pajas, failed in that obligation, and those failures likely had a direct causal link to his death. Regardless of whether the medical staff knew that Mr. Pajas suffered from an underlying heart condition, they had enough information to know that Mr. Pajas was at substantial risk for serious harm.

### 2. Acts/Omissions of Nurses

Multiple nurses responsible for providing care to Mr. Pajas on 1/19 and 1/20 committed multiple errors in the provision of that care, as described in Section III Summary of Facts. Here, I summarize the errors which were most likely to have been causally linked to Mr. Pajas' death.

Nurse Russum failed to conduct her initial assessment of Mr. Pajas on 1/19 at 20:08 in a private setting, i.e. it was conducted in front of a DO and within earshot of other incarcerated individuals. In addition, a complex evaluation that required dozens and dozens of questions, lasted just over two minutes. For either or both reasons, Mr. Pajas was likely unable to provide the nurse with sufficient detail about his current health. One important piece of information that the nurse thereby failed to elicit from Mr. Pajas was the fact that he had ingested amphetamines. Knowledge of this would have prompted further questioning and examination (for example, monitoring of vital signs) that may have revealed some of the physiologic abnormalities Mr. Pajas was developing. During the same evaluation, the nurse failed to note or address (i.e. notify a practitioner) Mr. Pajas' elevated – and rising – blood pressure.

Multiple nurses failed to provide care to Mr. Pajas (administration of ordered medications and/or conducting evaluations, including measuring of vital signs) on multiple occasions, alleging that he "refused" the care. In some of the instances, it is not clear that Mr. Pajas even verbalized that he was refusing. Rather, nurses took his lack of performing some task they had asked him to do (such as sitting up straight) as lack of cooperation, and therefore, refusal. Even allowing that Mr. Pajas *may have* voiced refusal on any of these occasions, there is no evidence that any of these "refusals" were an informed refusal, because a) there is insufficient evidence that he had the capacity to make informed decisions in his own best interest, and reason to believe that he did not, and b) nurses made no effort to explain the importance of the intervention he was refusing and the risks of refusal. Further, regardless of whether his refusals were informed, the nurses failed to invest much – if any – good faith effort, as a compassionate, caring, and minimally competent nurse, to try to support and convince their patient to make a good decision. Finally, the nurses all failed to follow good nursing practice and CMJ policy which required them to contact the physician as soon as possible for any "refusal of essential medications and treatments (i.e. the absence of which would jeopardize the health and safety of the inmate);" nurses knew that in the absence of vital signs, their detoxification assessments were incomplete (e.g. see Russum Deposition, page 36). To the extent that some of the medications would have reduced Mr. Pajas' blood pressure, anxiety, or vomiting (e.g. clonidine, Valium, Phenergan, Vistaril), treatment would have reduced the workload on his heart. To the extent that evaluations would have revealed abnormalities – which, as I explained above, I believe they would have – further testing and treatment would have been conducted. And had they contacted the physician, the consultation would have inevitably led to further evaluation and treatment.

The results of the two evaluations conducted by Nurse Kaupp (1/20 at 08:30 and 13:02) were so incredible as to be suspicious for fabrications or guesses or to be based on a lack of understanding of health science which is deplorable. (Nurse Ruybel's recorded breathing rate for Mr. Pajas at 05:02 was also incredible.) For the reasons explained earlier, I believe Mr. Pajas' evolving illness was measurable by the appropriate evaluations, and thus the likely inaccurate or inappropriate evaluations of him by Nurse Kaupp delayed any life-saving care he might have gotten.

### 3. Acts/Omissions of DOs

On 1/19 around 21:49, DOs noted a change in Mr. Pajas' condition, enough so to prompt them to change his housing status to the Sobering Cell. However, contrary to minimally acceptable custody practice, as well as MCJ policy, they failed to notify nursing staff (Policy Sobering Cells – Custody Role: "3. Medical staff shall be notified when an inmate is placed in a sobering cell."). A proper nursing evaluation at this point would likely have revealed abnormalities (such as his feeling unable to get up, his elevated blood pressure), which in turn would have led to further evaluation and treatment.

The following morning, at 04:05, DOs finally made their assignment of Mr. Pajas to Sobering Cell status official. They were supposed to notify a nurse, who was supposed to conduct an evaluation at that point. The nurse did not arrive until 05:02. Timely evaluation of Mr. Pajas

---

Report of Marc F. Stern, MD                                                                 Page 20

upon "official" assignment to Sobering Cell status may have revealed whatever physiologic perturbations he was experiencing, leading to treatment and avoidance of his death.[13]

Finally, multiple DOs, on multiple occasions, failed to monitor Mr. Pajas while he was in the Sobering Cell and/or failed to conduct the monitoring in a thorough manner (making four determinations about his condition). Any one of these checks may have revealed whatever physiologic perturbations he was experiencing, leading to treatment and avoidance of his death.

### 4. Acts/Omissions of Dr. Garcia, as provider

In the morning of 1/20 Nurse Kaupp informed Dr. Garcia that Mr. Pajas, a patient in withdrawal, had refused Phenergan, a medication used to stop vomiting. He knew that patients are ordered medications for a reason and that when they don't get those needed medications, there may be consequences. As the attending physician responsible for Mr. Pajas' health, Dr. Garcia had an obligation to find out more about this. Instead, he did nothing other than tell the nurse to make sure he was in a detoxification cell (which he already was), and to make sure nurses were following the detoxification protocol (which, he already knew they were not by virtue of the fact that Mr. Pajas was throwing up and not getting treated). Further inquiry would inevitably have led to discovering how poorly Mr. Pajas was doing, leading to further evaluation and treatment that may have avoided his death.

### 5. Deficient Opiate Withdrawal Protocol

Based on current medical science, withdrawal symptoms of a patient detoxifying from opiates should be managed by monitoring and interventions specific to opiates. Safe management of opiate detoxification at MCJ in January of 2015 was hampered by two problems. First, MCJ at least some medical staff were under the mistaken impression that withdrawal is managed the same, regardless of the drug (e.g. see Nurse Kaupp 30(b)(6) Deposition, page 32). Second, and more importantly, even for the staff who realized that withdrawal from opiates needed to be managed in a specific way, the protocol in use at the time was grossly deficient relative to the state of medical science (which was also the state of the science at the time).

The protocol was deficient in at least three ways. First, the standard medication regimen contained errors of inclusion and exclusion. The regimen included Valium. This is a medication appropriate in the treatment of withdrawal from alcohol, barbiturates, and benzodiazepines, not opiates. The regimen failed to include a medication to control nausea and vomiting. Second, the protocol did not require the involvement of a practitioner (physician, nurse practitioner, physician assistant) to actually make the diagnosis of opiate withdrawal. Such a step is necessary because the diagnosis of opiate withdrawal in a jail setting can be difficult to make as it fraught with room for error. Indeed, patients admitted to jails have a high prevalence of chronic medical diseases, acute medical illness, mental illness, and abuse of (and therefore also withdrawal from) substances other than opiates, all of which have overlapping features with withdrawal from opiates. Third, and perhaps most importantly, the protocol was bereft of an effective and meaningful monitoring component. There is a well-validated and widely-accepted scale (Clinical Opiate Withdrawal Scale; COWS) which is used in most jails and community settings to assess, follow, and guide treatment of, opiate withdrawal. Such treatment is meant to reduce the

---

[13] As stated earlier, I was unable to determine whether the delay in response resulted from a failure on the part of the DO, the nurse, or both, due to the absence of documentation by either.

symptoms of withdrawal and prevent serious outcomes, such as dehydration and death. In January of 2015, CFMG had not implemented use of the COWS scale, despite its widespread use for many years, and criticism of CFMG and MCJ for not using the scale by an independent party (Dr. Puisis) more than a year earlier. Using the COWS, a clinician assesses and scores a patient from one to four or five on 11 different physiologic functions. The resulting score is recorded every few hours and compared to the previous results. These data then help the clinician assess the presence and severity of opiate withdrawal as well as indicate how well the patient is responding to treatment (i.e. guiding adjustments to medication doses as well as signaling when treatment is not working and evacuation to a hospital is warranted). Despite the easy availability of this monitoring instrument, the monitoring system used at MCJ can best be called a "seat of the pants" approach. MCJ nurses were expected to measure a patient's vital signs and some other clinical information (which only captures three of the 11 functions of the COWS scale, and even for these three, does not convert them to a usable score) three times a day, and even then were given no guidelines as to how to evaluate and respond to their findings.

Medical staff at MCJ did not use the COWS scale (or conduct almost any kind of assessment) on Mr. Pajas, so they had no way of monitoring his condition and making appropriate treatment decisions. Based on the information available, it is highly likely Mr. Pajas was undergoing acute withdrawal from opiates. However, we cannot be certain, because MCJ staff did not properly assess him. Assuming he was in acute opiate withdrawal, it went largely untreated. Untreated opiate withdrawal by itself is potentially lethal. Further, some of the physiologic effects of withdrawal speed up the body's metabolism, e.g. increased heart rate, increased blood pressure, tremors. These effects increase the workload on the heart. In a patient such as Mr. Pajas, whose heart is not normal and sensitive to workload demands, the increase in heart workload can lead to heart failure, abnormal heart beats, or a heart attack.

Thus CMFG failed to provide to medical staff at MCJ the basic scientific tools to assess and safely respond to Mr. Pajas' changing metabolic state. Armed with the proper tools, medical staff would have been much more likely notice his changing state and treat it appropriately, decreasing the stress on his heart and averting his death.

**6. Incomplete and Ignored Policies**
At MCJ some policies (to include procedures and protocols) related to this case were poorly or incorrectly written. And while licensed professionals should recognize when a policy violates laws or patient safety, and seek further advice before proceeding, the existence of such policies certainly increases the chance that staff will make errors. The miserably deficient opiate withdrawal protocol described above is an example. Another example is the policy on patient refusal of care. MCJ has a Health Care Philosophy policy that addresses refusals. The policy states, "Inmates have a right to refuse treatment," and then instructs staff on how to proceed with documentation and notification. Unfortunately, the policy is crude and fails to guide staff on how to reduce the likelihood of a refusal (e.g. by a caring and strategic approach to support the patient in accepting the intervention), or how to recognize and deal with a patient who does not have the capacity to refuse. Had nurses caring for Mr. Pajas followed an accurate and complete policy on refusals, it should have led to either getting Mr. Pajas to agree to medications which in turn may have reduced the stress on his heart, or consultation with the physician followed by further evaluation and treatment.

In addition to flawed policies, MCJ suffers from policies which staff either don't understand or don't follow. For example, the aforementioned policy on refusals states "Refusal of essential mediations and treatment (i.e. the absence of which would jeopardize the health and safety of the inmate) shall be reported to the responsible medical provider as soon as possible." When asked in her deposition about the need to report a refusal to the doctor, Nurse Russum replied she would not call the doctor, "There's no requirement" (unless the patient's behavior or symptoms were escalating), in explicit contradiction to the policy and safe medical practice. In a second example, Nurse Kaupp testified (as a 30(b)(6) witness) that nurses were not getting "on-going evaluation – annually" (presumably on their knowledge of the Drug Withdrawal policy) as required by the same Drug Withdrawal policy. She knew this because she had never been evaluated. In a third example, the CMFG Procedure Manual required that MCJ document those nurses who were authorized to use the drug withdrawal protocols (such as the one used for Mr. Pajas). The documentation comprised signatures (with dates) of authorized nurses on a form (Appendix H, Section VIII of the Manual). This is an important management tool to ensure that only properly trained nurses are taking care of patients. However, the form listing authorized nurses at CMJ was blank. According to Nurse Kaupp (as a 30(b)(6) witness), the form is never used by CMJ.

The fourth example is particularly troubling. Quality Management Program policy states: "The [Medical Peer Review] Committee will conduct medical record reviews of all inmate deaths…with the objective of identifying appropriateness of, deficiencies and inconsistencies in service delivery. Findings are documented in the committee minutes, a plan and schedule for corrective action is developed to include action to be taken, responsibility for implementation, incorporation of findings and corrective action into the facility's staff education plan, re-audit, and follow-up reporting to the committee." When questioned about the review of deaths prior to Mr. Pajas' death, Dr. Garcia, the Jail Medical Director and one of the two people responsible for establishing the Medical Peer Review Committee, made it clear in his response that some key components of the policy's requirements are never followed, including but not limited to: the Committee does not review the medical record; there is no schedule for corrective action; there is no assignment of responsibility for implementation of the corrective action; the findings are not incorporated into the facility's staff education plan; there is no re-audit to measure the effectiveness of the corrective action; and there is no follow-up reporting to the Committee. Review of Mr. Pajas' death was a *post-hoc* event and clearly would have no causal role in his death. However, it raised the very likely possibility that there existed a practice, pattern, or custom of similarly slipshod death reviews prior to Mr. Pajas' death. If that were the case, lessons learned from those deaths that might have prevented Mr. Pajas' death would have been missed. To endeavor to assess that possibility, I requested from Plaintiff's counsel any records related to previous deaths involving similar circumstances to Mr. Pajas' death.

I received and reviewed the medical records and corresponding death reviews of Mr. Jose Contreras and Mr. Daniel Lariviere. I discuss my findings in more detail Section 8 below. Briefly, I found that in both cases, the Quality Management Program policy was not followed. In Mr. Contreras' case, the Medical Peer Review Committee failed to adequately review his record to "identify appropriateness of, deficiencies and inconsistencies in service delivery": withdrawal from a substance upon admission was handled very poorly by medical staff, but ignored in the

review process as reflected in Quality Assurance Committee minutes of 11/15/07. In Mr. Lariviere's case, the Committee also failed to adequately review his record: there were numerous problems with management of his health care upon admission, including, but not limited to management of reported alcohol intoxication, but the Committee failed to recognize and address them. Further, for the single problem the Committee did recognize (failure to be seen by a mental health professional as ordered), the Committee again did not follow policy by failing to "incorporat[e] the findings and corrective action into the facility's staff education plan, re-audit, and follow-up […] to the committee.] Repair of the errors in these previous cases, more likely than not, would prevented errors in the care of Mr. Pajas. Thus my review of Mr. Pajas' death review suggested, and review of previous death reviews confirmed, that MCJ and CFMG staff had a habit of failing to follow their own policies, that some of those failures, more likely than not, contributed to Mr. Pajas' death.

## 7. Acts/Omissions of Dr. Garcia, as Jail Medical Director

A jail health service cannot run well without medical leadership. Dr. Garcia was supposed to be that medical leader, yet I have rarely seen a full-time medical director as disengaged with the operation of a jail medical unit as Dr. Garcia seemed to be, based on his overall deposition testimony. This was particularly visible with regard to issues related to conditions affecting Mr. Pajas.

During a 2013 review by Dr. Puisis, an independent evaluator, Dr. Puisis noted, "At this facility, given the extensive self directed nurse protocols, there should be some direct supervision of nursing by the [Jail] Medical Director." However, in his deposition, Dr. Garcia said he did not supervise the nurses and did not think it was his responsibility. Dr. Garcia also did not think he was responsible for creating and implementing policies and procedures. However, according to the cover page of the policy manual, he is an approver (though that page bears no signatures). Not only did Dr. Garcia not think he was responsible for creating and implementing policies, he didn't even think he was responsible for having a good working knowledge of them: "…I have looked at them and have at least a distant familiarity with them. I think the people that operate the programs, as they pertain mostly to nurses, are more responsible for implementation and adherence." However, contrary to his impression, the jail physician figures prominently in many policies throughout both the policy manual and the nursing procedure manual. As expected, Dr. Garcia's apparent detachment from operations extended to policies related specifically to drug treatment. When asked about the Alcohol Intoxification [sic] and Detoxification policy, he was unable to answer whether it covered opiates or whether there was a separate policy for opiates, and deferred to the non-physician administrator.

## 8. Lack of a Robust Quality Improvement Process

Isolated errors can occur in any complex system, such as health care delivery. However, the sign of a healthy health care delivery system is one in which isolated errors are identified and fixed. If the way in which MCJ and CMFG evaluated the death of Mr. Pajas is indicative of their approach to error identification and repair, the system is not a healthy one. Dr. Garcia reviewed the case with the committee at the 3/19 and 6/18 meetings of the CFMG Quality Assurance Committee. Not a single error or area for possible improvement was noted and no further action was planned or taken specifically related to errors discovered from the death of Mr. Pajas, both

according to the records produced by the defendants as well as Dr. Garcia's best recollection in deposition testimony.

Despite the myriad errors I identify in this review of Mr. Pajas' death, CFMG's internal review apparently did not find a single one. As described above in Section 6 Incomplete and Ignored Policies, I endeavored to see if the slipshod review of Mr. Pajas' death was an isolated incident or part of a pattern, and thus reviewed two previous deaths. Mr. Jose Contreras died on 8/2/07 from a heroin overdose. Upon admission on 2/27/07, he reported to the admitting DO an "alcohol habit that could cause withdrawal problems," however, there is no evidence that they began full periodic assessments and medication treatment for this per policy. Limited vital sign measurement was ordered twice a day for the next three days, but was only attempted four of the six times, and not once completed. For three of those attempts "refused" was given as the reason, and the person executing the "refusal" cannot be discerned. None of these errors were recognized or addressed in Mr. Contreras's death review. Mr. Lariviere was admitted on 7/5/11 and died on 7/8/11 from hanging. Upon arrival he reported to the admitting DO an "alcohol habit that could cause withdrawal problems" and a history of high blood pressure. A nurse saw him that day and elicited a history of having been released from a mental health hospital on 7/1/11, but there is no evidence that s/he sought to verify that or obtain medical records. The nurse reported that he had tremors (a possible indication of impending withdrawal from alcohol), but did not contact a physician, did not implement the alcohol withdrawal protocol, or order any further monitoring except for measurement of blood pressure daily for five days, a mental health evaluation the following day, and a chronic care visit with the practitioner. His blood pressure was only measured once, on the following day. It was 148/96 (abnormal, and higher than the already abnormally high level of 140/90 on the day of admission), but the nurse who measured it failed to notify a practitioner. No further blood pressure measurements were made, as ordered, until Mr. Lariviere was found dead on 7/8/11. He also never saw a mental health professional. The only error that was recognized and addressed during Mr. Lariviere's death review was the failure to conduct a mental health evaluation. None of the other serious failures, all consistent with critical failures in Mr. Pajas' case, were either recognized or addressed. And even the single error that was recognized, was incompletely addressed. Medical staff failed to "incorporate [the] findings and corrective action into the facility's staff education plan, re-audit, and follow-up [...] to the committee as required by the Quality Management Program policy.

I conclude that the death review process at CFMG is seriously broken. While no level of post-hoc review would have changed the outcome in Mr. Pajas' case, this analysis clearly indicates that the review process that preceded Mr. Pajas' death, a review process that would have yielded system repairs to prevent his death, was severely deficient.

## 9. Other flawed systems

I discovered two other flawed systems at MCJ. Both systems were directly related to errors made in Mr. Pajas' care and both were systems that, by their design, were destined to not work.

The first dysfunctional system related to (yet another aspect of) how nurses handled medication refusals. During her deposition (as an individual), Nurse Kaupp stated that "If there was a refusal, the nursing staff will note the refusal and attempt to dispense it on the next welfare check." This was endorsed by the Health Care Program Manager via a written document

presented during the deposition. This process is in direct violation of policy, which required quicker action. However, based on how nurses operated at MCJ, even their delayed process was destined to not work. When asked why, when she saw Mr. Pajas at 13:00 for the next welfare check after he had refused his noon medications, she didn't attempt to re-dispense his earlier medications, Nurse Kaupp said she was "unaware that he had refused it." The typical mechanism for the RNs conducting the welfare checks to learn of a refusal is for the LVNs to alert them. But, according to Nurse Kaupp, "Seeing that the med pass goes from about 10:00 to 1:00ish, I just may not have been notified at the time of this." Thus the system for re-attempting medication administration depended on an LVN-to-RN communication that was usually not going to take place because the LVN and RN don't necessarily run into each other. And the next welfare check would have been at 17:00 at which time there would have been a new set of nurses, and even less chance that the message would get passed on. Thus the system in place to re-attempt administration of missed medications was unlikely to work, by design.

The second dysfunctional system related to provision of fluids to patients undergoing detoxification. Fluid replacement is essential for patients in withdrawal who are losing fluids via vomiting and/or diarrhea. While replacement with water helps, fluid replacement also requires replacing electrolytes and providing a source of energy, such as sugar. Typically – and at MCJ – Gatorade is used for this purpose. Nurses caring for Mr. Pajas were expected to "push fluids," meaning they were supposed to encourage him to drink, support him in so doing, and monitor his intake. An essential feature of support was to provide him with an adequate supply of Gatorade. However, the system for provision of Gatorade was inadequate. Gatorade was only kept on the medication cart and only distributed by LVNs during medication pass. During medication pass they either poured pre-mixed Gatorade in the patient's cup, or put powder in the cup expecting the patient to mix the powder with water from the sink.[14] Medication pass occurred three or four times per day, and assuming the jail uses the typical six to ten ounce plastic cup used in most jails, many, if not most patients in withdrawal at MCJ could be expected to receive no more than 40 ounces (the equivalent of two individual size Pepsi containers) of Gatorade which is woefully insufficient in many cases of detoxification to prevent dehydration. Thus the system for provision of fluids to patients undergoing detoxification was unlikely to prevent dehydration, by design. While dehydration may not have played a major role in Mr. Pajas cause of death, depletion of electrolytes, leading to a abnormal heart beats, may have.

## 10. CFMG Corporate Oversight

If there's a single problem with a car, it's probably the car; when there are several problems with several cars, it's probably the mechanic. Thus, while each of the individual MCJ staff members – especially those operating under licenses – must be held accountable for their errors, the plethora of errors – often the same errors – across multiple staff members, is strong evidence of a failure at the supervisory/management level. Two management chains of command exert significant influence over health-related operations at MCJ: I address CFMG here in Section 10, and the jail commanders in Section 11.

There is substantial evidence of the failure of CFMG to make a sufficient effort to keep patients such as Mr. Pajas safe at MCJ. As noted previously, Nurse Kaupp, a nurse who played a key role

---

[14] According to Nurse Kaupp, "sometimes" they give pitchers. Mr. Pajas was not given a pitcher, and it's not clear if he even had a cup in his cell.

in Mr. Pajas' care, had never received a performance evaluation in the six years she worked at MCJ, despite the fact that it was required by policy and good health practice. Despite being the Jail Medical Director at MCJ for a number of years, Dr. Garcia was still unclear about his supervisory responsibilities, as described earlier; such orientation is the responsibility of his supervisors in the CFMG organization. According to policy and good practice, CMFG corporate leaders were expected to be intimately involved in the process of reviewing deaths such that any system errors could be recognized and addressed, thereby preventing these system errors from causing adverse events in the future. It is clear that the reviews of, not only Mr. Pajas' death, but at least two previous deaths involving broken systems that impacted Mr. Pajas, were slipshod. CMFG corporate leaders had ample information at their fingertips to conclude that the system (Quality Management and Death Reviews) in place to detect and repair other systems, was itself broken, yet ignored that information. Ignoring that information allowed system errors to be perpetuated, ultimately directly contributing to Mr. Pajas' death.

In October of 2013, Dr. Michael Puisis, an independent consultant, conducted an extensive review of health-related practices at MCJ and on November 6, 2013, issued a comprehensive report addressing the deficiencies he had identified. In his executive summary he wrote:

> Clinical care needs to be re-designed to ensure that sick patients and patients with chronic illness are identified at intake and then appropriately managed. This is a multi-faceted problem involving intake screening, identification and management of persons with chronic illness, provision of necessary medication, and provision of adequate access to services through nursing sick call procedures. All areas should be improved. It appears that staffing issues are a major contributor to deficiencies. However, in some areas policy directives and defective system processes are barriers to adequate care. I am confident that the existing leadership can overcome these difficulties. (Puisis, page 3)

This paragraph encapsulates most of the themes I describe in this report. In the body of the report, Dr. Puisis concentrated on deficiency systems that played a central role in Mr. Pajas' death:

> 15. Chemically Dependent Inmates. This policy and procedure permits nurses as well as physicians or mid-level providers to diagnose chemical dependency. This is inappropriate. All patients identified as chemically dependent and thereby placed in detoxification should be diagnosed by a physician or mid-level provider. In practice, nurses use a poorly written detoxification protocol which is inconsistently followed. This has the appearance, based on chart reviews, of nurses making up rules as they go along.
> 16. Alcohol Intoxication and Detoxification (Sobering Cells) This policy does not specify who is responsible for placement of detainees in sobering cells and initiating detoxification. In practice officers do this which is not clinically appropriate as this assumes a diagnosis which physicians or mid-level providers should make. The policy and procedure is vague with respect

Report of Marc F. Stern, MD                                                    Page 27

to nursing and physician responsibilities in this process. This should be clarified. RNs may be permitted to initiate this process but this should be under physician supervision by virtue of consultation. All persons in detoxification should be examined by a physician as soon as possible after placement in a sobering cell for detoxification.

17. Sobering Cells-Custody's Role This medical policy directs officers to house persons in sobering cells deemed by custody to be intoxicated on alcohol or other drugs or a threat to themselves or others. In practice, officers place detainees in sobering cells and in isolation cells. Based on chart reviews officers appear to have placed a person in isolation who was undergoing alcohol withdrawal. Placement in these cells should be a medical responsibility and include a medical evaluation and physician consultation prior to initiating placement in the cell. (Puisis, page 15)

The role of physicians in [the Alcohol Intoxication and Detoxification (Sobering Cells)] policy is not clear. The policy appears to allow nurses to manage withdrawal by virtue of using a protocol which, in practice, is not strictly followed. The policy requires nurses consult with a physician for any one of 8 abnormal signs. Based on chart reviews, it does not appear that this is happening. I was told that all persons at risk of withdrawal see a physician within 24 hours of incarceration during week days. Based on chart reviews, I could not see evidence that this is occurring. As a result, alcohol and other drug withdrawal syndromes are managed by officers and nurses without physician supervision…. When nurses evaluate detainees in sobering cells, the AWS Flowsheet is sometimes used and sometimes not used. When used, the form is not always completed. The use of an un-validated form by nurses, who incompletely follow policy, and perform without proper physician oversight results in nurses managing withdrawal in a serendipitous fashion based on individual nurse practice rather than a clinically based consistent practice… Detoxification procedures at MCJ should be reviewed, policy should be clarified and practice should be strengthened so that detainees who are intoxicated and withdrawing from alcohol or other substances are protected and appropriately managed. Several examples of problems with this process are provided in chart reviews at the end of this report." (Puisis, page 19)

In the Chart Reviews section of his report, he provides an example an example of the dangers posed by the existing opiate detoxification process at MCJ to a patient in a similar situation to that of Mr. Pajas:

Patient #6 was incarcerated on 6/16/13 at 11:30 pm…With respect to the opiate withdrawal protocol, the nurse ordered by protocol, valium 10 mg three times a day for 3 days with Vistaril, clonidine and multivitamins along with Imodium and Maalox. Opiate, benzodiazepine, and alcohol withdrawal syndromes are entirely different clinical entities. … Each of these entities has a different duration of the withdrawal. Placing all individuals who are

---

Report of Marc F. Stern, MD                                          Page 28

withdrawing into a single protocol will invariably result in inappropriate treatment for individual patients... This inadequate protocol was being managed entirely by a nurse without physician consultation and included prescription medication that was unnecessary. This placed the patient at risk."

Based on his examination of "pattern[s] and practice[s]...that present a serious risk of harm to detainees," Dr. Puisis submitted his recommendations to MCJ more than 14 months prior to Mr. Pajas' admission to the jail. He essentially gave MCJ a prescription for how to prevent Mr. Pajas' death. Tragically, MCJ appears to have ignored that prescription, at least with regard to factors directly affecting Mr. Pajas. As a company specializing in correctional health care, with years of experience at MCJ and other jails, CFMG should have known that the conditions extant at MCJ posed a risk of serious harm to the patients there. Not only *should* they have known, but armed with Dr. Puisis' report, it is certain they were actually on notice.

The wanton disregard shown by CMFG for the safety of patients at MCJ is best captured by a single fact. Shortly after Mr. Pajas' unnecessary death, the nurse whose behavior towards Mr. Pajas was perhaps the most egregious of all those who interacted with him on the last two days of his life, was promoted to Health Care Program Manager at MCJ.

## 11. Jail Commander Oversight
Jail commanders (i.e. the Sheriff and those in his chain of command) are not physicians or nurses. They are not expected to have the expertise of health care professionals. However, they are the captains of their ships, and as such are expected to exert sufficient non-expert oversight of the health care operation at their facility to assure that systems are running smoothly and safely. One way of achieving this is to engage the services of an independent auditor who does have the expertise of a health care professional. And, in fact, that's what the MCJ jail commander had with Dr. Puisis. Yet the dangerous conditions persisted more than a year later.

Maintaining the safety of some health-related systems in a jail does not require the professional expertise of a doctor or nurse. Indeed, patient safety in a jail relies heavily on the actions of DOs. I described in Section 3 of this report several errors committee by DOs. These were errors, not in professional medical judgement, but errors in following the simple requirements of the routine job of a DO as laid out in policy written by jail commanders. DOs were supposed to notify medical staff when they placed Mr. Pajas in a Sober Cell. They did not. DOs were supposed to begin a Sobering Cell Log as soon as they placed Mr. Pajas in a Sobering Cell. They did not. DOs were supposed to monitor Mr. Pajas every 15 minutes, or more often. They did not. When monitoring Mr. Pajas they were supposed to evaluate him on four factors. They rarely evaluated him on even one. These activities are well within the ken of a jail commander and recognizing deficiencies does not require medical expertise.

While I cannot determine with certainty if the errors committed by DOs on 1/19 and 1/20 constituted a single isolated event, the evidence suggests they did not. Two facts are telling. First, the failure to notify medical staff and begin a log when Mr. Pajas was first assigned to a Sobering Cell was not the error of a single DO. According to depositions, two DOs shared this responsibility, and neither performed as expected. Second, and more notably, each of eight DOs

failed to monitor Mr. Pajas according to the jail's time and content requirements of the monitoring. Thus there is strong evidence that the deficient behaviors of DOs on 1/19 and 1/20, behaviors that materially contributed to Mr. Pajas' death, were part of a pattern and practice at the jail.

Lack of sufficient oversight of health-related activities at the jail is also demonstrated by the poor quality of the jail commanders' review of Mr. Pajas' death. At least three investigators working for the Sheriff were involved in reviewing and analyzing the events surrounding Mr. Pajas' death, yet none of them discovered the obvious DO errors described in this report. For at least some of the errors, the evidence could not have been any plainer or more obvious to the investigators, nor their missing it, more inexcusable. The most striking evidence was the Sobering Cell Assessment Report log. The investigators wrote that the logs showed "Pajas received on average 2 welfare checks every 30 minutes while in Detox 1 [Sobering Cell 1]." First, the Sheriff's investigators were not familiar with the policy upon which they were relying. Policy (Sobering Cells – Custody's Role) requires individuals to be "re-evaluated every <u>15 minutes</u> or more frequently if necessary" (emphasis is as it appears in the original policy), not twice per 30 minutes *on average*. Second, even under this mistaken reading of jail policy, Mr. Pajas did not receive, on average, two checks every 30 minutes. He received 31 checks over 10.1 hours, yielding an average of two checks every 39 minutes, which is significantly (30%) worse than what the investigators stated and what they thought was required by policy.

Thus it is clear from Dr. Puisis' report and from my findings in this case, that practices, patterns, or customs existed at MCJ that put patients' safety at serious risk, that jail commanders knew of these risks, that they had the ability to directly correct at least some of the deficiencies prior to Mr. Pajas' death, but they did not.

## V. Conclusions

Almost every individual, medical and non-medical alike, who interacted with Mr. Pajas on the last two days of his life, had a duty to Mr. Pajas and erred in the execution of that duty. Many of these errors they committed were serious and had causal links to Mr. Pajas' death. Based on my experience, as well as the science of patient safety, when errors occur, especially so many errors across so many individuals, the systems under which those individuals operate have also failed. The evidence in this case clearly shows failure of system after system. Each individual or supervisory organization knew, or should reasonably have known, of the significant risks posed by their behavior to the safety of individual incarcerated at MCJ in general, and Mr. Pajas in particular, but ignored those risks.

Three findings in my review of Mr. Pajas' death, however, suggest that there was a level of recklessness at MCJ that transcended just ignoring significant risks.

The first relates to the November 2013 report of Dr. Puisis. If, despite the person-years of experience running jails among the Sheriff's chain of jail commanders, and the 357[15] person-years of experience running jail health care operations among CFMG supervisors, neither set of supervisors knew the dangers to which incarcerated individuals at MCJ were exposed, Dr. Puisis

---

[15] CFMG website

entirely filled that knowledge gap for them in his report. He provided a roadmap for making CMJ detainees safe. And all parties did nothing, at least with regard to the risks affecting Mr. Pajas.

Second, a chilling profile of the health care staff emerges when reading DO Colon's description Nurse Kaupp's interaction with Mr. Pajas at 13:02 on the day he died. A professional nurse, legally and ethically bound to provide care, compassion, and support to the sick, used her position of power and authority to engage in a power struggle with her patient, a power struggle that Mr. Pajas would, predictably, lose. Mr. Pajas (for *whatever* reason, but likely because he was in the throes of dying and may not have been thinking clearly) wouldn't follow Nurse Kaupp's instructions, instructions which were not medically necessary for her to do her job. The "tit for tat" (You're not going to do what I ask, I'm gone!) was unconscionable.

Finally, despite not only this attitude and horrendous performance during her two encounters with Mr. Pajas, in the opinion of CFMG, Nurse Kaupp represented all CFMG stands for, and for this, they rewarded her with a promotion.

It is a maxim in patient safety science that "All systems are perfectly designed to get the results they get." The health care system at MCJ was perfectly designed to get the results it got. Mr. Pajas' death was predictable and more likely than not avoidable.

## VI. Expert Declaration

I was compensated at a rate of $575 per hour for the study and testimony in this case. My qualifications are contained in this report and my accompanying curriculum vitae which also lists the cases in which I have given testimony in the past four years.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration is executed at Olympia, Washington this 31st day of August, 2017.

Marc F. Stern, MD, MPH

**MARC F. STERN, M.D., M.P.H., F.A.C.P.**

August, 2017

1100 Surrey Trace Drive, SE                                                      marcstern@live.com
Tumwater, Washington 98501, USA                                              +1 (360) 701–6520

## SUMMARY OF EXPERIENCE

**CORRECTIONAL HEALTH CARE CONSULTANT**                          **2009 – PRESENT**

Consultant in the design, management, and operation of health services in a correctional setting to assist in evaluating, monitoring, or providing evidence-based, cost-effective care consistent with constitutional mandates of quality.

Current activities include:

- Consultant on "Drug-related Death after Prison Release," a research grant continuing work with Dr. Ingrid Binswanger, University of Colorado, Denver, examining the causes of, and methods of reducing deaths after release from prison to the community. National Institutes of Health Grant R21 DA031041-01. (2011 - )
- Patient safety/health systems advisor to various jails in Washington State and the Nassau County (New York) (2014 - )
- Consultant to Human Rights Watch to evaluate medical care of immigrants in Homeland Security detention (2016 - )
- Consultant to the US Department of Justice, Civil Rights Division, Special Litigation Section. Providing investigative support and expert medical services pursuant to complaints regarding care delivered in any US jail, prison, or detention facility. (2010 - ) (no current open cases)

Previous activities include:

- Member of monitoring team (medical expert) pursuant to Consent Agreement between US Department of Justice and Miami-Dade County (Unites States of America v Miami-Dade County, *et al.*) regarding, *entre outre*, unconstitutional medical care. (2013 - 2016)
- Jointly appointed Consultant to the parties in Flynn v Walker (formerly Flynn v Doyle), a class action lawsuit before the US Federal District Court (Eastern District of Wisconsin) regarding Eighth Amendment violations of the health care provided to women at the Taycheedah Correctional Institute. Responsible for monitoring compliance with the medical component of the settlement. (2010 - 2015)
- Consultant to the US Department of Homeland Security, Office for Civil Rights and Civil Liberties. Providing investigative support and expert medical services pursuant to complaints regarding care received by immigration detainees in the custody of U.S. Immigration and Customs Enforcement. (2009 - 2014)
- Special Master for the US Federal District Court (District of Idaho) in Balla v Idaho State Board of Correction, et al., a class action lawsuit alleging Eighth Amendment violations in provision of health care at the Idaho State Correctional Institution. (2011 - 2012)
- Facilitator/Consultant to the US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, providing assistance and input for the development of the first National Survey of Prisoner Health. (2010-2011 )
- Project lead and primary author of National Institute of Corrections' project entitled "Correctional Health Care Executive Curriculum Development," in collaboration with National Commission on Correctional Health Care. NIC commissioned this curriculum for its use to train executive leaders from jails and prisons across the nation to better manage the health care missions of their facilities. Cooperative Agreement 11AD11GK18, US Department of Justice, National Institute of Corrections. (2011 - 2015 )
- Co-teacher, with Jaye Anno, Ph.D., for the National Commission on Correctional Health Care, of the Commission's standing course, *An In-Depth Look at NCCHC's 2008 Standards for Health Services in Prisons and Jails* taught at its national meetings. (2010 - 2013)
- Contributor to 2014 Editions of Standards for Health Services in Jails and Standards for Health Services in Prisons, National Commission on Correctional Health Care. (2013)
- Consultant to the California Department of Corrections and Rehabilitation court-appointed Receiver for medical operations. Projects included:
  - Assessing the Receiver's progress in completing its goal of bringing medical care delivered in the Department to a constitutionally mandated level. (2009)
  - Providing physician leadership to the Telemedicine Program Manager tasked with improving and expanding the statewide use of telemedicine. (2009)

65

Marc F. Stern, M.D.                                                                                        Page 2

- Conceived, co-designed, led, and instructed in American College of Correctional Physicians and National Commission on Correctional Health Care's Medical Directors Boot Camp (now called Leadership Institute), a national training program for new (Track "101") and more experienced (Track "201") prison and jail medical directors. (2009 - 2012)
- Participated as a member of a nine-person Delphi expert consensus panel convened by Rand Corporation to create a set of correctional health care quality standards. (2009)
- Convened a coalition of jails, Federally Qualified Health Centers, and community mental health centers in ten counties in Washington State to apply for a federal grant to create an electronic network among the participants that will share prescription information for the correctional population as they move among these three venues. (2009 - 2010)
- Participated as a clinical expert in comprehensive assessment of Michigan Department of Corrections as part of a team from the National Commission on Correctional Health Care. (2007)
- Provided consultation to Correctional Medical Services, Inc., St. Louis (now Corizon), on issues related to development of an electronic health record. (2001)
- Reviewed cases of possible professional misconduct for the Office of Professional Medical Conduct of the New York State Department of Health. (1999 – 2001)
- Advised Deputy Commissioner, Indiana State Board of Health, on developing plan to reduce morbidity from chronic diseases using available databases. (1992)
- Provided consultation to Division of General Medicine, University of Nevada at Reno, to help develop a new clinical practice site combining a faculty practice and a supervised resident clinic. (1991)

**OLYMPIA FREE CLINIC, OLYMPIA, WASHINGTON**                                      **2017 - PRESENT**

Volunteer practitioner providing episodic care at a neighborhood clinic which provides free care to individuals without health insurance until they can find a permanent medical home

**OLYMPIA UNION GOSPEL MISSION CLINIC, OLYMPIA, WASHINGTON**                      **2009 – 2014**

Volunteer practitioner providing primary care at a neighborhood clinic which provides free care to individuals without health insurance until they can find a permanent medical home; my own patient panel within the practice focuses on individuals recently released jail and prison.

**WASHINGTON STATE DEPARTMENT OF CORRECTIONS**                                    **2002 – 2008**

Assistant Secretary for Health Services/Health Services Director, 2005 – 2008
Associate Deputy Secretary for Health Care, 2002 – 2005

Responsible for the medical, mental health, chemical dependency (transiently), and dental care of 15,000 offenders in total confinement. Oversaw an annual operating budget of $110 million and 700 health care staff.

- As the first incumbent ever in this position, ushered the health services division from an operation of 12 staff in headquarters, providing only consultative services to the Department, to an operation with direct authority and responsibility for all departmental health care staff and budget. As part of new organizational structure, created and filled statewide positions of Directors of Nursing, Medicine, Dental, Behavioral Health, Mental Health, Psychiatry, Pharmacy, Operations, and Utilization Management.
- Significantly changed the culture of the practice of correctional health care and the morale of staff by a variety of structural and functional changes, including: ensuring that high ethical standards and excellence in clinical practice were of primordial importance during hiring of professional and supervisory staff; supporting disciplining or career counseling of existing staff where appropriate; implementing an organizational structure such that patient care decisions were under the final direct authority of a clinician and were designed to ensure that patient needs were met, while respecting and operating within the confines of a custodial system.
- Improved quality of care by centralizing and standardizing health care operations, including: authoring a new Offender Health Plan defining patient benefits based on the Eighth Amendment, case law, and evidence-based medicine; implementing a novel system of utilization management in medical, dental, and mental health, using the medical staffs as real-time peer reviewers; developing a pharmacy procedures manual and creating a Pharmacy and Therapeutics Committee; achieving initial American Correctional Association accreditation for 13 facilities (all with almost perfect scores on first audit); migrating the eight individual pharmacy databases to a single central database.

Marc F. Stern, M.D.                                                                                    Page 3

- Blunted the growth in health care spending without compromising quality of care by a number of interventions, including: better coordination and centralization of contracting with external vendors, including new statewide contracts for hospitalization, laboratory, drug purchasing, radiology, physician recruitment, and agency nursing; implementing a statewide formulary; issuing quarterly operational reports at the state and facility levels.
- Piloted the following projects: direct issuance of over-the-counter medications on demand through inmates stores (commissary), obviating the need for a practitioner visit and prescription; computerized practitioner order entry (CPOE); pill splitting; ER telemedicine.
- Oversaw the health services team that participated variously in pre-design, design, or build phases of five capital projects to build complete new health units.

## NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES                        2001 – 2002

Regional Medical Director, Northeast Region, 2001 – 2002

Responsible for clinical oversight of medical services for 14,000 offenders in 14 prisons, including one (already) under court monitoring.

- Oversaw contract with vendor to manage 60-bed regional infirmary and hospice.
- Coordinated activities among the Regional Medical Unit outpatient clinic, the Albany Medical College, and the 13 feeder prisons to provide most of the specialty care for the region.
- Worked with contracting specialists and Emergency Departments to improve access and decrease medical out-trips by increasing the proportion of scheduled and emergency services provided by telemedicine.
- Provided training, advice, and counseling to practitioners and facility health administrators in the region to improve the quality of care delivered.

## CORRECTIONAL MEDICAL SERVICES, INC. (now CORIZON)                        2000 – 2001

Regional Medical Director, New York Region, 2000 – 2001

Responsible for clinical management of managed care contract with New York State Department of Correctional Services to provide utilization management services for the northeast and northern regions of New York State and supervision of the 60-bed regional infirmary and hospice.

- Migrated the utilization approval function from one of an anonymous rule-based "black box" to a collaborative evidence-based decision making process between the vendor and front-line clinicians.

## MERCY INTERNAL MEDICINE, ALBANY, NEW YORK                                1999 – 2000

Neighborhood three-physician internal medicine group practice.

Primary Care Physician, 1999 – 2000 (6 months)

Provided direct primary care to a panel of community patients during a period of staff shortage.

## ALBANY COUNTY CORRECTIONAL FACILITY, ALBANY, NEW YORK                     1998 – 1999

Acting Facility Medical Director, 1998 – 1999

Directed the medical staff of an 800 bed jail and provided direct patient care following the sudden loss of the Medical Director, pending hiring of a permanent replacement. Coordinated care of jail patients in local hospitals. Provided consultation to the Superintendent on improvements to operation and staffing of medical unit and need for privatization.

## VETERANS ADMINISTRATION MEDICAL CENTER, ALBANY, NY                        1992 – 1998

Assistant Chief, Medical Service, 1995 – 1998
Chief, Section of General Internal Medicine and Emergency Services, 1992 – 1998

Responsible for operation of the general internal medicine clinics and the Emergency Department.

- Designed and implemented an organizational and physical plant makeover of the general medicine ambulatory care clinic from an episodic-care driven model with practitioners functioning independently supported by minimal nursing involvement, to a continuity-of-care model with integrated physician/mid-level practitioner/registered nurse/licensed practice nurse/practice manager teams.
- Led the design and opening of a new Emergency Department.

Marc F. Stern, M.D.                                                                  Page 4

- As the VA Section Chief of Albany Medical College's Division of General Internal Medicine, coordinated academic activities of the Division at the VA, including oversight of, and direct teaching in, ambulatory care and inpatient internal medicine rotations for medical students, residents, and fellows. Incorporated medical residents as part of the general internal medicine clinics. Awarded $786,000 Veterans Administration grant ("PRIME I") over four years for development and operation of educational programs for medicine residents and students in allied health professions (management, pharmacy, social work, physician extenders) wishing to study primary care delivery.

**ERIE COUNTY HEALTH DEPARTMENT, BUFFALO, NY**                          **1988 – 1990**

Director of Sexually Transmitted Diseases (STD) Services, 1989 – 1990
Staff Physician, STD Clinic, 1988 – 1989
Staff Physician, Lackawanna Community Health Center, 1988 – 1990

Provided leadership and patient care services in the evaluation and treatment of STDs. Successfully reorganized the county's STD services which were suffering from mismanagement and were under public scrutiny. Provided direct patient care services in primary care clinic for underserved neighborhood.

**UNION OCCUPATIONAL HEALTH CENTER, BUFFALO, NY**                       **1988 – 1990**

Staff Physician, 1988 – 1990

Provided direct patient care for the evaluation of occupationally-related health disorders.

**VETERANS ADMINISTRATION MEDICAL CENTER, BUFFALO, NY**                 **1985 – 1990**

Chief Outpatient Medical Section and Primary Care Clinic, 1986 – 1988
VA Section Head, Division of General Internal Medicine, University of Buffalo, 1986 – 1988
- Developed and implemented a major restructuring of the general medicine ambulatory care clinic to reduce fragmentation of care by introduction of a continuity-of-care model with a physician/nurse team approach.
Medical Director, Anticoagulation Clinic 1986 – 1990
Staff Physician, Emergency Department, 1985 – 1986

## FACULTY APPOINTMENTS

| | |
|---|---|
| 2007 – present | Affiliate Assistant Professor, Department of Health Services, School of Public Health, University of Washington |
| 1999 – present | Clinical Professor, Fellowship in Applied Public Health (previously Volunteer Faculty, Preventive Medicine Residency), University at Albany School of Public Health |
| 1996 – 2002 | Volunteer Faculty, Office of the Dean of Students, University at Albany |
| 1992 – 2002 | Associate Clinical/Associate/Assistant Professor of Medicine, Albany Medical College |
| 1993 – 1997 | Clinical Associate Faculty, Graduate Program in Nursing, Sage Graduate School |
| 1990 – 1992 | Instructor of Medicine, Indiana University |
| 1985 – 1990 | Clinical Assistant Professor of Medicine, University of Buffalo |
| 1982 – 1985 | Clinical Assistant Instructor of Medicine, University of Buffalo |

## OTHER PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2016 – present | Chair, Education Committee, Academic Consortium on Criminal Justice Health |
| 2016 – present | Member (Prisoner Advocate), Washington State Institutional Review Board |
| 2015 – present | Founding Editorial Board Member, Journal for Evidence-based Practice in Correctional Health, Center for Correctional Health Networks, University of Connecticut |
| 2013 – present | Course Faculty, "Health in Prisons" course, Bloomberg School of Public Health, Johns Hopkins University/International Committee of the Red Cross |
| 2013 – present | Member (Prisoner Advocate), Institutional Review Board, University of Washington |
| 2011 – 2012 | Member, Education Committee, National Commission on Correctional Health Care |

Marc F. Stern, M.D.                                                                                              Page 5

| | |
|---|---|
| 2010 | Recipient, Armond Start Award of Excellence, American College of Correctional Physicians |
| 2010 | Recipient, (First) Annual Preventive Medicine Faculty Excellence Award, New York State Preventive Medicine Residency Program, University at Albany School of Public Health/New York State Department of Health |
| 2010 – present | Member, International Advisory Board, International Journal of Prison Health |
| 2009 – present | Member, Editorial Board, Journal of Correctional Health Care |
| 2007 – present | Member, National Advisory Committee, COCHS (Community–Oriented Correctional Health Services) |
| 2007 – present | Member, Planning Committee, Annual Academic and Health Policy Conference on Correctional Health, University of Massachusetts Medical School and Commonwealth Medicine Correctional Health Program |
| 2005 – present | Member, American Correctional Association/Washington Correctional Association |
| 2004 – 2006 | Member, Board of Directors, American College of Correctional Physicians |
| 2004 – 2006 | Member, Fellow's Advisory Committee, University of Washington Robert Wood Johnson Clinical Scholar Program |
| 2004 | Member, External Expert Panel to the Surgeon General on the "Call to Action on Correctional Health Care" |
| 2004 | Recipient, Excellence in Education Award for excellence in clinical teaching, Family Practice Residency Program, Providence St. Peter Hospital, Olympia, Washington |
| 2003 – present | Faculty Instructor, Critical Appraisal of the Literature Course, Family Practice Residency Program, Providence St. Peter Hospital, Olympia, Washington |
| 2001 – present | Chair/Co–Chair/Member, Education Committee, American College of Correctional Physicians |
| 2000 – present | Member, American College of Correctional Physicians |
| 1999 – present | Faculty Instructor, Critical Appraisal of the Literature Course, Preventive Medicine Residency Program, New York State Department of Health/University at Albany School of Public Health |
| 1999 | Co–Chairperson, Education Subcommittee, Workshop Submission Review Committee, Annual Meeting, Society of General Internal Medicine |
| 1997 – 1998 | Northeast US Representative, National Association of VA Ambulatory Managers |
| 1996 – 2002 | Faculty Mentor, Journal Club, Internal Medicine Residency Program, Albany Medical College |
| 1996 – 2002 | Faculty Advisor and Medical Control, 5 Quad Volunteer Ambulance Service, University at Albany |
| 1996 | Recipient, Special Recognition for High Quality Workshop Presentation at Annual Meeting, Society of General Internal Medicine |
| 1995 – 1998 | Preceptor, MBA Internship, Union College |
| 1995 | Member, Quality Assurance/Patient Satisfaction Subcommittee, VA National Curriculum Development Committee for Implementation of Primary Care Practices, Veterans Administration |
| 1994 – 1998 | Member, Residency Advisory Committee, Preventive Medicine Residency, New York State Department of Health/School of Public Health, University at Albany |
| 1993 | Chairperson, Dean's Task Force on Primary Care, Albany Medical College |
| 1993 | Member, Task Group to develop curriculum for Comprehensive Care Case Study Course for Years 1 through 4, Albany Medical College |
| 1988 – 1989 | Instructor, Teaching Effectiveness Program for New Housestaff, Graduate Medical Dental Education Consortium of Buffalo |
| 1987 – 1990 | Member, Human Studies Review Committee, School of Allied Health Professions, University of Buffalo |
| 1987 – 1989 | Chairman, Subcommittee on Hospital Management Issues and Member, Subcommittee on Teaching of Ad Hoc Committee to Plan Incoming Residents Training Week, Graduate Medical Dental Education Consortium of Buffalo |
| 1987 – 1988 | Member, Dean's Ad Hoc Committee to Reorganize "Introduction to Clinical Medicine" Course |
| 1987 | Preceptor, Nurse Practitioner Training Program, School of Nursing, University of Buffalo |
| 1986 – 1988 | Course Coordinator, Simulation Models Section of Physical Diagnosis Course, University of Buffalo |
| 1986 – 1988 | Chairman, Service Chiefs' Continuity of Care Task Force, Veterans Administration Medical Center, Buffalo, New York |

Marc F. Stern, M.D.                                                                    Page 6

| 1986 | Recipient, Letter of Commendation, House Staff Teaching, University of Buffalo |
| 1979 – 1980 | Laboratory Teaching Assistant in Gross Anatomy, Université Libre de Bruxelles, Brussels, Belgium |
| 1973 – 1975 | Instructor and Instructor Trainer of First Aid, American National Red Cross |
| 1972 – 1975 | Chief of Service or Assistant Chief of Operations, 5 Quad Volunteer Ambulance Service, University at Albany. |
| 1972 – 1975 | Emergency Medical Technician Instructor and Course Coordinator, New York State Department of Health, Bureau of Emergency Medical Services |

### EDUCATION

University at Albany, College of Arts and Sciences, Albany; B.S., 1975 (Biology)

University at Albany, School of Education, Albany; AMST (Albany Math and Science Teachers) Teacher Education Program, 1975

Université Libre de Bruxelles, Faculté de Medecine, Brussels, Belgium; Candidature en Sciences Medicales, 1980

University at Buffalo, School of Medicine, Buffalo; M.D., 1982

University at Buffalo Affiliated Hospitals, Buffalo; Residency in Internal Medicine, 1985

Regenstrief Institute of Indiana University, and Richard L. Roudebush Veterans Administration Medical Center; VA/NIH Fellowship in Primary Care Medicine and Health Services Research, 1992

Indiana University, School of Health, Physical Education, and Recreation, Bloomington; M.P.H., 1992

New York Academy of Medicine, New York; Mini-fellowship Teaching Evidence-Based Medicine, 1999

### CERTIFICATION

Provisional Teaching Certification for Biology, Chemistry, Physics, Grades 7–12, New York State Department of Education (expired), 1975

Diplomate, National Board of Medical Examiners, 1983

Diplomate, American Board of Internal Medicine, 1985

Fellow, American College of Physicians, 1991

License: Washington (#MD00041843, active); New York (#158327, inactive); Indiana (#01038490, inactive)

Certified Correctional Health Professional, 2010

### REVIEWER

| 2015 – present | Journal for Evidence-based Practice in Correctional Health |
| 2015 – present | PLOS ONE |
| 2001 – present | Journal of Correctional Health Care |
| 2011 – present | American Journal of Public Health |
| 2010 – present | Langeloth Foundation (grants) |
| 2001 – 2004 | Journal of General Internal Medicine |
| 1996 | Abstract Committee, Health Services Research Subcommittee, Annual Meeting, Society of General Internal Medicine |
| 1990 – 1992 | Medical Care |

### WORKSHOPS and PRESENTATIONS

**Stern, MF.** *Why it Matters: Advocacy and Policies to Support Health Communities after Incarceration.* At the Nexus of Correctional Health and Public Health: Policies and Practice session. American Public Health Association Annual Meeting. Chicago, Illinois. 2015

**Stern MF.**, Kern D. *Hot Topics in Correctional Health Care.* American Jail Association Annual Meeting. Charlotte, North Carolina. 2015.

**Stern MF.** *Contracting for Health Services: Should I, and if so, how?* American Jail Association Annual Meeting. Dallas, Texas. 2014

Marc F. Stern, M.D.                                                                                    Page 7

**Stern MF, Allen S, May J, Ritter S.** *Hunger Strikes: What should the Society of Correctional Physician's position be?* American College of Correctional Physicians (Formerly Society of Correctional Physicians) Annual Meeting.  Nashville, Tennessee.  2013

**Stern MF.** *Addressing Conflict between Medical and Security: an Ethics Perspective.*  International Corrections and Prison Association Annual Meeting.  Colorado Springs, Colorado.  2013

**Stern MF,** Barboza S. *Patient Safety: Raising the Bar in Correctional Health Care.*  National Commission on Correctional Health Care Mid-Year Meeting, Nashville, Tennessee, 2010

**Stern MF**. *Patient Safety: Raising the Bar in Correctional Health Care.*  American Correctional Health Services Association, Annual Meeting, Portland, Oregon, March, 2010

**Stern MF.** *Evidence Based Decision Making for Non-Clinical Correctional Administrators*. American Correctional Association 139th Congress, Nashville, Tennessee, August 2009

Wright L, Kendig N, Hearn P, **Stern M.** *Managing the Geriatric Population.*  Panel Discussion, State Medical Directors' Meeting, American Corrections Association, Alexandria, Virginia, November 2007

**Stern MF,** Hohmann LK. *Evidence Based Medicine.* The Empire State Advantage, Annual Excellence at Work Conference: Leading and Managing for Organizational Excellence, Albany, New York, May 2002

**Stern MF**. *Diagnosis and Management of Male Erectile Dysfunction – A Goal–Oriented Approach.*  Society of General Internal Medicine National Meeting, San Francisco, California, May 1999

Turner C, Charleston VA Staff, **Stern MF**. *Models For Measuring Physician Productivity.*  National Association of VA Ambulatory Managers National Meeting, Memphis, Tennessee, August, 1997

**Stern MF**. *Evaluation and Treatment of the Patient with Impotence: A Practical Primer for General Internists.*  Society of General Internal Medicine National Meeting, Washington D.C., May 1996

**Stern MF**. *Patient Motivation: A Key to Success.* Tuberculosis and HIV: A Time for Teamwork. AIDS Program, Bureau of Tuberculosis Control – New York State Department of Health and Albany Medical College.  Albany, 1994

**Stern MF**. *Impotence: A Rational and Practical Approach to Diagnosis and Treatment for the General Internist.*  Society of General Internal Medicine National Meeting, Washington D.C., May 1991

**Stern MF,** Lubitz RM. *Nirvana and Audio–Visual Aids.*  Society of General Internal Medicine, Midwest Regional Meeting,  Chicago, October 1991

## INVITED LECTURES

*Prison Health Leadership Conference.* 2-Day workshop. International Corrections and Prisons Association/African Correctional Services Association/Namibian Corrections Service. Omaruru, Namibia, 2016.

*What Would YOU Do? Navigating Medical Ethical Dilemmas*. Spring Conference.  National Commission on Correctional Health Care. Nashville, Tennessee, 2016.

*Improving Patient Safety*. Spring Provider Meeting. Oregon Department of Corrections. Salem, Oregon, 2016.

*A View from the Inside: The Challenges and Opportunities Conducting Cardiovascular Research in Jails and Prisons.* Workshop on Cardiovascular Diseases in the Inmate and Released Prison Population.  The National Heart, Lung, and Blood Institute.  Bethesda, Maryland, 2016.

January 5-6, 2016*Medical Ethics in Corrections.*  Recurring seminar.  Criminal Justice 441 – Professionalism and Ethical Issues in Criminal Justice.  University of Washington, Tacoma, 2012 – present.

*Turning Sick Call Upside Down.* Annual Conference.  National Commission on Correctional Health Care.  Dallas, Texas, 2015.

*Diagnostic Maneuvers You May Have Missed in Nursing School.*  Annual Conference.  National Commission on Correctional Health Care.  Dallas, Texas, 2015.

*The Challenges of Hunger Strikes: What Should We Do? What Shouldn't We Do?*  Annual Conference.  National Commission on Correctional Health Care.  Dallas, Texas, 2015.

Practical and Ethical Approaches to Managing Hunger Strikes.  Annual Practitioners' Conference.  Washington Department of Corrections.  Tacoma, Washington 2015.

*Patient Safety and 'Right Using' Nurses*. Keynote address.  Annual Conference.  American Correctional Health Services Association.  Philadelphia, Pennsylvania, 2013.

*Patient Safety: Overuse, underuse, and misuse…of nurses.*  Keynote address.  Essentials of Correctional Health Care conference.  Salt Lake City, Utah, 2012

*The ethics of providing healthcare to prisoners-An International Perspective.*  Global Health Seminar Series. Department of Global Health, University of Washington, Seattle, Washington, 2012

*Recovery, Not Recidivism: Strategies for Helping People Who are Incarcerated.* NAMI Annual Meeting, Seattle, Washington, 2012 (Co-presented with Sue Rahr, Washington State Criminal Justice Training Commission and Ari Kohn, Post-Prison Education Program)

*Ethics and HIV Workshop.* HIV/AIDS Care in the Correctional Setting Conference, Northwest AIDS Education and Training Center, Salem, Oregon, 2011

*Ethics and HIV Workshop.* HIV/AIDS Care in the Correctional Setting Conference, Northwest AIDS Education and Training Center, Spokane, Washington, 2011

*Achieving Quality Care in a Tough Economy.* National Commission on Correctional Health Care Mid-Year Meeting, Nashville, Tennessee, 2010 (Co-presented with Rick Morse and Helena Kim, PharmD.)

*Involuntary Psychotropic Administration: The Harper Solution.*  American Correctional Health Services Association, Annual Meeting, Portland, Oregon, 2010 (Co-presented with Bruce Gage, MD, Director of Psychiatry, Washington State Department of Corrections)

*Death Penalty Debate.* Panelist.  Seattle University School of Law, Seattle, Washington, 2009

*The Patient Handoff – From Custody to the Community.*  Washington Free Clinic Association, Annual Meeting, Olympia, Washington. Lacey, Washington, 2009

*Balancing Patient Advocacy with Fiscal Restraint and Patient Litigation.*  National Commission on Correctional Health Care and American College of Correctional Physicians "Medical Directors Boot Camp,"  Seattle, Washington, 2009

*Staff Management.*  National Commission on Correctional Health Care and American College of Correctional Physicians "Medical Directors Boot Camp,"  Seattle, Washington, 2009

*Management Dilemmas in Corrections: Boots and Bottom Bunks.* 2008 Annual Meeting, American College of Correctional Physicians, Chicago, Illinois

*Public Health and Correctional Health Care.*  Guest Lecturer: Masters Program in community–based population focused management – Populations at risk, Washington State University, Spokane, Washington, 2008

*I Want to do my own Skin Biopsies.*  2005 Annual Meeting, American College of Correctional Physicians, New Orleans, Louisiana

*Corrections Quick Topics.*  2003 Annual Meeting, American College of Correctional Physicians,

*Evidence Based Medicine in Correctional Health Care.*  2003 Annual Meeting, National Commission on Correctional Health Care, Austin, Texas

*Evidence Based Medicine.*  2002 Excellence at Work Conference, Empire State Advantage. Albany, New York

*Evidence Based Medicine, Outcomes Research, and Health Care Organizations.*  National Clinical Advisory Group, Integrail, Inc., Albany, New York, 2002

*Taking the Mystery out of Evidence Based Medicine: Providing Useful Answers for Clinicians and Patients.* Breakfast Series, Institute for the Advancement of Health Care Management, School of Business, University at Albany, Albany, New York, 2001

*Study Design and Critical Appraisal of the Literature.*  Graduate Medical Education Lecture Series for all housestaff, Albany Medical College, Albany, New York, 1999

*Male Impotence: Its Diagnosis and Treatment in the Era of Sildenafil.* 4th Annual CME Day,  Alumni Association of the Albany–Hudson Valley Physician Assistant Program, Albany, New York, 1998

*Introduction to Male Erectile Dysfunction and the Role of Sildenafil in Treatment.*  Northeast Regional Meeting Pfizer Sales Representatives, Equinox Hotel, Vermont, 1997

*Male Erectile Dysfunction.* Topics in Urology, A Seminar for Primary Healthcare Providers, Bassett Healthcare, Cooperstown, New York, 1997

*Impotence: An Update.*  Department of Medicine Grand Rounds, Albany Medical College, 1996

*Diabetes for the EMT First–Responder.*  Five Quad Volunteer Ambulance, University at Albany, 1996

Marc F. Stern, M.D.                                                                                      Page 9

*Impotence: An Approach for Internists.*  Medicine Grand Rounds, St. Mary's Hospital,  Rochester, New York, 1994

*Male Impotence.* Common Problems in Primary Care Precourse.  American College of Physicians National Meeting, Miami, Florida, 1994

*Recognizing and Treating Impotence.*  Department of Medicine Grand Rounds, Albany Medical College, 1992

*Medical Decision Making: A Primer on Decision Analysis.*  Faculty Research Seminar, Department of Family Practice, Indiana University, 1992

*Effective Presentation of Public Health Data.* Bureau of Communicable Diseases, Indiana State Board of Health, 1991

*Impotence: An Approach for Internists.* Housestaff Conference, Department of Medicine, Indiana University, 1991

*Using Electronic Databases to Search the Medical Literature.*  NIH/VA Fellows Program, Indiana University, 1991

*Study Designs Used in Epidemiology.*  Ambulatory Care Block Rotation.  Department of Medicine, Indiana University, 1991

*Effective Use of Slides in a Short Scientific Presentation.* Housestaff Conference, Department of Medicine, Indiana University, 1991

*New Perspectives in the Management of Hypercholesterolemia.* Medical Staff, West Seneca Developmental Center, West Seneca, New York, 1989

*Effective Use of Audio–Visual Aids.* Nurse Educators, American Diabetes Association, Western New York Chapter, 1989

*Management of Diabetics in the Custodial Care Setting.* Medical Staff, West Seneca Developmental Center, West Seneca, New York, 1989

*Effective Use of Audio–Visuals in Diabetes Peer and Patient Education.* American Association of Diabetic Educators, Western New York Chapter, 1989

*Pathophysiology, Diagnosis and Care of Diabetes.*  Nurse Practitioner Training Program, School of Nursing, University of Buffalo, 1989

*Techniques of Large Group Presentations to Medical Audiences – Use of Audio–Visuals.*    New Housestaff Training Program,  Graduate Medical Dental Education Consortium of Buffalo, 1988

## PUBLICATIONS/ABSTRACTS

Wang EA, Redmond N, Dennison Himmelfarb CR, Pettit B, Stern M, Chen J, Shero S, Iturriaga E, Sorlie P, Diez Roux AV. *Cardiovascular Disease in Incarcerated Populations.* Journal of the American College of Cardiology 2017 69(24):2967-76

Mitchell A, Reichberg T, Randall J, Aziz-Bose R, Ferguson W, **Stern M.** *Criminal Justice Health Digital Curriculum.* Poster, Annual Academic and Health Policy Conference on Correctional Health, Atlanta, Georgia, March, 2017

**Stern MF.** *Patient Safety (White Paper).* Guidelines, Management Tools, White Papers, National Commission on Correctional Health Care. http://www.ncchc.org/filebin/Resources/Patient-Safety-2016.pdf. June, 2016

Binswanger IA, **Stern MF**, Yamashita TE, Mueller SR, Baggett TP, Blatchford PJ. *Clinical risk factors for death after release from prison in Washington State: a nested case control study.* Addiction 2015 Oct 17

**Stern MF.**  Op-Ed on Lethal Injections.  The Guardian 2014 Aug 6

**Stern MF.**  *American College of Correctional Physicians Calls for Caution Placing Mentally Ill in Segregation: An Important Band-Aid.*  Guest Editorial.  Journal of Correctional Health Care 2014 Apr; 20(2):92-94

Binswanger I, Blatchford PJ, Mueller SR, **Stern MF.** *Mortality After Prison Release: Opioid Overdose and Other Causes of Death, Risk Factors, and Time Trends From 1999 to 2009.*  Annals of Internal Medicine 2013 Nov; 159(9):592-600

Williams B,  **Stern MF,** Mellow J, Safer M, Greifinger RB. *Aging in Correctional Custody: Setting a policy agenda for older prisoner health care.* American Journal of Public Health 2012 Aug; 102(8):1475-1481

Binswanger I, Blatchford PJ, Yamashita TE, **Stern MF.** *Drug-Related Risk Factors for Death after Release from Prison: A Nested Case Control Study.* Oral Presentation, University of Massachusetts 4th Annual Academic and Health Policy Conference on Correctional Healthcare, Boston, Massachusetts, March, 2011

Binswanger I, Blatchford PJ, Forsyth S, **Stern MF**, Kinner SA. *Death Related to Infectious Disease in Ex-Prisoners: An International Comparative Study.*  Oral Presentation, University of Massachusetts 4th Annual Academic and Health Policy Conference on Correctional Healthcare, Boston, Massachusetts, March, 2011

Marc F. Stern, M.D.                                                          Page 10

Binswanger I, Lindsay R, **Stern MF**, Blatchford P. *Risk Factors for All-Cause, Overdose and Early Deaths after Release from Prison in Washington State Drug and Alcohol Dependence.* Drug and Alcohol Dependence Aug 1 2011;117(1):1-6

**Stern MF**, Greifinger RB, Mellow J. *Patient Safety: Moving the Bar in Prison Health Care Standards.* American Journal of Public Health November 2010;100(11):2103-2110

Strick LB, Saucerman G, Schlatter C, Newsom L, **Stern MF**. *Implementation of Opt-Out HIV testing in the Washington State Department of Corrections.* Poster Presentation, National Commission on Correctional Health Care Annual Meeting, Orlando, Florida, October, 2009

Binswanger IA, Blatchford P, **Stern MF**. *Risk Factors for Death After Release from Prison.* Society for General Internal Medicine 32nd Annual Meeting; Miami: Journal of General Internal Medicine; April 2009. p. S164-S95

**Stern MF**. *Force Feeding for Hunger Strikes – One More Step.* CorrDocs Winter 2009;12(1):2

Binswanger I, **Stern MF**, Deyo RA, Heagerty PJ, Cheadle A, Elmore JG, Koepsell TD. *Release from Prison – A High Risk of Death for Former Inmates.* New England Journal of Medicine 2007 Jan 11;356(2):157–165

**Stern MF**, Hilliard T, Kelm C, Anderson E. *Epidemiology of Hepatitis C Infection in the Washington State Department of Corrections.* Poster Presentation, CDC/NIH *ad hoc* Conference on Management of Hepatitis C in Prisons, San Antonio, Texas, January, 2003

Phelps KR, **Stern M**, Slingerland A, Heravi M, Strogatz DS, Haqqie SS. *Metabolic and skeletal effects of low and high doses of calcium acetate in patients with preterminal chronic renal failure.* Am J Nephrol 2002 Sep–Dec;22(5–6):445–54

Goldberg L, **Stern MF**, Posner DS. *Comparative Epidemiology of Erectile Dysfunction in Gay Men.* Oral Presentation, International Society for Impotence Research Meeting, Amsterdam, The Netherlands, August 1998. Int J Impot Res. 1998;10(S3):S41 [also presented as oral abstract Annual Meeting, Society for the Study of Impotence, Boston, Massachusetts, October, 1999. Int J Impot Res. 1999;10(S1):S65]

**Stern MF**. *Erectile Dysfunction in Older Men.* Topics in Geriatric Rehab 12(4):40–52, 1997. [republished in Geriatric Patient Education Resource Manual, Supplement. Aspen Reference Group, Eds. Aspen Publishers, Inc., 1998]

**Stern MF**, Wulfert E, Barada J, Mulchahy JJ, Korenman SG. *An Outcomes–Oriented Approach to the Primary Care Evaluation and Management of Erectile Dysfunction.* J Clin Outcomes Management 5(2):36–56, 1998

Fihn SD, Callahan CM, Martin D, et al.; for the **National Consortium of Anticoagulation Clinics.*** *The Risk for and Severity of Bleeding Complications in Elderly Patients Treated with Warfarin.* Ann Int Med. 1996;124:970–979

Fihn SD, McDonell M, Martin D, et al.; for the **Warfarin Optimized Outpatient Follow–up Study Group.*** *Risk Factors for Complications of Chronic Anticoagulation.* Ann Int Med. 1993;118:511–520. (*While involved in the original proposal development and project execution, I was no longer part of the group at the time of this publication)

**Stern MF**, Dittus RS, Birkhead G, Huber R, Schwartz J, Morse D. *Cost–Effectiveness of Hepatitis B Immunization Strategies for High Risk People.* Oral Presentation, Society of General Internal Medicine National Meeting, Washington, D.C., May 1992. Clin Res 1992

Fihn SD, McDonell MB, Vermes D, Martin D, Kent DL, Henikoff JG, and the **Warfarin Outpatient Follow–up Study Group**. *Optimal Scheduling of Patients Taking Warfarin. A Multicenter Randomized Trial.* Oral Presentation, Society of General Internal Medicine National Meeting, Washington, D.C., May 1992. Clin Res 1992

Fihn SD, McDonnell MB, Vermes D, Kent DL, Henikoff JG, and the **Warfarin Anticoagulation Study Group**. *Risk Factors for Complications During Chronic Anticoagulation.* Poster Presentation, Society of General Internal Medicine National Meeting, Seattle, May 1991

Pristach CA, Donoghue GD, Sarkin R, Wargula C, Doerr R, Opila D, **Stern M**, Single G. *A Multidisciplinary Program to Improve the Teaching Skills of Incoming Housestaff.* Acad Med. 1991;66(3):172–174

**Stern MF**. *Diagnosing Chlamydia trachomatis and Neisseria gonorrhea Infections.* (letter) J Gen Intern Med. 1991;6:183

**Stern MF**, Fitzgerald JF, Dittus RS, Tierney WM, Overhage JM. *Office Visits and Outcomes of Care: Does Frequency Matter?* Poster Presentation, Society of General Internal Medicine Annual Meeting, Seattle, May 1991. Clin Res 1991;39:610A

**Stern MF**. *Cobalamin Deficiency and Red Blood Cell Volume Distribution Width.* (letter) Arch Intern Med. 1990;150:910

**Stern M**, Steinbach B. *Hypodermic Needle Embolization to the Heart.* NY State J Med. 1990;90(7):368–371

Marc F. Stern, M.D.                                                                                    Page 11

**Stern MF**, Birkhead G, Huber R, Schwartz J, Morse D. *Feasibility of Hepatitis B Immunization in an STD Clinic.* Oral Presentation, American Public Health Association Annual Meeting, Atlanta, November 1990

## EXPERT TESTIMONY

Walter v. Correctional Healthcare Companies, *et al.* US District Court, District of Colorado, 2017 (deposition)

Winkler v. Madison County, Kentucky, *et al.* US District Court, Eastern District of Kentucky, Central Division at Lexington, 2016 (deposition)

US v. Miami-Dade County *et al.* US District Court, Southern District of Florida, periodically 2014 - 2016

Rosemary Saffioti v. Snohomish County *et al.* US District Court Western District of Washington at Seattle, 2015 (deposition)

Christopher Alsobrook v. Sergeant Alvarado, *et al.*, US District Court, Southern District of Florida, Miami Division, 2014 (deposition)

Stefan Woodson v. City of Richmond, Virginia, *et al.*, US District Court, Eastern District of Virginia, Richmond Division, 2013 and 2014 (deposition)

Robert Mitchell, *et al.* v. Matthew Cate *et al.*, US District Court, Eastern District of California, 2013 (deposition)

75

**PROOF OF SERVICE**

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 128 N. Fair Oaks Avenue, Pasadena, California 91103.

On September 26, 2017, I served the foregoing document described as: **PLAINTIFFS' INITIAL DISCLOSURE OF EXPERT TESTIMONY FRCP 26 (a)(2)(A)-(D)** on the interested parties in this cause by placing true and correct copies thereof in envelopes addressed as follows:

| | |
|---|---|
| Charles J. McKee, Esq.<br>Michael R. Philippi, Esq.<br>County of Monterey<br>168 West Alisal Street, Third Floor<br>Salinas, California 93901-2653<br>Email:  philippimr@co.monterey.ca.us<br>        zinmank@co.monterey.ca.us (assistant) | **Attorneys for Defendants COUNTY OF MONTEREY and SHERIFF STEVE BERNAL, in his individual and official capacity** |
| Alan Martini, Esq.<br>SHEUERMAN, MARTINI, TABARI,<br>ZENERE & GARVIN<br>1033 Willow Street<br>San Jose, California 95125<br>Emails: amartini@smtlaw.com<br>        amesa@smtlaw.com (assistant)<br>        aobey@smtlaw.com (assistant) | **Attorneys for Defendants CALIFORNIA FORENSIC MEDICAL GROUP and CHRISTINA KAUPP** |

XX    **BY E-MAIL**

XX    I served the above-mentioned document electronically on the parties listed at the e-mail addresses on the next page and, to the best of my knowledge, the transmission was complete and without error in that I did not receive an electronic notification to the contrary.

XX    **BY MAIL**

___    I deposited such envelope in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid.

XX    I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on the same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.

Executed on September 26, 2017, at Pasadena, California.

XX    (Federal)    I declare that I am employed in the office of a member of the bar of this Court at whose direction the serve was made.

_____
Norma A. Molina
Declarant

76