**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MARK VASQUEZ PAJAS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF MONTEREY, et al., <br><br> Defendants. | Case No. 16-cv-00945-BLF <br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING CFMG DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> [Re: ECF 151, 152, 155] |

Twenty hours after fifty-six year old Mark Pajas was booked into the Monterey County jail on drug charges, he was found unresponsive and face down in a pool of his own vomit. He died shortly afterward without recovering consciousness. Mr. Pajas' wife, children, and estate ("Plaintiffs") filed this suit, asserting that jail personnel were deliberately indifferent to Mr. Pajas' serious medical needs in violation of federal and state law.

This order addresses three motions: (1) a motion for partial summary judgment by Plaintiffs; (2) a motion for summary judgment by Monterey County and Sheriff Steve Bernal (collectively, "County Defendants"); and (3) a motion for summary judgment by California Forensic Medical Group ("CFMG") and its employee Christina Kaupp (collectively, "CFMG Defendants").

For the reasons discussed below, Plaintiffs' motion is DENIED, the County Defendants' motion is GRANTED as to Sheriff Bernal and DENIED as to the County, and the CFMG Defendants' motion is DENIED.

## I. BACKGROUND[1]

On January 19, 2015, King City police officers arrested Mr. Pajas on heroin-related charges. The police transported Mr. Pajas to Natividad Medical Center at approximately 4:00 p.m. to obtain medical clearance to book him into the Monterey County jail. Mr. Pajas complained of leg pain and shortness of breath, and he reported to Natividad staff that he was a heroin user. Dr. Daniel Wasserman, who examined Mr. Pajas at Natividad, indicated in his treatment notes that Mr. Pajas was a "56-year-old man with likely lower extremity cellulitis."[2] Rifkin Decl. Exh. 87 at p. 19, ECF 152-1. Dr. Wasserman prescribed two antibiotics for the cellulitis and ordered IV morphine for the related leg pain.[3] Mr. Pajas was discharged from Natividad at approximately 6:30 p.m. with instructions that "[i]f he develop [sic] chest pain or shortness of breath return to the ER immediately." Rifkin Decl. Exh. 87 at p. 4, ECF 152-1.

King City police officers transported Mr. Pajas to the Monterey County jail, and there transferred custody of him to the Monterey County Sheriff's Office ("MCSO") shortly before 7:00 p.m. During intake screening by a MCSO deputy, Mr. Pajas reported that he used 3/4 grams of heroin daily and had used earlier that day. The deputy placed Mr. Pajas in a cell in the corner of the intake area pending completion of the booking process.

At approximately 9:00 p.m., a Registered Nurse ("RN"), Kristina Russum, evaluated Mr. Pajas from the door of the booking cell. Mr. Pajas' blood pressure was 178/92, which Nurse Russum considered to be a little high, but she did not think anything of it because Mr. Pajas was agitated. Russum Dep. 58:8-19, ECF 152-3. Nurse Russum started an opiate detoxification protocol. However, she did not move Mr. Pajas to a sobering cell.

Shortly before 10:00 p.m., MCSO deputies Nora Quintero and Alejandro Miranda escorted

---

[1] The background facts are undisputed unless otherwise noted.

[2] Dr. Wasserman's treatment notes also reflect "Congestive heart failure with not elevated BNP." *Id.* However, Dr. Wasserman testified at his deposition that the note regarding congestive heart failure was a typographical error and that in fact he did not believe that Mr. Pajas suffered from congestive heart failure. Wasserman Dep. 47:18-48:8, Martini Decl. Exh. C, ECF 166-3.

[3] Plaintiffs suggest in their briefing that the morphine was given for withdrawal pain, but Dr. Wasserman stated in his deposition that he prescribed the morphine for leg pain related to cellulitis. *See* Wasserman Dep. 22:6-23:22, ECF 152-3.

2

Mr. Pajas to the front of the intake area to complete booking. Mr. Pajas asked to use the bathroom and was directed to use the bathroom in Sobering Cell 1. After a few minutes, the deputies discovered Mr. Pajas lying down in Sobering Cell 1. The deputies tried to convince him to come out, telling him that if he wanted a blanket he had to go back into the original cell. When Mr. Pajas refused to come out, the deputies left him in Sobering Cell 1. However, they neither informed medical staff that Mr. Pajas was in a sobering cell nor initiated a sobering cell log. Pursuant to MCSO policies, when an inmate is placed in a sobering cell an in-person nursing assessment must be conducted within an hour, a sobering cell log must be started, and deputies must conduct safety checks of the sobering cell every 15 minutes.

At about 4:00 a.m. on the morning of January 20, 2015 – approximately six hours after Mr. Pajas was left in Sobering Cell 1 – a Licensed Vocational Nurse ("LVN") gave him medication. Mr. Pajas began vomiting, which was witnessed by the LVN and two deputies. Neither the LVN nor the deputies called other medical staff. After Mr. Pajas' death, the regurgitated medications were found in the sink of Sobering Cell 1.

At 4:05 a.m., Deputy Quintero began a sobering cell log for Mr. Pajas. Deputy Quintero observed that Mr. Pajas was unsteady and pale, his speech was slow, and his eyes were watery. Deputy Quintero did not document that she had observed Mr. Pajas vomiting.

At approximately 5:00 a.m., an RN entered the first assessment in the Sobering Cell Log, stating that "RN was told by deputy that I/M [inmate] had N/V [nausea/vomiting] x 1 [one time]." Rifkin Decl. Exh. 220 at p. 24, ECF 152-1. The RN indicated in the log that she did not take Mr. Pajas' vital signs because "Pt refused." *Id.*

The next entry in the Sobering Cell Log was made by another RN, Defendant Christina Kaupp, at 8:30 a.m. Nurse Kaupp did not take Mr. Pajas' vital signs. She wrote in the log that Mr. Pajas was lying on the cell floor, refused her offer of anti-nausea medication, and wanted Gatorade. Rifkin Decl. Exh. 220 p. 24, ECF 152-1. At her deposition, however, Nurse Kaupp stated that Mr. Pajas was sitting up when she saw him at 8:30 a.m. *See* Kaupp Dep. 33:19-25, ECF 152-3.

At approximately 10:20 a.m., an LVN and a deputy stopped at the sobering cell. The LVN

attempted to give medication, but Mr. Pajas refused it.

The third and final entry in the Sobering Cell Log was made at 1:00 p.m. by Nurse Kaupp. Nurse Kaupp testified that when she entered the cell Mr. Pajas was on the floor in a slouched position against the wall of the cell with his legs out in front of him. Kaupp Dep. 38:15-39:10, ECF 152-3. She knelt down near Mr. Pajas and asked him to sit up so that she could take his vital signs, but he told her he could not move. Kaupp Dep. 42:2-43:12, ECF 152-3. Nurse Kaupp testified that she asked him repeatedly to sit up so that she could take his vitals, and that Mr. Pajas moved his upper body enough to scoot up the wall a little, but he did not reach a sitting position. Kaupp Dep. 39:21-40:24, ECF 152-3. Nurse Kaupp did not ask him why he could not move and did not ask the deputies who were with her to help Mr. Pajas to sit up. Kaupp Dep. 44:20-45:4, ECF 152-3. She left the cell without taking Mr. Pajas' vitals. As she left, Mr. Pajas asked for the Gatorade he had requested earlier. Kaupp Decl. 48:5-7, ECF 152-3. Nurse Kaupp documented this visit by writing in the Sobering Cell Log, "Refuses Medical. States he can't move – yet witnessed walking around cell moments prior by deputies." Rifkin Decl. Exh. 220 at p. 25, ECF 152-1.

Under MCSO policies, deputies must conduct welfare checks of inmates in sobering cells every 15 minutes. The welfare checks of Mr. Pajas were recorded on a Sobering Cell Assessment Report ("welfare check log"), which shows more than 30 welfare checks between 4:06 a.m. and 1:45 p.m. on January 20, 2015. *See* Rifkin Decl. Exh. 90 at pp. 1-2, ECF 152-1. There was no welfare check at 2:00 p.m. *See id.* At 2:12 p.m.,[4] Deputies McGrew and Serrano took another inmate to Sobering Cell 1 for placement with Mr. Pajas. The deputies saw that Mr. Pajas was lying face down on the floor in his own vomit, closed the door, and escorted the other inmate to a different cell. The deputies then returned to the sobering cell and tried to rouse Mr. Pajas, but he was unresponsive. The deputies began chest compressions and used an AED to administer

---

[4] For purposes of the present motions, Plaintiffs accept Defendants' evidence that the last welfare check was done at 1:45 p.m. and Mr. Pajas was discovered at 2:12 p.m. *See* Plaintiffs' Motion at p. 8, n.6, ECF 161. Plaintiffs contend, however, that the jail's surveillance video shows that the last welfare check actually occurred at 1:42 p.m. and that Mr. Pajas actually was discovered at 2:14 p.m. *See id.* These potential discrepancies do not alter the Court's analysis.

4

shocks. Emergency medical personnel arrived at 2:21 p.m. Mr. Pajas was transported to Natividad and pronounced dead at 2:53 p.m. The coroner determined that the cause of death was coronary heart disease and that opiate and alcohol withdrawal could have contributed to cardiac stress.

Plaintiffs filed this suit on February 26, 2016. They filed the operative first amended complaint ("FAC") on August 5, 2016, asserting the following claims: (1) a § 1983 claim for excessive force in violation of the Fourteenth Amendment; (2) a § 1983 claim for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment ; (3) a § 1983 claim for failure to protect from harm in violation of the Fourteenth Amendment; (4) a § 1983 claim for deprivation of substantive due process in violation of the First and Fourteenth Amendments, causing loss of familial relationship; (5) a state law claim for failure to furnish/summon medical care; (6) a state law claim for negligent supervision, training, hiring, and retention; (7) a claim under California's Bane Act; (8) a state law battery claim; (9) a claim for wrongful death under California Code of Civil Procedure § 377.60; and (10) a state law claim for negligence. *See* FAC, ECF 63. The FAC names as defendants Monterey County, Sheriff Bernal, King City, King City police officer Steve Orozco, CFMG, and Nurse Kaupp.

The Court dismissed Claim 6 (negligent supervision) and Claim 10 (negligence) with prejudice. *See* Order Granting Motion to Dismiss, ECF 77. Plaintiffs stipulated to dismissal of King City and Officer Orozco, which disposed of Claim 1 (excessive force), Claim 5 (failure to furnish medical care), Claim 7 (Bane Act), and Claim 8 (battery). *See* Stipulation for Dismissal, ECF 115. This order addresses summary judgment motions brought by the remaining parties with respect to the remaining claims.

## II. LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

5

1 *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

Plaintiffs' remaining claims are Claim 2 for failure to provide adequate medical care in violation of the Fourteenth Amendment, Claim 3 for failure to protect from harm in violation of the Fourteenth Amendment, Claim 4 for deprivation of familial relationship in violation of the First and Fourteenth Amendments, and Claim 9 for wrongful death under California law. Claims 2, 3, and 4 are asserted against Monterey County, Sheriff Bernal, CFMG, and Nurse Kaupp. Claim 9 is asserted only against CFMG.

**A.   Failure to Provide Medical Care (Claim 2) and Failure to Protect (Claim 3)**

The due process clause of the Fourteenth Amendment guarantees that pretrial detainees receive constitutionally adequate medical and mental health care. *Conn v. City of Reno*, 591 F.3d 1081, 1094 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *opinion reinstated*, 658 F.3d 897 (9th Cir. 2011). That right requires treatment of a "serious" medical need, which exists when "failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 1095 (internal quotation marks and citation omitted). Pretrial detainees also have a due process right to be protected from a substantial risk of serious harm. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016).

"[T]he Supreme Court has treated medical care claims substantially the same as other conditions of confinement violations including failure-to-protect claims," finding "no significant

distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (quotation marks and citation omitted). Thus, claims for failure to provide medical care and failure to protect are evaluated under the same legal standards. *Id.* (The Ninth Circuit has "long analyzed claims that government officials failed to address pretrial detainees' medical needs using the same standard as cases alleging that officials failed to protect pretrial detainees in some other way.").

The legal standards applicable to individual defendants and to entity defendants differ slightly. The elements of a pretrial detainee's Fourteenth Amendment claim against an individual for deprivation of adequate medical care or failure to protect from harm are: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125 (medical care claim); *see also Castro*, 833 F.3d at 1071 (failure to protect claim). "With respect to the third element, the defendant's conduct must be objectively unreasonable." *Gordon*, 888 F.3d at 1125 (quotation marks and citation omitted).

The elements of a pretrial detainee's Fourteenth Amendment claim against an entity defendant for deprivation of adequate medical care or failure to protect from harm are those set forth in *Monell* and its progeny. *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1247 (9th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978)). A detainee must (1) show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation," and (2) "demonstrate that the custom or policy was adhered to with deliberate indifference to the constitutional rights of the jail's inhabitants." *Castro*, 833 F.3d at 1075-76. The deliberate indifference standard for municipalities is an objective standard. *Castro*, 833 F.3d at 1076. "[A]n objective standard applies to municipalities 'for the practical reason that

7

government entities, unlike individuals, do not themselves have states of mind.'" *Mendiola-Martinez*, 836 F.3d at 1248 (quoting *Castro*, 833 F.3d at 1076). "This *Castro* objective standard is satisfied when 'a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Id.* at 1248-49 (quoting *Castro*, 833 F.3d at 1076) (alteration in original).

### 1. Plaintiffs' Motion

Plaintiffs seek partial summary judgment as to the liability of the County, CFMG, and Nurse Kaupp on Claim 2 for failure to provide medical care and Claim 3 for failure to protect from harm.

#### a. County

Under the authorities discussed above, Plaintiffs must prove the following elements in order to establish *Monell* liability against the County: (1) "a direct causal link" between a County custom or policy and the deprivation of Mr. Pajas' constitutional rights to adequate medical care and/or protection from harm, and (2) "the custom or policy was adhered to with deliberate indifference to the constitutional rights of the jail's inhabitants." *See Castro*, 833 F.3d at 1075-76. "The custom or policy must be a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Castro*, 833 F.3d at 1075 (quotation marks and citation omitted).

Plaintiffs identify two policies or customs which they contend give rise to the County's liability under *Monell*: (1) failing to ensure that deputies conducted welfare checks every 15 minutes in accordance with the County's own policy; and (2) failing to ensure that CFMG provided adequate detoxification treatment to inmates.

##### i. Failing to Ensure that Deputies Conducted Welfare Checks

Plaintiffs assert liability against the County based on the County's alleged custom or policy of failing to ensure that deputies complied with required 15-minute welfare checks on inmates

held in sobering cells. As discussed below, Plaintiffs present substantial evidence that the County fails to enforce the 15-minute welfare checks. However, the Court concludes that Plaintiffs have not established the absence of disputed facts as to whether that failure caused Mr. Pajas' death.

Existence of Custom or Policy

The County's written Sobering Cell Policy, set forth in relevant part as follows, requires deputies to check on inmates held in sobering cells every 15 minutes:

> Deputies shall conduct 15 minute checks of inmates in the Sobering Cell. The fifteen minutes checks shall be direct visual observation to determine consciousness, responsiveness, no difficulty breathing, not acutely ill, no apparent injuries, no vomiting while sleeping, and lying on side rather than on back.

Sobering Cell Policy, App'x to Plaintiff's Motion, ECF 152. That policy, or one substantially similar, was in place in January 2015. Bass Dep. 58:1-14, ECF 152-3. Plaintiffs assert, however, that the County had an actual custom or policy of failing to ensure that the 15-minute checks were made.

Plaintiffs present evidence that the County has had long-standing problems enforcing jail welfare checks generally. A Jail Needs Assessment prepared in December 2011 indicated that that MCSO had insufficient staff to perform all required safety checks at the jail. Rifkin Decl. Exh. 235 at p. 9, ECF 152-2. In 2014, MCSO command staff assigned a sergeant to audit jail welfare checks on a daily basis. Bass Dep. 51:18-57:4. However, those audits did not include the 15-minute checks for sobering cells. *Id.*

In September 2014, an internal 60-day audit of all Custody Operation Bureau ("COB") operations and programs found that "COB commanders do not appear competent and ethical in the areas of inmate welfare checks as they refuse to hold subordinates accountable for their actions or in actions [sic]." Rifkin Decl. Exh. 234 at p. 16, ECF 161-1. The MCSO chose not to adopt recommendations to address that issue, and it chose not to adopt a proposal for electronic tracking and recording of deputies' welfare checks. *See* Tomaselli Dep. 82:15-83:7, 111:2-112:6, ECF 161.

The MCSO instead relied on the receiving sergeant – the sergeant responsible for receiving inmates and for all of the jail dorms – to ensure that 15-minute checks were done, and it relied on

the team commander to monitor the sergeant. *See* Bass Dep. 42:23-45:22, ECF 152-3. In January 2015, there was only one commander assigned to supervise the entire jail. Mihu Dep. 18:11-19:25, 29:18-30:9, ECF 152-3. Commander Mihu, who held the position, testified that supervising all welfare checks in the jail was too much for one individual to do effectively. *Id.* at 79:25-80:4. However, it was not until recently that the MCSO developed and implemented new training to ensure proper monitoring of sobering cells and enforcement of sobering cell policy. Bass Dep. 114:9-117:23, ECF 152-3.

The above evidence is sufficient to show that the County had a custom or policy of failing to ensure that deputies complied with required 15-minute welfare checks on inmates held in sobering cells. In fact, the County does not dispute the existence of such custom or policy in opposition to Plaintiffs' motion.

Causation

It is undisputed that the Sobering Cell Policy was not followed in Mr. Pajas' case, as more than 15 minutes elapsed between the 1:45 p.m. welfare check and deputies' discovery of Mr. Pajas unconscious in the sobering cell at 2:12 p.m. However, Plaintiffs have not presented evidence establishing that there is a direct causal link between deputies' failure to perform the 2:00 p.m. welfare check and Mr. Pajas' death.

Plaintiffs point to the deposition testimony of CFMG's medical expert, Dr. Neal Benowitz, who opined that Mr. Pajas died of "a heart arrhythmia caused by coronary heart disease possibly triggered by methamphetamine use." Benowitz Dep. 31:1-4, ECF 152-3. Plaintiffs assert that Dr. Benowitz testified to the effect that if CPR had been started on Mr. Pajas within 10-15 minutes of his cardiac event, Mr. Pajas would have survived. *See* Plaintiffs' Motion at 8, ECF 161. Plaintiffs argue that, based on Dr. Benowitz's testimony, Mr. Pajas likely would have survived if a 2:00 p.m. welfare check had been done.

Dr. Benowitz's testimony is not as conclusive as portrayed by Plaintiffs. When Plaintiffs' counsel asked Dr. Benowitz whether Mr. Pajas could have been resuscitated if he had been discovered "less than ten minutes into the cardiac event," Dr. Benowitz stated that Mr. Pajas possibly could have been resuscitated if he had been found "immediately after the event."

Benowitz Dep. 41:21-42:1, ECF 152-3. When asked to clarify what time frame he meant by "immediately after," Dr. Benowitz indicated that resuscitation would have been possible "[c]ertainly within five minutes," but that "[w]ithin ten minutes depends." Benowitz Dep. 42:3-8.

The County Defendants point out that Plaintiffs' own medical expert, Dr. Marc Stern, testified that he could not say whether Mr. Pajas' life would have been saved had the 2:00 p.m. welfare check been done. Dr. Stern opined that "[t]he welfare check would have saved his life, or rather, have the potential to save his life only if it happened to occur within that window of four to six minutes when resuscitation is likely to restore all functions back to a person who has temporarily died." Stern Dep. 108:19-109:4, Philippi Decl. Exh. A, ECF 162-1.

Based on this record, it appears that if Mr. Pajas' cardiac event occurred immediately after the 1:45 p.m. welfare check, he may well have died whether or not the 2:00 p.m. welfare check occurred. "In order to establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Castro*, 833 F.3d at 1073.

Plaintiffs' motion for summary judgment with respect to Claims 2 and 3 is DENIED to the extent the claims are based on the County's alleged policy or custom of failing to ensure adequate monitoring of sobering cells.

### ii. Failing to Ensure that CFMG Provided Adequate Detoxification Treatment

Plaintiffs also assert liability against the County based on its custom or policy of failing to monitor CFMG to ensure that CFMG provided adequate detoxification treatment to inmates. It is undisputed that the County did not review CFMG's detoxification procedures or otherwise monitor the quality of detoxification treatment provided to inmates. *See* Bernal Dep. 42:3-7, 45:5-47:22, ECF 152-3; Bass Dep. 139:4-140:17, ECF 152-3. Such failure could give rise to liability on the part of the County if the treatment CFMG rendered to Mr. Pajas was constitutionally inadequate. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) ("[A] State cannot avoid its obligations under federal law by contracting with a third party to perform its functions.").

However, the Court concludes that there are disputed issues as to whether the asserted

11

policy or custom led to a deprivation of Mr. Pajas' constitutional rights. There is a factual dispute whether CFMG's treatment of Mr. Pajas met the standard of care, created in part by the opinions of Defendants' experts, Dr. Benowitz and Nurse Pearson. As discussed below, Dr. Benowitz and Nurse Pearson opine that CFMG's policies and the care provided by Nurse Kaupp were within the standard of care. Benowitz Report ¶¶ 11, 16, 17, Martini Decl. Exh. B, ECF 166-2; Pearson Report pp. 10, 17, Martini Decl. Exh. E, ECF 166-2. If that is true, there would be no causal connection between the County's failure to monitor CFMG and injury to Mr. Pajas.

Plaintiffs' motion for summary judgment with respect to Claims 2 and 3 is DENIED to the extent the claims are based on the County's alleged policy or custom of failing to ensure that CFMG provided adequate detoxification treatment to inmates.

### b. CFMG and Nurse Kaupp

Plaintiffs contend that CFMG provided Mr. Pajas with constitutionally deficient care by failing to implement policies to ensure adequate detoxification treatment to inmates. Plaintiffs also contend that Nurse Kaupp is personally liable under the Fourteenth Amendment for failing to provide Mr. Pajas with adequate medical care.

Disputed issues regarding the adequacy of CFMG's policies and Nurse Kaupp's treatment of Mr. Pajas preclude summary judgment. In order to establish *Monell* liability against an entity defendant such as CFMG, Plaintiffs must (1) show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation," and (2) "demonstrate that the custom or policy was adhered to with deliberate indifference to the constitutional rights of the jail's inhabitants." *Castro*, 833 F.3d at 1075-76. Similarly, to establish liability against Nurse Kaupp for deprivation of adequate medical care, Plaintiffs must establish "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125 (medical care claim); *see also*

12

*Castro*, 833 F.3d at 1071 (failure to protect claim). Neither of these tests can be met if CFMG and Nurse Kaupp met the standard of care in their treatment of Mr. Pajas.

Plaintiffs cite to an evaluation prepared by Dr. Mike Puisis, an expert retained by the parties in *Hernandez v. Cnty. of Monterey*, Case No. 5:13-cv-02354. Dr. Puisis concluded that the drug and alcohol withdrawal policies then in place at the jail were inadequate in many respects. *See* Rifkin Decl. Exh. 233, ECF 152-2. Plaintiffs also point to the *Hernandez* court's negative findings, three months after Mr. Pajas' death, regarding the jail's detoxification policies. *See Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 949 (N.D. Cal. 2015). Plaintiffs argue that the doctrine of issue preclusion applies to those findings because Mr. Pajas was a *Hernandez* class member, the County and CFMG were parties in the *Hernandez* litigation, and the issues were actually litigated. However, while Dr. Puisis' evaluation and other evidence presented in *Hernandez* certainly may be offered here, this Court is not persuaded that the *Hernandez* court's determinations regarding the adequacy of CFMG's detoxification policies, which were made *after* Mr. Pajas' death, preclude Defendants from arguing that the policies and conduct at the time of his death were adequate. None of the cases cited by Plaintiffs involved application of issue preclusion in similar circumstances.

CFMG's medical expert, Dr. Benowitz, opines that CFMG's opiate withdrawal management protocol was reasonable and within the standard of care. Benowitz Report ¶ 4, Martini Decl. Exh. B, ECF 166-2. He also states that "[t]he drug withdrawal and chemically dependent inmate policies used by the Monterey County Jail are reasonable and within the standard of care," and that "the opiate withdrawal protocol used by the Monterey County Jail was reasonable and within the standard of care." Benowitz Report ¶¶ 16, 17, Martini Decl. Exh. B, ECF 166-2. CFMG's nursing expert, Kimberly M. Pearson, R.N., opines that "Nurse Kaupp met the established standard of care expected in an adult correctional facility as it pertains to her duties and responsibilities as a Registered Nurse monitoring a patient undergoing opiate detoxification in a sobering cell"; and "Nurse Kaupp followed policies and procedures and acted within the standard of care for a registered nurse in an adult correctional facility monitoring a patient with opiate detoxification orders." Pearson Report pp. 10, 17, Martini Decl. Exh. E, ECF 166-2.

Plaintiffs' challenges to Defendants' experts pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), go to the weight of the experts' opinions and not to their admissibility. Both Dr. Benowitz and Nurse Pearson are qualified to offer opinions regarding CFMG's policies and the treatment provided to Mr. Pajas. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony.").

The Court has not attempted to address each and every disputed fact in this case. Because the disputed facts identified above create triable issues as to the adequacy of the policies and care provided by CFMG and Nurse Kaupp, Plaintiffs' motion for summary judgment with respect to Claims 2 and 3 is DENIED as to the CFMG Defendants.

### 2. County Defendants' Motion

The County Defendants seek summary judgment as to all claims asserted against them, including Claims 2 and 3.

#### a. Sheriff Bernal

In their claims for failure to provide adequate medical care (Claim 2) and failure to protect from harm (Claim 3), Plaintiffs allege the following conduct on the part of "Defendants": failing to have minimally adequate policies and procedures for providing appropriate medical treatment to inmates, and in particular detoxification treatment, FAC ¶¶ 74, 78, 84, 88; failing to provide necessary medical treatment to Mr. Pajas, FAC 77, 78, 83, 86, 88; and failing to appropriately train and supervise staff regarding the provision of treatment to inmates with medical issues, FAC ¶¶ 74, 78, 88.

In order to establish liability against Sheriff Bernal in his individual capacity for this alleged conduct, Plaintiffs must establish that Sheriff Bernal (i) made an intentional decision with respect to the conditions under which Mr. Pajas was confined; (ii) those conditions put Mr. Pajas at substantial risk of suffering serious harm; (iii) Sheriff Bernal did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved; and (iv) by not taking such measures, the Sheriff Bernal caused the Mr. Pajas' injuries. *See Gordon*, 888 F.3d at 1125 (medical care claim); *Castro*,

833 F.3d at 1071 (failure to protect claim). "With respect to the third element, the defendant's conduct must be objectively unreasonable." *Gordon*, 888 F.3d at 1125 (quotation marks and citation omitted).

Sheriff Bernal argues that Plaintiffs cannot establish these elements and thus cannot establish a violation of Mr. Pajas' constitutional rights as required under Claims 2 and 3. Sheriff Bernal also argues that he is entitled to qualified immunity with respect to Claims 2 and 3.

### i. Constitutional Violation

As to the first element articulated above, an intentional decision with respect to the conditions under which Mr. Pajas was confined, Sheriff Bernal argues that he did not have *time* to make any such intentional decision given that he took office on December 31, 2014 and Mr. Pajas was brought into the jail less than three weeks later, on January 19, 2015. *See* Bernal Decl. ¶¶ 2-3, ECF 151-2. Sheriff Bernal states in his declaration that in January 2015, immediately after taking office, he "began the process of recruiting new management level personnel." Bernal Decl. ¶ 4. He intended that the new management personnel would review MCSO policies and procedures, including those relating to operation of the jail, to see how they could be improved. *Id.*

The Court concludes that Sheriff Bernal's declaration statements are sufficient to meet his initial burden on summary judgment. No reasonable jury could find that Sheriff Bernal's failure to revamp jail policies and procedures in less than three weeks constituted an "intentional decision" regarding conditions of confinement at the jail. The burden thus shifts to Plaintiffs to present evidence from which a reasonable jury could find that Sheriff Bernal made an intentional decision regarding policies and procedures for providing detoxification treatment to inmates, or policies and procedures regarding training and supervision of staff, and that such decision put Mr. Pajas at substantial risk of harm.

With respect to detoxification treatment, Plaintiffs point to Sheriff Bernal's testimony that shortly after he took office, he was briefed on the issues raised in the *Hernandez* lawsuit. Bernal Dep. 32:16-33:13, ECF 163-3. As discussed above, *Hernandez* alleged multiple deficiencies in jail policies and procedures, including detoxification procedures. *See Hernandez v. Cnty. of Monterey*, Case No. 5:13-cv-02354. Sheriff Bernal testified that despite that briefing, he

personally has never "done anything to look into or review the detoxification procedures used at the jail." Bernal Dep. 42:3-7, ECF 163-3. Sheriff Bernal stated that he ensures that inmates receive adequate medical care by contracting with CFMG, and that he relies on feedback from his executive staff to inform him whether the care provided by CFMG is adequate. Bernal Dep. 45:11-46:16, ECF 163-3.

With respect to supervision of staff, Plaintiffs submit a January 6, 2015 email to Sheriff Bernal from Sarafina M. Tomaselli, MCSO Corrections Ombudsman. Rifkin Exh. 115, ECF 163-1. The email addresses audit results for December 25, 2014, and it highlights several missed health and welfare checks during that 24-hour period. *Id.* Plaintiffs also point to Sheriff Bernal's testimony that he could not remember if he had directed that any action be taken to ensure that deputies conduct health and welfare checks. Bernal Dep. 55:6-13, ECF 163-3.

None of this testimony suggests that Sheriff Bernal made an intentional decision regarding policies or procedures during his first three weeks in office that put Mr. Pajas at risk of harm. Even if Sheriff Bernal's leaving existing policies and practices in place while he got up to speed could constitute an intentional decision which placed Mr. Pajas at risk, Plaintiffs have not identified what "reasonable available measures to abate that risk" Sheriff Bernal could have undertaken. Absent some evidence that Sheriff Bernal was aware of, and declined to adopt, reasonable available measures regarding detoxification procedures or missed welfare checks, no reasonable jury could find Sheriff Bernal liable for violating Mr. Pajas' constitutional rights under the standards set forth above.

At the hearing, Plaintiffs' counsel suggested that Sheriff Bernal could have given some direction to staff that they must complete welfare checks. However, there is no evidence that verbal direction from Sheriff Bernal would have had any effect on improving compliance with the welfare check policy. Commander Mihu, the sole commander assigned to supervise welfare checks in January 2015, testified that supervising all welfare checks in the jail was too much for one individual to do effectively. *See* Mihu Dep. 18:11-19:25, 29:18-30:9, 79:25-80:4, ECF 152-3. Thus, it appears that the missed welfare checks were at least in part a staffing issue. No reasonable jury could find that Sheriff Bernal could have addressed that staffing issue in the scant

weeks he was in office before Mr. Pajas' death.

Sheriff Bernal's motion for summary judgment is GRANTED as to Claims 2 and 3 on the basis that no reasonable jury could find that Sheriff Bernal violated Mr. Pajas' constitutional rights under applicable standards.

### ii. Qualified Immunity

Sheriff Bernal makes the alternative argument that he is entitled to qualified immunity. "Qualified immunity protects government officers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity applies, the Court asks (1) whether the alleged misconduct violated a constitutional right and (2) whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2008); *Maxwell*, 708 F.3d at 1082. The Court may consider these two questions in any order. *Id.* When this test is properly applied, it protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citation omitted).

The Court need not address that issue given its conclusion that Sheriff Bernal has established his entitlement to summary judgment on the grounds discussed above. If the Court were to reach the issue, however, Sheriff Bernal would be entitled to qualified immunity under prong one of the above test based on his showing that Plaintiff cannot demonstrate a constitutional violation.[5]

### b. County

As discussed above, Plaintiffs identify two policies or customs which they contend give rise to the County's liability under *Monell*: (1) failing to ensure that deputies conducted welfare checks every 15 minutes in accordance with the County's own policy; and (2) failing to ensure

---

[5] The County Defendants misstate this test, arguing incorrectly that "[o]n an assertion of qualified immunity, a two-part test applies: first, the court determines whether the law that governs the official's conduct was clearly established; second, the court considers whether a reasonable officer could have believed the conduct was lawful." County Defs.' Motion at 10-11, ECF 151.

17

that CFMG provided adequate detoxification treatment to inmates.

Rather than addressing these asserted policies or the elements of a *Monell* claim, the County makes several conclusory statements, unsupported by any evidence whatsoever, such as, "[d]uring the time of Mr. Pajas' last incarceration at the Monterey County jail, and prior, the Monterey County jail's policies were to provide continual training to custody staff on proper procedures to follow to care for inmates booked into the jail." County Defs.' Motion at 10, ECF 151. Similarly, the County states that, "[a]t all times pertinent here, the County provided appropriate training for custody staff, including regular training on, among other topics, custody procedures, care and safety concerns for inmates, policies and procedures on services for inmates, including classification and housing, food and drink, medical care, identifying signs of immediate medical and mental health needs of inmates, and emergency medical response." County Defs.' Motion at 13, ECF 151. The County also states without any citation to evidence that Mr. Pajas "was provided medical care in a timely and reasonable fashion." County Defs.' Motion at 10, ECF 151. These bare statements, untethered to evidence, do not satisfy the County's initial burden on summary judgment.

The County also asserts that it is entitled to qualified immunity. Qualified immunity is not available to entity defendants such as the County. *Mendiola-Martinez*, 836 F.3d at 1250 ("But as a threshold matter, Maricopa County is not eligible for qualified immunity because counties do not enjoy immunity from suit – either absolute or qualified – under § 1983." (quotation marks and citation omitted)).

The County's motion for summary judgment with respect to Claims 2 and 3 is DENIED.

### 3. CFMG Defendants' Motion

The CFMG Defendants seek summary judgment with respect to Claims 2 and 3, arguing that Plaintiffs cannot establish that the CFMG Defendants were deliberately indifferent to Mr. Pajas' serious medical needs or failed to protect him from harm in violation of the Fourteenth Amendment. The CFMG Defendants' motion against Plaintiffs fails for the same reason that Plaintiffs' motion against CFMG fails – there are disputed facts as to the adequacy of CFMG's policies and procedures and as to the adequacy of the care that Nurse Kaupp provided to Mr.

1 Pajas. As the opinions of the CFMG Defendants' experts were sufficient to defeat Plaintiffs'
motion, the directly contrary opinions of Plaintiffs' expert, Dr. Stern, are sufficient to defeat the
CFMG Defendants' motion. Dr. Stern provided extensive criticism of the treatment provided to
Mr. Pajas by CFMG, characterized Nurse Kaupp's performance as "horrendous," and opined that
"Mr. Pajas' death was predictable and more likely than not avoidable." Rifkin Decl. Exh. 240 pp.
30-31. He concluded that there "was a level of recklessness" in the care provided to Mr. Pajas
"that transcended just ignoring significant risks." *Id.* Dr. Stern's report creates triable issues as to
the liability of CFMG and Nurse Kaupp under the standards set forth in *Castro* and *Gordon*.

The CFMG Defendants' motion for summary judgment is DENIED as to Claims 2 and 3.
The Court has highlighted only those disputed facts that are critical to ruling on the motions. The
Court does not purport to identify all disputed facts in this case.

### B. Loss of Familial Relationship (Claim 4)

Plaintiffs seek summary judgment on liability against the County, CFMG, and Nurse
Kaupp with respect to Claim 4, asserting loss of familial relationship in violation of the First and
Fourteenth Amendments. The County Defendants and the CFMG Defendants seek summary
judgment in their favor as to Claim 4.

"The substantive due process right to family integrity or to familial association is well
established." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). "A parent has a
fundamental liberty interest in companionship with his or her child." *Kelson v. City of Springfield*,
767 F.2d 651, 654-55 (9th Cir. 1985). The violation of the right to family integrity is subject to
remedy under § 1983. *Id.* "Parents and children may assert Fourteenth Amendment substantive
due process claims if they are deprived of their liberty interest in the companionship and society of
their child or parent through official conduct." *Lemire*, 726 F.3d at 1075 (9th Cir. 2013). "The
same principles establish a constitutional basis for the right of spouses to the support and
companionship of each other." *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1273-74 (E.D.
Cal. 2012).

To amount to a violation of substantive due process, the harmful conduct must "shock the
conscience" or "offend the community's sense of fair play and decency." *Rosenbaum*, 663 F.3d at

1079. "A prison official's deliberately indifferent conduct will generally 'shock the conscience' so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire*, 726 F.3d at 1075 (internal quotation marks and citation omitted).

Claim 4 is based on Defendants' asserted deliberate indifference to Mr. Pajas' serious medical needs and failure to protect him from harm. With respect to the County and the CFMG Defendants, summary judgment is DENIED as to Claim 4 because triable issues exist as to all conduct upon which Claim 4 is based with respect to those defendants. With respect to Sheriff Bernal, summary judgment is GRANTED as to Claim 4 because Sheriff Bernal is entitled to judgment on all conduct upon which Claim 4 is based.

### C. Wrongful Death (Claim 9)

Claim 9, for wrongful death under California law, is asserted against only CFMG. Plaintiff does not seek summary judgment as to Claim 9. While CFMG states in its notice of motion that it seeks summary judgment as to "each and every cause of action" asserted against it, CFMG presents argument only as to Claims 2, 3, and 4 in its motion. Apparently recognizing that it failed to address Claim 9 at all in its motion brief, CFMG's reply brief characterizes its motion as seeking "partial summary judgment" and again limits argument to Claims 2, 3, and 4.

Accordingly, the Court DENIES CFMG's motion for summary judgment as to Claim 9.

### V. ORDER

(1) Plaintiffs' motion for partial summary judgment is DENIED;

(2) The County Defendants' motion for summary judgment is GRANTED as to Sheriff Bernal and DENIED as to the County; and

(3) The CFMG Defendants' motion for summary judgment is DENIED.

Dated: November 5, 2018

_____
BETH LABSON FREEMAN
United States District Judge